**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

-------------------------------------------------------------X

In re:                                                      Chapter 11

AFFINITY HEALTHCARE MANAGEMENT,             Case Number:  16-30042 (JAM)
INC.,

                          Debtor.
-------------------------------------------------------------X

In re:
                                                            Chapter 11

HEALTH CARE INVESTORS, INC. d/b/a
ALEXANDRIA MANOR,                                   Case Number:  16-30043(JAM)

                          Debtor.
-------------------------------------------------------------X

In re:
                                                            Chapter 11

HEALTH CARE ALLIANCE, INC.
d/b/a BLAIR MANOR,                                  Case Number:  16-30045 (JAM)

                          Debtor.
-------------------------------------------------------------X

In re:
                                                            Chapter 11

HEALTH CARE ASSURANCE, LLC
d/b/a DOUGLAS MANOR,                                Case Number:  16-30046 (JAM)

                          Debtor.
-------------------------------------------------------------X

In re:
                                                            Chapter 11

HEALTH CARE RELIANCE, LLC
d/b/a ELLIS MANOR,                                  Case Number:  16-30047 (JAM)

                          Debtor.
-------------------------------------------------------------X

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

```
------------------------------------------------------------  X
In re:                                                        :
                                                              :
AFFINITY HEALTHCARE MANAGEMENT,                               :
INC., et al                                                   :
                                                              :
                          v.                                  :
                                                              :
                                                              :
REVENUE MANAGEMENT SOLUTIONS, LLC;                            :
STATE OF CONNECTICUT DEPARTMENT OF                            :
SOCIAL SERVICES;                                              :
STATE OF CONNECTICUT DEPARTMENT OF                            :
REVENUE SERVICES; AND                                         :
STATE OF CONNECTICUT DEPARTMENT OF                            :
LABOR                                                         :
------------------------------------------------------------  X
```

**DEBTORS' MOTION FOR ORDER (A) APPROVING SALE OF PROVIDER
ACCOUNTS RECEIVABLE TO REVENUE MANAGEMENT SOLUTIONS, LLC
PURSUANT TO §§ 363(b) AND (f) OF THE BANKRUPTCY CODE; (B) GRANTING
FIRST-PRIORITY SECURITY INTERESTS ON PURCHASED ACCOUNTS; (C)
AUTHORIZING INDEBTEDNESS WITH ADMINISTRATIVE SUPER-PRIORITY AND
SECURED BY LIENS ON AND SECURITY INTERESTS IN NON-PURCHASED
ACCOUNTS AND ON ALL OTHER ASSETS OF THE PROVIDERS PURSUANT TO §§
364(c) AND (d) OF THE BANKRUPTCY CODE; (D) AUTHORIZING USE OF CASH
COLLATERAL AND (E) GRANTING RELATED RELIEF**

Affinity Healthcare Management, Inc. ( "Lead Debtor"), Health Care Investors, Inc. d/b/a

Alexandria Manor ("Alex"), Health Care Alliance, Inc. d/b/a Blair Manor ("Blair"), Health Care

Assurance, L.L.C. d/b/a Douglas Manor ("Douglas"), and Health Care Reliance, L.L.C. d/b/a

Ellis Manor ("Ellis") (collectively the "Debtors" and together with the Providers, the "Debtors"),

debtors and debtors-in-possession in the above-referenced chapter 11 cases (collectively, the

"Cases"), hereby moves this Court, pursuant to §§ 105, 361, 362, 363, 364, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. ("Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, *inter alia*, the entry of an interim and final order (a) approving the sale of provider accounts receivable to Revenue Management Solutions, LLC ("RMS") pursuant to §§ 363(b) and (f) of the  Bankruptcy Code; (b) granting first-priority security interests on purchased accounts; (c) authorizing indebtedness with administrative super-priority and secured by liens on and security interests in non-purchased accounts and on all other assets of the Providers pursuant to §§ 364(c) and (d) of the  Bankruptcy code; (d) authorizing use of cash collateral and (e) granting related relief (the "Motion") and in support thereof would show the Court as follows:

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these proceedings and this motion is proper in the District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The relief sought in this Motion is based upon §§ 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code.

## BACKGROUND

3.      On January 13, 2016, (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under the Bankruptcy Code.  A Motion for Joint Administration of the Debtors' Cases has been filed.

4.      No Committee of unsecured creditors has been appointed in this case.

5.      Affinity is a nursing home management company that is located at 1781 Highland Avenue, Suite 206, Cheshire, Connecticut 06410.

6.      Alex is a Connecticut corporation that is engaged in the business of operating a skilled 120 bed nursing home.   The facility is located at 55 Tunxis Ave. in Bloomfield, Connecticut.

7.      Blair is a Connecticut corporation that is engaged in the business of operating a skilled 98 bed nursing home.   The facility is located at 612 Hazard Avenue in Enfield, Connecticut.

8.      Douglas is a Connecticut limited liability company that is engaged in the business of operating a skilled 90 bed nursing home.  The facility is located at 103 N Road in Windham, Connecticut.

9.      Ellis is a Connecticut corporation that is engaged in the business of operating a 105 skilled bed nursing home.  The facility is located at 210 George St. in Hartford, Connecticut.

10.     Collectively, there are 413 beds in the Debtors' Facilities and the debtors have approximately 550 full and part-time employees.  Approximately 250 of the Debtors' employees belong to the New England Healthcare Employees Union District 1199.

11.     The Debtors' Books and records indicated that as of the Petition Date, the Debtors have Assets totaling approximately $7,830,000, and Liabilities totaling approximately $21,850,000.

12.     The Debtors have commenced these Chapter 11 cases (the "Bankruptcy Cases") to restructure their operations and ensure their long term viability through a plan of reorganization subject to Court approval.  The Debtors have sought protection under Chapter 11 because they were unable to pay their debts as they were coming due for a multiplicity of reasons.   The Debtors have received no increase in its Medicaid rate from the State of Connecticut Department of Social Services ("DSS") for more than five years. Moreover, since

2013, DSS has not even paid the Debtors the rates set forth in the rate letters issued by DSS to the Debtors and as a result the Debtors have been shorted on their Medicaid rate for the past three years in excess of $3,600,000.00.  Further, it is the Debtors' position that the delays in the processing of claims submitted to the DSS through the Medicaid application process have resulted in cash flow issues and the ultimate improper denial of $2.4 million of claims by DSS has further aggravated the cash flow situation for the Debtors.  These factors combined with an all-time low bed rate for nursing homes have combined to produce an environment where the lack of sufficient cash flow has put the Debtors in a situation of not being able to stay current on the provider taxes due to the State of Connecticut Department of Revenue Services ("DRS") as well as other expenses.  The Debtors currently owe DRS  approximately $6 million, $1.5 million of which  constitutes penalties, charges and other service fees.  As a result of the non-payment of Provider Taxes, DRS issued Tax Warrants in the amount of $1,297,944 against the Debtors in December, 2015 and in response DSS has informed the Debtors that beginning on January 13, 2016 will recoup $432,648.00 per month to reduce the tax obligation.[1]  This will leave the Debtors with insufficient cash to operate.

13.     Pursuant to that certain Purchase Agreement (the "Purchase Agreement,"), a true and genuine copy of which is attached hereto as **Exhibit A** made as of May 25, 2012, by and between the Providers and Revenue Managements Solutions, LLC or its permitted successors and assigns[2] ("RMS"), as "Buyer",[3] and other Funding Documents, the Providers, jointly and

---

[1] Ironically, because one arm of the State has shorted the Debtors on Medicaid rates and failed to conduct a proper review of claims, another arm of the State has issued warrants that will put the Debtors out of business if the amounts due are recouped.  Also, one must question why DRS allowed the amounts the accrue over three years before issuing warrants.
[2] Funding affiliates of RMS (owned directly or indirectly by RMS or its principals) are permitted assigns under the Purchase Agreement.
[3] Terms with initial capitalization herein have the same meaning as in the Purchase Agreement, unless otherwise defined herein.

severally, individually and collectively, as set out in the Purchase Agreement, offered to sell and RMS purchased certain healthcare accounts receivables of the Providers (the "Prepetition Purchased Accounts," and together with the Post-Petition Purchased Accounts, the "Purchased Accounts") together with all books, records, billing and credit files, an irrevocable paid-up license to use related medical and patient records, chattel paper, documents, instruments and general intangibles related to the Prepetition Purchased Accounts and certain other assets necessary RMS or its agents to collect the Prepetition Purchased Accounts, all as set forth in the Purchase Agreement (collectively, with the Prepetition Purchased Accounts, the "Prepetition Conveyed Property," and, together with the Post-Petition Conveyed Property, the "Conveyed Property"), on the terms and conditions set forth in the Purchase Agreement and the other Funding Documents (the "Prepetition Funding Facility"), and together with the Post-Petition Funding Facility, the "Funding Facility").

14.    The Purchase Agreement provides that the aggregate amount of the Outstanding Initial Installments plus any other outstanding Obligations of the Providers shall not (except as permitted by RMS in its sole discretion) exceed $2,500,000 (the "Facility Cap").   As of the Petition Date, the aggregate amount of the Outstanding Initial Installments due and payable pursuant to the Prepetition Funding Facility was approximately $1,400,000 (together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Funding Documents, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations, all obligations of the Lead Debtor as provided in the Lead Debtor Guaranty (as defined below), and other Obligations of the Debtors to RMS of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Obligations").

15.    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Lead Debtor Guaranty"), by and among the Lead Debtor and RMS, the Lead Debtor, *inter alia*, guaranteed the obligations of the Providers under the Purchase Agreement.  The Lead Debtor granted a security interest in and lien upon (the "Lead Debtor Liens") all of its assets to RMS to secure it obligations under the Lead Debtor Guaranty including its guarantee of the Providers' obligations under the Purchase Agreement.

16.    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Fischman Guaranty"), by and among Benjamin Z. Fischman ("Fischman") and RMS, Fischman, *inter alia*, guaranteed the obligations of the Providers under the Purchase Agreement.

17.    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Strasser Guaranty"), by and among Samuel Strasser ("Strasser") and RMS, Strasser, *inter alia*, guaranteed the obligations of the Providers under the Purchase Agreement.

18.    Pursuant to that certain Security Agreement dated as of May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Security Agreement"), by and between RMS and the Providers, and as more fully set forth in the other Funding Documents, to secure all of the Obligations of every nature of the Providers then or thereafter existing under or arising out of or in connection with the Purchase Agreement, the Providers granted to RMS a continuing security interest in and liens upon (the "Prepetition Liens") their respective right, title and interest in all of the properties, assets and rights of the Providers, wherever located, whether now owned or thereafter acquired or arising, and all

proceeds and products thereof (the "Prepetition Collateral" and together with DIP Collateral, the "Collateral").  The Prepetition Liens are validly perfected and prior in right, title and interest to any other lien, encumbrance or interest in the Prepetition Collateral.

19.   As of the Petition Date, (a) the Providers had absolutely sold, transferred and conveyed and RMS had absolutely purchased and acquired all right, title and interest in the Prepetition Purchased Accounts and the other Prepetition Conveyed Property, on the terms and conditions set forth in the Purchase Agreement and the other Funding Documents, and that the transfer of ownership and title to the Prepetition Purchased Accounts and the other Prepetition Conveyed Property from the Providers to RMS constituted a "true sale" of the Prepetition Conveyed Property for fair value and is not subject to re-characterization as a loan or a financing; (c) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected; (d) as of the Petition Date, the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Funding Documents (to the extent any such permitted liens are valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens");[4] (e) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (f) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, re-characterization, or subordination (whether equitable

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest, including, but not limited to, the Debtors, RMS, and the Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Lien and/or security interest.

or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (g) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against RMS or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Obligations exceeded the amount of those obligations, and accordingly the Prepetition Obligations are allowed secured claims within the meaning of § 506 of the Bankruptcy Code, in an amount of not less than $5,900,000 on account of the Outstanding Initial Installments as of the Petition Date together with any and all other amounts of whatever nature owing in respect of such Prepetition Obligations of the Debtors; and (i) any payments made on account of the Prepetition Obligations to or for the benefit of RMS prior to the Petition Date were on account of amounts in respect of which RMS was over-secured, were payments out of the Prepetition Collateral, and therefore such payments did not diminish any property otherwise available for distribution to any other creditors of the Debtors.

20.    Substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the "Cash Collateral" of RMS; provided, however, that, notwithstanding the forgoing, the Purchased Accounts and their proceeds, wherever located, constitute the exclusive property of RMS pursuant to the terms of the Funding Documents and this Interim Order.

## **RELIEF REQUESTED**

21.    By this Motion, the Debtors respectfully request that the Court enter an interim order and a final order that:

(a)    authorizes and obligates Health Care Investors, Inc. d/b/a Alexandria Manor,

9

Health Care Alliance, Inc. d/b/a Blair Manor, Health Care Assurance, L.L.C. d/b/a Douglas Manor, and Health Care Reliance, L.L.C. d/b/a Ellis Manor (individually and collectively, jointly and severally, the "Providers") to affirm, undertake and continue to perform all of their respective obligations under the Purchase Agreement.  Providers, each of which operate a skilled nursing facility as aforesaid, shall continue, jointly and severally, individually and collectively, as set out in the Purchase Agreement, to offer to sell and RMS may purchase, at its discretion, certain healthcare accounts receivables of the Providers (the "Post-Petition Purchased Accounts") together with all books, records, billing and credit files, an irrevocable paid-up license to use related medical and patient records, chattel paper, documents, instruments and general intangibles related to the Post-Petition Purchased Accounts and certain other assets necessary for RMS or its agents to collect the Post-Petition Purchased Accounts, all as set forth in the Purchase Agreement (collectively, with the Purchased Accounts, the "Post-Petition Conveyed Property"), on the terms and conditions set forth in the Purchase Agreement and the other documents and instruments provided for therein and related thereto (collectively, with the Purchase Agreement, the "Funding Documents"), such purchases and sales being made free and clear of liens, claims, interests and encumbrances, under §§ 363(b) and (f) of the Bankruptcy Code;

(b)     grants RMS a first-priority security interest in the Post-Petition Purchased Accounts and in the proceeds thereof pursuant to § 1-201(35) of the Uniform Commercial Code of the State of Connecticut, Conn. Gen. Stat. § 42a-1-101 *et seq.*, to secure all of its rights, title and interest in the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property (the "Post-Petition Ownership Interests");

(c)     authorizes the Providers to obtain Initial Installments, Subsequent Installments

and other financial accommodations and post-petition funding from RMS pursuant to the terms and conditions of the Funding Documents and the Interim Order (the "Post-Petition Funding Facility");

(d)    seeks this Court's approval of the terms of an interim order approving the Post-Petition Funding Facility in the form and substance satisfactory to RMS, at its sole and absolute discretion. A copy of the proposed interim order (the "Interim Order") is attached hereto as **Exhibit B**;

(e)    authorizes the Providers to grant RMS assurances for the Providers' full and timely payment by and performance of all Obligations owed by the Provider to RMS arising under, out of, or in connection with the Funding Documents, by granting RMS (i) pursuant to §364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim allowable under § 503(b) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code including, without limitation, §§ 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as hereinafter defined), and (ii) pursuant to § 364(d) of the Bankruptcy Code, a valid, enforceable, binding and duly perfected, continuing first-priority security interest in and to and a first lien upon the Non-Purchased Accounts and the credit balances and all of the Providers' other property and assets, real, personal tangible and intangible, pledged as collateral and not sold to RMS under the Purchase Agreement (including, without limitation, inventory, general intangibles, contract rights, purchase orders, documents, instruments, chattel, paper goods, good will, patents, trademarks, and other intellectual property, cash, deposit, accounts, rights to payment, furniture, fixtures, machinery, equipment, lease rights, land and other real property, causes of action, commercial tort

claims, and all other "Collateral" defined in the Security Agreement which (definition is incorporated herein by reference), wherever located, whether now owned or hereinafter acquired or arising, and all proceeds and products thereof, subject only to the Carve-Out; provided, however, that the DIP Collateral (as defined below) shall not include any avoidance or similar actions of the Providers arising under §§ 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code ("Avoidance Actions");

(f)     authorizes  and directs the Providers to pay all Obligations of every nature of the Providers now or hereafter existing under or arising out of or in connection with the Purchase Agreement, including, without limitation, the Outstanding Initial Installments, the Funding Fee, Buyer's out-of-pocket costs and expenses, the indemnification obligations, the Lock Box Fees, wire transfer fees, and other amounts payable under the Funding Documents as they become due, all to the extent provided by and in accordance with the terms of the respective Funding Documents;

(g)     authorizes the Debtors' continued use of "cash collateral" as that term is defined by Bankruptcy Code § 363(a) ("Cash Collateral") on the terms and conditions set forth in the Interim Order;

(h)     authorizes the Debtors to provide adequate protection of the liens and security interests of RMS and the State of Connecticut Department of Labor ("DOL");

(i)     provides adequate protection to RMS (to the extent any Prepetition Obligations, as defined below, remain outstanding) and the DOL for any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral;

(j)        vacates and modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Funding Documents and the Interim Order;

(k)        scheduling a final hearing (the "Final Hearing") on the Motion no later than February 3, 2016 to consider the entry of the Final Order (the "Final Order") authorizing the borrowings under the DIP Documents on a final basis and approve the form of notice procedures with respect thereto; and

(l)        provides for other related relief.

22.    The Debtors seek authorization for RMS to purchase Accounts and extend to the Providers, jointly and severally, as one Provider, certain Initial Installments, Subsequent Installments and other financial and funding accommodations, as more particularly described and on the terms and conditions of the Purchase Agreement, the other Funding Documents and this Order.

23.    The Providers do not have sufficient available sources to provide working capital to operate their businesses in the ordinary course without the requested post-petition funding from RMS. The Providers' ability to provide patient services, and maintain their business relationships with vendors, suppliers and employees, and to otherwise fund their operations, are essential to the Providers' viability.  There is an immediate need for funding to minimize the disruption of the Providers' business and daily operations, manage and preserve the assets of its bankruptcy estate, provide patient care to existing and future patients and enhance the likelihood of a successful reorganization for the benefit of the Debtors' bankruptcy estates, creditors and other parties-in-interest.  Thus, the Post-Petition Funding Facility contemplated by the Motion is necessary, essential and appropriate to prevent immediate and irreparable harm to the Debtors,

and their estates, employees and patients. Absent entry of the Interim Order, the Debtors' operations risk being disrupted, resulting in immediate and irreparable harm to the estate and the likelihood of a successful reorganization will be impaired. The sale of the Post-Petition Purchased Accounts to RMS on the terms and conditions set forth in the Funding Documents and this Interim Order is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

24.    The Providers, jointly and severally, individually and collectively, are treated as one "Provider" under the Purchase Agreement.[5]  As such, the Provider has agreed to sell, and RMS has agreed to purchase, the Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property, now existing or hereafter arising, together with all proceeds thereof, and to advance funds and provide other financial accommodations to the Provider, upon the entry of the Interim Order (and, later, the Final Order), which sales to RMS shall be free and clear of liens, claims, interests and encumbrances under §§363(b) and (f), upon the terms and conditions of the Purchase Agreement and the other Funding Documents.  To secure all of its rights, title and interest in the Post-Petition Purchase Accounts, and the related Post-Petition Conveyed Property and their proceeds, RMS shall be granted a first priority security interest in the Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property, and the proceeds thereof, pursuant to Section 1-201(35) of the Uniform Commercial Code of the State of Connecticut, Conn. Gen. Stat. § 42a-1-101, *et. seq.*  The transfer of ownership and title to the Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property from the Provider to RMS constitutes a "true sale" of the subject property for fair value and is not subject to re-characterization as a loan or a financing.

---

[5]  All references herein to the "Provider", unless otherwise stated, shall hereafter mean the four (4) providers,  individually and collectively, jointly and severally.

25.     The Debtors submit that in view of the Provider's current financial condition, financing arrangements and capital structure, that the Provider is unable at this time to obtain sufficient unsecured financing on an administrative priority basis under §503(b)(1) of the Bankruptcy Code.

26.     RMS is unwilling to purchase the Post-Petition Purchased Accounts and to provide the Initial Installments and Subsequent Installments on account thereof, and any other financial accommodations without being afforded the protections afforded by: (i) a "true sale" finding as to the Purchased Accounts and the related Conveyed Property; (ii) a sale "free and clear" of liens, claims, interest and encumbrances pursuant to Sections 363(b) and (f), as to the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property; (iii) the grant, in accordance with Sections 364(d)(1) of the Bankruptcy Code, of a continuing security interest in and lien on the DIP Collateral pledged to RMS by the Provider under the Funding Documents as security for the Provider's Obligations thereunder, such liens of RMS, being senior in priority to any existing duly perfected liens and security interests in the DIP Collateral of any person (including the DOL) which existed on the Petition Date and any replacement liens they may hold, subject only to the Carve-Out; and (iv) the other protections afforded by Section 363(m) and Section 364(e) of the Bankruptcy Code and the entry of the Interim Order.

27.     As a condition to RMS' continued funding and the agreement for the use of Cash Collateral, RMS requires, and the Debtors have agreed, that proceeds of the Post-Petition Funding Facility shall be used, in each case in a manner consistent with the terms and conditions of the Funding Documents, and solely for (1) payment of the Prepetition Obligations, (2) working capital and other general corporate purposes, (3) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out (as defined herein),

(4) payment of fees and expenses due under the Post-Petition Funding Facility, (5) payment of such prepetition expenses, in addition to the Prepetition Obligations permitted to be so paid in accordance with the consents required under the Funding Documents, and as approved by the Court. Payment of the Prepetition Obligations in accordance with this Interim Order is necessary as RMS will not otherwise consent to providing the Post-Petition Funding Facility, and will not otherwise consent to the use of its Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve Out. Such payment will not prejudice the Debtors or their estates, because payment of such amounts is on account of RMS being oversecured and is subject to the rights of certain parties in interest.

28.     As a condition to RMS' continued funding and agreement for the use Cash Collateral and other Prepetition Collateral, Benjamin Z. Fischman and Samuel Strasser (individually and collectively referred to herein as the "Individual Guarantors") shall consent and agree to the entry of the Interim Order and any further and Final Order relating to the Post-Petition Funding Facility, and they shall execute and deliver guaranty agreements to RMS.

29.     The Debtors propose to provide to RMS and DOL adequate protection on account of their respective interests in the Prepetition Collateral, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, the subordination to the Carve Out (as defined herein) and to the DIP Liens (as defined herein), the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value"). Pursuant to sections 361, 363, 364 and 507(b), as adequate protection: (i) RMS will receive (a) adequate protection liens and super-priority claims, (b) current payments fees, costs

and expenses and other amounts due under the Funding Documents and (c) ongoing payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of RMS; and (ii) DOL will receive adequate protection liens.

30.    The Debtors request that in light of (i) the Post-Petition Funding Facility and RMS' agreement to subordinate its rights of payment, liens and super-priority/priority claims to the Carve Out; and (ii) DOL's agreement to subordinate its rights of payment, liens and super-priority/priority claims to the Carve Out, DIP Liens and DIP Super-Priority Claims, RMS and DOL be granted (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) upon entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

31.    The Debtors submit that the terms of the Post-Petition Funding Facility taken as a whole are at least as favorable to the Providers as those available from other sources, and are fair, just and reasonable under the circumstances, are ordinary and appropriate for funding of a debtor-in-possession and reflect the Providers' exercise of prudent business judgment, and also as to the Lead Debtor as guarantor of the Providers' obligations and indebtedness to RMS, consistent with the fiduciary duties of the Debtors, supported by reasonably equivalent value and fair consideration, and the Funding Documents are enforceable in accordance with their terms.

32.    The Debtors further submit that (i) the sale of the Post-Petition Purchased Accounts to RMS and their funding by RMS under §§ 363(b) and (f) of the Bankruptcy Code have been in good faith, as that term is used in §363(m) of the Bankruptcy Code, and (ii) any other financial accommodations, credit, loans, indebtedness, and liens on the Collateral extended to the Provider by RMS under the terms of this Interim Order and the Funding Documents

provided on or after the commencement of these Cases have been extended in good faith, as that term is defined in §364(e) of the Bankruptcy Code.

33.    The Debtors require post-petition financing to meet day to day operating expenses, for payroll, payroll taxes, utilities, medical and pharmaceutical supplies and other expenses, and has not been able, to date, to successfully attract sufficient post-petition financing on an unsecured basis, with the administrative priority allowed under §503(b) of the Bankruptcy Code, on terms and conditions acceptable to the Debtors.  Post-petition financing on the terms requested is needed to assure continuity of patient care, to maintain the viability of the Debtors' reorganizational efforts, and to preserve the value of their estate.

## LEGAL AUTHORITY

### A.    The Post-Petition Funding Facility

Bankruptcy Code Section 363(b)(1) provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  In general, the debtor(s) may use property of the estate outside the ordinary course of its business where the use of such property represents an exercise of the debtor's sound business judgment.  *In re Schipper,* 933 F. 2d 513, 515 (7th Cir. 1991).

This Court may authorize use of estate property outside the ordinary course of business if the debtor demonstrates a sound business justification for doing so, which establishes that the proposed sale or other use of property of the estate would be beneficial to the estate.  *See e.g. In re Lionel Corp.*, 722 F. 2d 1063 (2d. Cir. 1983).

After a valid justification is articulated, "[T]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company." *In re*

*Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted). The Court should approve of the Debtors' business judgment, "[u]nless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice'". *In re Aerovox, Inc.*, 269 B.R. 74, 81 (Bankr. D. Del. 2001), quoting *In re Interco, Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991). In this regard, "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence." *Integrated Resources*, 147 B.R. at 656. The party "[o]pposing the proposed existence of a debtor's business judgment bears the burden of proof of rebutting the presumption of validity. *Id.*

As discussed herein, the Providers and the Lead Debtor submit that their decision to enter into and perform their respective obligations under the Purchase Agreement with RMS, and also the entry by the Providers and the Lead Debtor into other funding documents delivered to RMS in connection with the Purchase Agreement and the funding thereunder, represent a sound exercise of their business judgments, insofar as the relief requested serves a valid justifiable business purpose and the Debtors believe that the terms of the Post-Petition Funding Facility are fair and reasonable in the circumstances.

It is typical for debtors in chapter 11 cases to seek and obtain approval, at our prior to the hearing of confirmation of their reorganization plan, to enter into financing arrangements such as the Post-Petition Funding Facility and to pay associated fees and expenses thereunder.

Moreover, chapter 11 debtors typically require exit financing to repay outstanding debtor-in-possession and other secured loans, to make one time and other plan payments due upon their exit from chapter 11, and to fund post-emergence working capital needs. It is contemplated that, subject to the agreement on final documents and RMS' acceptance of the Debtors'

reorganization plan and associated financial projections, that the Debtor will enter into an exit facility with RMS (the "Exit Funding Facility") as part of the Debtors' plan confirmation process.

In the immediate need for use of cash and the funding, the Debtors seek approval of the Motion on an expedited basis, with the request that the Court consider the relief requested herein on or before January 15, 2016.

The sale and factoring of the accounts to RMS under the Purchase Agreement has been negotiated in good faith, at arms' length.

The Motion represents a "core" proceeding under 28 U.S.C. § 157(b) to 2(A), (D), (G), (K) and (M).

The Debtors represent and acknowledge that the sale of the Providers' purchased accounts and other conveyed property to RMS under the terms of the Purchase Agreement will be a true sale of same to RMS.

The Providers require approval of the Motion, to avoid immediate and irreparable harm to themselves and their patients.

B.    <u>**True Sale of Accounts**</u>

Under the Post-Petition Funding Facility, as more fully discussed therein, RMS, as purchaser, assumes full credit risk on purchased accounts sold by the Providers to RMS under the Purchase Agreement where "Credit Risk" means the failure of a Payor of the Provider to pay a Purchased Account solely because of the bankruptcy, appointment of a receiver, trustee, assignment for the benefit of creditors, or other financial inability to pay of the Payor occurring post-purchase of an eligible account by RMS.

The passage of credit risk to the factor as, in the present case, credit risk, as to Purchased Accounts passes to RMS under the Funding Facility is the leading a hallmark of a "true sale" of the subject accounts.  *See e.g., Matrix International Textiles, Inc. vs. Jolie Intimates, Inc.*, 801 N.Y.S.D. 2d 236 (N.Y. Civ. Ct. 2005) at *3:

> The core of the Factoring Agreement, however, is SunTrust's purchase from Matrix or "certain receivables created by [Matrix'] sale of goods to . . . customers approved by" SunTrust, clearly including Jolie (see P. 1) *the purchase and sale of accounts "without recourse to [Matrix] for insolvency or non-payment* after the goods . . . have been actually delivered to and finally accepted without claim or dispute [Matrix'] customer".  *See Id...*
>
> [A]ll of the evidence points to a sale of the accounts without recourse in Suntrust's ownership and control of the account . . . (emphasis added).

A "true sale" was also found, where credit risk passed to the factor, *In re GiroCredit Bank Aktiengesellschaft Der Yarkassen vs. Focus Shoes, Inc.*, 1998 W.L. 867390, No. 97 Civ. 452 (RPP) (S.D.N.Y. Dec. 14, 1998), where the factor also had the right to (and did) re-factor the accounts, by selling them to a second factor.  There, GiroCredit, an Australian Bank, along with two other banks, provided financing to a new factor Initial Funding Corporation ("Initial Funding"), to finance its purchase of receivables.  GiroCredit took a first priority security interest in Initial Funding's assets, to wit, in the accounts it purchased from clients.  Initial Funding and

Focus Shoes, Inc. ("Focus") entered into a factoring agreement for the sale of accounts dated March 13, 1995, where Initial Funding purchased accounts from Focus, a company which was in the majority owned by Paul Sherman ("Sherman"), engaged in the import and sale of shoes to retail chains and stores. The factoring agreement provided that the accounts purchased by Initial Funding from Focus could be conveyed and assigned by Initial Funding to NationsBanc Commercial Credit Corp. ("NationsBanc") or to another re-factor.

Focus executed Sales Assignment Schedules and it initiated their issued invoices which expressly confirmed to Initial Funding, and to each of Focus' customers, that Focus had sold and assigned its accounts receivable to Initial Funding. Focus notified its accounts debtors to make payment directly to NationsBanc, not to Initial Funding. Slip Op. at *2. Each Sale Assignment Schedule stated that Focus had "bargained, sold, assigned and transferred "the subject accounts to Initial Funding Corp. and its successors and assigns. Slip Op. at *3. Initial Funding's purchases were funded by loans from GiroCredit. *Id.*

Sherman, seeking to avoid judgment, argued that the transaction between Focus and Initial Funding was a loan secured by Focus' own accounts, not a true sale of accounts to Initial Funding. The District Court rejected this claim. First, Sherman [t]estified that for all accounts receivable "approved" by Initial Funding, *the factor assumed the risk that customers of Focus whose accounts it had purchased would be unable to pay their obligations.* Slip Op. at *7 (*emph. added).* In other words, Sherman testified, for those accounts that were credit approved, Initial Funding, guaranteed to make payment to Focus even if the ultimate customer was unable to pay Initial Funding due solely to the customer's bankruptcy or similar insolvency problem. Slip Op. at *8. Moreover, "[t]he factor agreement not only transferred title in the Accounts Receivable to Initial Funding but it also authorized Initial Funding to resell the accounts receivable 'and all

22

[Initial Funding's] rights thereto' to NationsBanc or any other re-factor." *Id.* Furthermore, "The Factoring Agreement  required Focus to direct any and all payments to Initial Funding or its transferee . . . and prohibited Focus from collecting any of the Accounts Receivable itself directly from its customers whose accounts receivable it had sold." *Id.*

On these facts the District Court opined:

> In view of the documentary evidence and Mr. Sherman's deposition testimony, *there is no merit to Mr. Sheman's Affidavit in support of Focus' counter-claims and defenses arguing that the accounts receivables were only held by Initial Funding as security for the loans, rather than sold to Initial Funding . . . The Court does not accept the Defendants' counter-claims and supporting affidavits to the extent that the contradict the clear provisions of the underlying factoring agreement, invoices and sales assignments, which manifest a sale of absolute title to accounts receivable.* Slip Op. at *9 (*emph. added*).

The fact that RMS can "charge-back" to the Providers, as sellers, as more fully discussed in the Post-Petition Funding Facility and as discussed above, any purchased accounts which breach the seller's representations and warranties, if the subject receivables are disputed by the payor otherwise are the subject to rights of recoupment, setoff and counter-claim i.e., the fact that RMS has rights of "quality recourse" (but no "credit recourse") against the seller-Providers, is in no way inconsistent with a "true sale" of the subject healthcare receivables to RMS. *See e.g., United Virginia Factors vs. Aetna Casualty & Surety Co.* 624 F. 2d 814 (4th Cir. 1980). There, the Court held that a factor's loss incurred on its purchase of fictitious accounts was not excluded from coverage under the "loan" exclusion of the Defendant's blanket bond, because the subject transaction was a true sale of accounts.

> *Factors purchased these accounts without recourse and if the customers failed to pay, Factors was required to bear the loss.* Clients did, however, warrant to Factors that each account was a bona fide existing obligation, and if an account assigned to factors was not paid because the account was not bona fide, Clients were obligated under the agreement to repay the amounts advanced with interest . . . . In 1976, Clients sold and assigned to Factors certain accounts

23

receivable which were wholly fictitious . . . .  *We agree with Factors and the District Court that these transactions did not qualify as well as subject to exclusion from coverage under 2(e)(1).*  The flaw in Aetna's position on this point is that it would convert any fraudulent transaction to a loan and the courts have consistently rejected such an argument . . . .

   *Nor does the fact that the agreement gave Factors an express right to recover from Clients the amounts paid on spurious invoices changed the nature of these transactions.  While it is true that the invoices assigned to Factors carried a warranty from Clients that the represented bona fide existing obligations, the right of Factors to recover for a breach of such warranty was merely a contingent contractual right incident to the purchase and could not convert the transaction to a loan.*  624 F. 2d at 815 – 816 (*emph. added*).

Summarizing, the Debtors believe and represent that the purchased accounts and related conveyed property sold by Providers to RMS under the Post-Petition Funding Facility represent "true sales" of the purchased accounts and other conveyed property to RMS because: (1) the purchased accounts and related conveyed property are factored and purchased by RMS on a non-recourse basis (i.e., with full Credit Risk passing to RMS); (2) the parties intended the transactions to constitute true sales; (3) discount fees (variously factoring commissions) are charged by RMS on the entire purchase price, not just RMS's initial "advance" against the purchase price; (4) the Seller-Providers in each case will hold a contractual right to re-purchase or redeem the accounts they sell to RMS; (5) RMS will control all collection activity (provided, however, that, as to governmental receivables, to satisfy the anti-assignment rules of Medicare and Medicaid, such receivables will still be paid to Providers, into a bank account in the name and sole control of the Provider, with collected proceeds only then thereupon "swept" from such bank account RMS; and (6) RMS has no obligation but merely a contractual right, at RMS's sole discretion, to charge back Purchased Accounts not timely collected to the Providers due to issues of "quality recourse."   There is no "credit recourse" and Purchased Accounts which are not

timely collected due solely to the occurrence of a post-purchased event of credit risk will not be changed back by RMS to the Providers.

## C.    Use of Cash Collateral

Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> the trustee may not use, sell, or lease cash collateral . . . unless –
>
> (A)   Each entity that has an interest in such cash collateral consents, or
>
> (B)   the court after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

Further, § 363(e) of the Bankruptcy Code provides that "on request of an entry that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

The Debtors have satisfied the requirements of §§ 363(c)(2) and (e) of the Bankruptcy Code, and should be authorized to use cash collateral.  First, RMS has consented to the use of cash collateral.  Second, the RMS' and DOL's interests in cash collateral are adequately protected in satisfaction of § 363(e) of the Bankruptcy Code.  The Debtors are providing replacement liens on the RMS' and DOL's collateral, including Cash Collateral, which adequately protects their interests in the Pre-petition Collateral from diminution caused by the Post-Petition Funding Facility.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under § 363(c)(2) of the Bankruptcy Code.

**D.**     **Authorization to Pay Fees Associated with DIP Facility**

As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to RMS in exchange for their providing the Post-Petition Funding Facility.  The fees the Debtors have agreed to pay to RMS and other obligations under the Purchase Agreement represent the most favorable terms to the Debtors on which RMS would agree to make the Post-Petition Funding Facility available.  The Debtors consider the fees described above when determining in their sound business judgment that the Post-Petition Facility constitutes the best terms on which the Debtors could obtain post-petition funding necessary to continue their operations and prosecute their Chapter 11 cases, and paying these fees in order to obtain the Post-Petition Facility is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

Courts routinely authorize debtors to pay fees similar to those the debtors propose to pay where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estate.  See e.g., G., In re Affinity Healthcare Management, Inc., et al, Case 08-22175 (ASD) (Bankr. D. Ct. May 11, 2010) (approving payment of fees and costs in connection with Exit Funding Facility); In re Johnson Memorial Corporation, et al., Case No. 08-22188 (ASD) (Bankr. D. Ct. March 26, 2010) (order authorizing debtors to pay fee in connection with obtaining proposed exit financing); In re InSight Health Servs. Holdings Corp., Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); In NR Liquidation III Company, (f/k/a Neff Corp.), Case 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and Exit Facility Fee); In re Lear Corp., Case No. 09-1426 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up-front fee and a 1.0% exit/conversion fee); In re Dura Auto. Sys., Case No. 06-11202 (KJC) (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fee related to refinancing and extending a post-petition financing facility).  Accordingly,

the Court should authorize the Debtors to pay the fees provided under the Purchase Agreement in connection with entering into such agreement.

## CARVE OUT

The Debtors are seeking a carve out from the liens of RMS for allowed fees and reimbursement for disbursements of professionals  retained by the Debtors ("Debtors' Professional Fees") (ii) allowed fees and reimbursement for disbursements of professionals retained by any Statutory Committee appointed in the Bankruptcy Cases ("Committee's Professional Fees") (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) amounts due and owing to the Debtors' employees for post-petition wages.

## EFFECTIVENESS

Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing the use, sale or lease of property is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors requests that any order approving the Motion be effective immediately.

## NOTICE

Notice of this Motion, via facsimile, hand delivery, electronic mail or overnight mail to: (i) the United States Trustee for the District of Connecticut; (ii) RMS and its counsel; (iii) the United States Attorney, (iv) the Internal Revenue Service (v) the State of Connecticut Department of Revenue Services ("DRS"); (vi) the State of Connecticut Department of Social Services ("DSS); (vii) the State of Connecticut Department Labor (viii) the United States Department of Housing and Urban Development; (ix) the Twenty Largest Unsecured Creditors filed in each of the Cases (x) the Office of the Attorney General for the State of Connecticut; and (xi) all other

persons entitled to notice under the Federal Rules of Bankruptcy Procedure (collectively, the "Notice Parties).  The Debtors submit that under the circumstances, no other notice need be given.

## **MEMORANDUM OF LAW**

Because the legal points and authorities on which the Motion relies are incorporated herein, the Debtors submit that no separate memorandum of law is required.

**WHEREFORE**, the Debtors prays that the Court enter an Interim Order, in the form attached hereto as **Exhibit B**, authorizing the Debtors' (a) approving the sale of provider accounts receivable to Revenue Management Solutions, LLC ("RMS") pursuant to §§ 363(b) and (f) of the  Bankruptcy Code; (b) granting first-priority security interests on purchased accounts; (c) authorizing indebtedness with administrative super-priority and secured by liens on and security interests in non-purchased accounts and on all other assets of the Providers pursuant to §§ 364(c) and (d) of the  Bankruptcy code; (d) authorizing use of cash collateral and (e) granting related relief and scheduling a final hearing.

Dated this 13th day of January, 2016.

Respectfully submitted,
Pullman & Comley, LLC
Proposed Counsel to the Debtors

AFFINITY HEALTHCARE MANAGEMENT,
INC., ET AL

By:  /s/ Elizabeth J. Austin                                  
    Elizabeth J, Austin (ct04383)
    Jessica Grossarth (ct23975)
    Pullman & Comley, LLC
    850 Main Street, P.O. Box 7006
    Bridgeport, CT  06601-7006
    (203) 330-2000  Fax:  (203) 576-8888
    eaustin@pullcom.com
    jgrossarth@pullcom.com