# EXHIBIT A

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the "**Agreement**") is made and entered into as of the 25th day of May, 2012, by and between **Revenue Management Solutions, LLC**, a limited liability company organized and existing under the laws of the State of Connecticut (the "**Buyer**") and **Health Care Investors, Inc., d/b/a Alexandria Manor, and Health Care Alliance, Inc., d/b/a Blair Manor, each a corporation, and Health Care Assurance, LLC, d/b/a Douglas Manor, and Health Care Reliance, LLC, d/b/a Ellis Manor**, each a limited liability company and all of which are organized under the laws of the State of Connecticut (together, the "**Providers**").

This Agreement will govern the relationship of the parties as it relates to the purchase and sale of the Providers' Accounts. Once signed by all parties, this Agreement shall be deemed effective as of the date set forth above.

## AGREEMENT

1.   **Definitions.**

When used herein, the following terms shall have the meanings set forth below:

"**Account**" or "**Accounts**" shall mean individually or collectively all of Providers' (i) accounts (as that term is defined in the UCC), (ii) payment intangibles (as that term is defined in the UCC), and (iii) all other rights of payment, collection or reimbursement (whether owed directly to the Providers or assigned to Providers by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering whether before or after the date of this Agreement of Healthcare Services, and including, without limitation, all of Providers' rights of payment, collection or reimbursement with respect to such Healthcare Services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also include all monies due or to become due to the Providers and obligations to the Providers in any form (whether arising in connection with contracts, contract rights, instruments, or chattel paper) with respect to Healthcare Services, in each case whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"**Affinity**" shall mean affinity Health Care Management, Inc.

"**Assets**" shall mean all Accounts and Related Property of such Accounts as may be Purchased by Buyer pursuant hereto.

"**Audit Fees**" shall have the meaning set forth 5.1.

"**Base Rate**" shall mean ten percent (10%) per annum.

"**Batch**" means all Accounts selected by Buyer to be purchased on a given Closing Date.

"**Billing Date**" means the day on which the applicable Providers first submitted a duly completed and supported claim or bill to a Payor for payment and collection of an Account.

"**Buyer**" shall have the meaning set forth in the heading of this Agreement.

"**Business Day**" means any day that is not a Saturday, Sunday, federal legal holiday or legal holiday in the State of Connecticut.

"**Closing**" shall have the meaning set forth in Section 2.3.

"**Closing Date**" shall mean the date upon which the Initial Installment (adjusted as set forth in Section 3.1(c)) is paid with respect to an Account or Batch of Accounts.

"**Collateral**" means all of the following property now owned or at any time hereafter acquired or created by the Providers, or in which the Providers now have or at any time in the future may acquire any right, title or interest (the "**Collateral**"): all present and future accounts, including all Accounts, whether or not Purchased by Buyer pursuant to this Agreement, all Related Property of the Accounts, all other personal property and fixtures of the Providers, all machinery and equipment, inventory, general intangibles (including, without limitation, payment intangibles and software), chattel paper, supporting obligations, investment property, instruments, securities, contract rights, equity interests in direct and indirect subsidiaries, deposit accounts (including, without limitation, the Lockbox Accounts), letter-of-credit rights, intellectual property, copyrights, trademarks, patents, and tradestyles in which the Providers now have or hereafter may acquire any right, title or interest and the proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto and therefor. The priority of the Buyer's security interests shall be as provided in the Intercreditor Agreements. Terms used in the foregoing language of this Section which are defined in the Uniform Commercial Code are used as so defined in the Uniform Commercial Code except as herein expressly provided to the contrary.

"**Collections**" means with respect to any Account, all cash collections and other amounts required to be credited to the Reserve Account pursuant to Section 3.2(b) hereof for such Account.

Purchase Agreement, Page 2

"**Commercial Lockbox Account**" shall have the meaning set forth in Section 5.3(a).

"**Contractual Adjustments**" means the aggregate of (i) amounts disallowed pursuant to terms of insurance contracts and payment arrangements with third party Payors and (ii) Patient Co-Payments.

"**Date of Service**" of an Account shall mean the earliest date the healthcare service for which the Account is payable was rendered or the healthcare related equipment, prosthetics, pharmaceuticals or other goods for which the Account is payable were delivered.

"**Default Rate**" means five percent (5%) in excess of the Base Rate per annum, or such lower rate required by law.

"**Eligible Account**" means an Account satisfying the following conditions:

(a)     The obligor is a resident of the United States;

(b)     It is denominated and payable in U.S. dollars in the United States;

(c)     It is not payable under workmen's compensation laws or insurance, automobile insurance whether under a no-fault law or otherwise;

(d)     The date the Healthcare Services were provided by the Providers to the applicable patient or healthcare facility (which Healthcare Services gave rise to the Account) is less than 180 days prior to the Closing Date;

(e)     If the Account has been billed, the Billing Date is not more than ten Business Days after the last Date of Service properly included in the invoice;

(f)     If the Account has not been billed, the Account shall be an Eligible Account only to the extent of revenue earned on each day prior to issuance of any invoice in an amount equal to 1/30th of the monthly revenue expected in Buyer's judgment for such Account or, in the case of new [Medicare] patients, at the private pay rate until the [Medicare] rate is set;

(g)     It was generated by the rendering by the Providers of Healthcare Services of the same type and scope and at the same healthcare facilities as the Healthcare Services being rendered by the Providers on the date of this Agreement as disclosed to Buyer; and

(h)     It complies with all of the representations and warranties set forth in Section 4.11 of this Agreement.

"**ENR**" means the expected net realizable value of an Account or Accounts. The ENR of Accounts shall be the aggregate Gross Value of Accounts minus Contractual

Purchase Agreement, Page 3

Adjustments, as estimated by the Providers and as acceptable to Buyer in its discretion. The ENR shall be subject to further adjustment by Buyer, in its sole discretion, to reflect the payment history of the Accounts and its own estimate of the Contractual Adjustments.

"**Event of Default**" shall have the meaning set forth in Section 8.1.

"**Extended Term**" shall have the meaning set forth in Section 9.1.

"**Facility Cap**" shall have the meaning set forth in Section 2.4.

"**financial inability to pay**" shall not include a delay in payment by a state Medicaid program (i) pending passage of necessary legislation or (ii) mandated by applicable law.

"**Funding Fee**" means a fee of Thirty-Five Thousand and 0/100 ($35,000.00) per month or any portion thereof.

"**Governmental Lockbox Account**" shall have the meaning set forth in Section 5.3.

"**Government Receivable**" means any Account which is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under Medicare or Medicaid or otherwise, and whether or not the Account is the primary obligation of such government, agency or agent.

"**Gross Value**" means the total billing amount of each Account inclusive of the amount of the Patient Co-Payment and the amount payable by a Payor.

"**Guaranty**" means any of the Guaranties referenced in Section 2.3(b) whether in the form attached hereto as **Exhibit E** or otherwise.

"**HCI**" means Health Capital Receivables Funding Administrative Corporation or or any of its affiliates, including without limitation Health Capital Receivables Funding Special Purpose Corporation I,  Health Capital Investors, Inc., and Steven B. Nitsberg.

"**Healthcare Services**" shall mean medical and healthcare services provided by any Person, including, but not limited to, services of physicians, nurses, therapists, or other licensed or unlicensed healthcare personnel, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home healthcare services, residential and out-patient behavioral healthcare services, the provision of room, board and daily living assistance at licensed healthcare facilities, home care services, transportation to or from healthcare facilities, or the sale, assignment, lease or license whether before or after the date of this Agreement of healthcare related equipment, prosthetics, pharmaceuticals or other goods and any

Purchase Agreement, Page 4

other medical and healthcare goods and services which are covered by a policy of insurance or by Medicare, Medicaid or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA.

"**HUD**" means the United States Department of Housing and Urban Development.

"**Indemnified Party**" shall have the meaning set forth in Section 6.1.

"**Initial Installment**" shall have the meaning set forth in Section 2.2(a), above.

"**Insolvency Proceeding**" means the commencement by the Providers of any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceedings under any federal or state law; or the commencement against any of the Providers or Affinity of any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceedings under any foreign, federal or state law.

"**Intercreditor Agreement**" means those certain Intercreditor Agreements of even date by and among each of the Providers and their respective landlords, the Buyer and the United States of America acting by the Secretary of HUD.

"**Laws**" shall mean any judgment, decree, order or award of any court, governmental body or arbitrator or any federal, state, municipal, local or foreign laws, statute, ordinance, rule or regulation.

"**Liens**" shall mean liens, mortgages, pledges, security interests, restrictions, prior assignments, encumbrances and charges of any kind or nature whatsoever (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to property is retained by or vested in some other Person for security purposes.

"**Lock Box Account**" shall have the meaning set forth in Section 5.3(a).

"**Lock Box Agreement**" shall have the meaning set forth in Section 5.3(a).

"**Lock Box Fee**" shall have the meaning set forth in Section 5.3(d).

"**Material Agreements**" means each contract, license or agreement of each of the Providers, whether oral or written, including without limitation, equipment and real property leases, credit, loan or other financing agreement, contracts or sales or purchase orders for the sale or purchase of any asset or service, employment agreements, and licenses or other agreements pertaining to the rights of each of the Providers or a licensee to utilize any patents, trademarks, trade names or know-how, in each case which involve payment or receipt by the Providers in the aggregate over the entire term of the contract exceeds $250,000.00.

"**Medicaid**" means, collectively, the health care assistance program established by Title XIX of the Social Security Act (42 USC Sec.1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements pertaining to such program including (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting such program; (b) all state statues and plans for medical assistance enacted in connection with such program and federal rules and regulations promulgated in connection with such program; and (c) all applicable provisions of all rules, regulations, manuals, orders and administrate, reimbursement, guidelines and requirements of all government authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Medicare**" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 USC Sec. 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program including (a) all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting such program; and (b) all applicable provisions of all rules, regulations, manuals, orders and administrative, reimbursement, guidelines and requirements of all governmental authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Non-Government Receivables**" shall mean all Accounts other than Government Receivables.

"**Non-Purchased Account**" shall mean any Account of any of the Providers that is not Purchased hereunder.

"**Obligations**" shall mean any and all payment obligations, including interest accrued thereon at the rate provided in this Agreement, which may at any time be owing by any of the Providers to Buyer, howsoever arising, whether now in existence or incurred by any of the Providers at any time or times hereafter, whether secured by pledge, lien upon or security interest in any assets or property of any of the Providers or the assets or property of any other person, firm, entity or corporation; whether any such payment obligation is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether any Providers are liable to Buyer as principal, surety, endorser, guarantor or otherwise. Obligations shall include, without limitation, the amounts that now are or which may hereafter become due and payable to Buyer by any of the Providers by reason of the Funding Fee, Buyer's attorneys' fees, Providers' indemnification obligations, the origination fee as specified in Section 2.4, the Lock Box Fees described in Section 5.3(d), the Audit Fees described in Section 5.1, wire transfer fees as described in Section 10.15, and any other fees and Obligations of any of the Providers that are then due and payable. Notwithstanding the foregoing, "Obligations" does not include the repurchase obligation set forth in Section 3.3.

"**Outstanding ENR Balance**" means the aggregate of the ENR of all Purchased Accounts in a Batch less all amounts withdrawn by Buyer from the Reserve Account pursuant to Section 3.2(d) hereof with respect to such Batch.

"**Outstanding Initial Installment**" means the aggregate of the Initial Installments with respect to a Batch less all amounts withdrawn by Buyer from the Reserve Account pursuant to Section 3.2(d) hereof with respect to such Batch plus all amounts withdrawn from the Reserve Account pursuant to Section 3.2(c) on account of the Providers' repurchase obligations in connection with such Batch.

"**Patient Co-Payment**" means the amount of each Account payable by the patient not payable by a Payor.

"**Payor**" shall mean Persons that are responsible either directly or as a third party payor for the payment of an Account.

"**Permits and Licenses**" shall have the meaning set forth in Section 4.6.

"**Providers**" shall have the meaning set forth in the heading of this Agreement.

"**Purchase**" shall have the meaning set forth in Section 2.1, which meaning shall apply to all forms of this term, including "**Purchased**" and "**Purchases**".

"**Purchased Account**" shall mean an Account of any of the Providers that is Purchased hereunder.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.

"**Related Property**" shall mean, with respect to each Account, the following: (i) all books and records of any nature evidencing or related to the Account, including, but not limited to, ledgers, records indicating, summarizing or evidencing an Account and all computer programs, discs, tapes or other electronic files or computer prepared information with respect to the foregoing and any software necessary to operate the same, all contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information, (ii) all security interests or liens and property subject thereto from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, supporting obligations and letter of credit rights (as such terms are defined in the Uniform Commercial Code), and all claims of lien filed or held by any of the Providers on personal property; (iii) all rights to any goods whose sale gave rise to such Account, including returned or repossessed goods; (iv) all instruments, documents, chattel paper and general intangibles (each as defined in the Uniform Commercial Code) arising from, related to or evidencing such Account; (v) all UCC financing statements covering any collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever character from

time to time supporting or securing payment of such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing.

**"Repurchase Date"** means (a) with respect to an Account Purchased on the initial Closing Date, the 180th day after the initial Closing Date and (b) with respect to any Account Purchased on any date subsequent to the initial Closing Date, the 180th day after the Date of Service with respect to such Account, and (c) with respect to any Account, the date on which Buyer reasonably determines, will not be paid within the periods set forth in clauses (a) and (b) above because of disputes raised by the payor or the payor's proposed exercise of rights of recoupment, set-off or counterclaim.

**"Reserve Account"** shall have the meaning set forth in Section 3.2.

**"Retained Liabilities"** shall have the meaning set forth in Section 2.5.

**"Servicing Fee"** shall have the meaning set forth in Section 5.3(c).

**"Subsequent Installment"** shall have the meaning set forth in Section 2.2(b) hereof.

**"Taxes"** shall have the meaning set forth in Section 4.14.

**"Term"** shall have the meaning set forth in Section 9.1.

**"Uniform Commercial Code"** shall mean the Uniform Commercial Code, as amended, as presently in effect in the State of Connecticut.

All references to Section numbers throughout this Agreement are references to those Sections of this Agreement, unless otherwise expressly stated to the contrary.

2. <u>**Sales and Purchases.**</u>

2.1 <u>**Obligation to Offer Accounts for Purchase; Purchase of Accounts; Identification of Accounts Purchased.**</u> The Providers agrees to offer for sale to Buyer all of the Providers' Accounts on a weekly basis during the Term of this Agreement and during any Extended Term and Buyer agrees to purchase all such accounts selected by the Buyer to be purchased. Such offer of Eligible Accounts by the Providers shall be by submission by each Provider to Buyer each week of a complete list of all of such Providers' Accounts which have not been Purchased by Buyer. Such submission shall be made electronically pursuant to criteria identified from time to time by Buyer. On the terms and subject to the conditions set forth in this Agreement, upon the payment of the Initial Installment (less any offsets, credits or reductions thereto as provided in this Agreement or by applicable law) by Buyer with respect to a Batch of Accounts, all Accounts in such Batch will be conveyed, transferred, assigned, sold

and delivered to Buyer and Buyer will have acquired, accepted and purchased from the Providers, all such Accounts. The specific Accounts Purchased on any Closing Date are those identified as Purchased by Buyer. Upon the transfer of the Accounts to Buyer, the Related Property of such Accounts shall also be transferred to Buyer automatically and without further action by either party hereto. Each transaction described in this Section shall be referred to as a "**Purchase**" for all purposes hereunder without regard to whether a court or other authority determines, contrary to the intention of the parties and the terms of this Agreement, that such transactions, in fact, constitute loans of funds by Buyer to the Providers. The representations and warranties made by the Providers in this Agreement or in any document delivered hereunder or in connection with any Purchase, shall survive the Closing Date of each and every Purchase of Accounts. The closing of any Purchase of Accounts shall not be deemed a waiver of any failure of the Providers to comply with any condition, covenant or agreement contained herein.

2.2     **Purchase Price for the Assets.** Except for the purchase referred to in (a) below, the purchase price (the "**Purchase Price**") of Accounts shall be determined separately for each Batch of Accounts purchased and shall be equal to the aggregate ENR of all Eligible Accounts in such Batch. The Purchase Price shall be paid as follows:

(a)     Upon the Purchase of Accounts, Buyer shall pay to the Providers an amount (the "**Initial Installment**") equal to the lesser of (a) eighty (80%) percent of the Purchase Price of all of the Eligible Accounts in a Batch or (b) the amount requested by Providers.

(b)     All remaining installments of the Purchase Price subsequent to the Initial Installment ("**Subsequent Installments**") with respect to all Purchased Accounts shall be aggregated and paid with respect to all Purchased Accounts as a group, regardless of the date such Accounts were or are Purchased, in accordance with the provisions of this paragraph (b) and such payment of all remaining amounts of the Purchase Price shall be subject to the terms of this Agreement and applicable legal requirements. The funds from which the Subsequent Installments of the Purchase Price are to be paid shall be limited to the funds in the Reserve Account from time to time pursuant to the terms of this Agreement. Funds shall be released from the Reserve Account on account of the Subsequent Installments of the Purchase Price, in accordance with the provisions of Section 3.2 hereof. All funds in the Reserve Account shall, until released to the Providers pursuant to the terms of this Agreement, be the sole property of Buyer and the Providers shall have no legal or equitable interest therein. Buyer shall have no responsibility for payment of any installment of the Purchase Price subsequent to the Initial Installment except from funds available in the Reserve Account pursuant to the terms of this Agreement. If the funds in the Reserve Account are insufficient to pay the full Purchase Price, Buyer shall have no independent obligation to pay any remaining portion of the Purchase Price subsequent to the Initial Installment.

2.3     **Closing**.

Each purchase and sale of Accounts and the Related Property with respect to such Accounts pursuant to this Agreement shall be referred to herein as a **"Closing"**.   The date upon which the Initial Installment is paid with respect to an Account or Batch of Accounts is referred to herein as the **"Closing Date"**.   Prior to the first Closing Date hereunder, Providers shall deliver to Buyer the following documents, executed by the Buyer and any third parties to such documents:

(a)    This Purchase Agreement;

(b)    A Validity Guaranty in the form attached hereto as **Exhibit E** from Affinity, Benjamin Z. Fischman and Samuel Strasser;

(c)    A Landlord's Waiver and Consent in the form attached hereto as **Exhibit F** hereto with respect to each facility occupied by the Providers and their management company;

(d)    An IRS Form 8821 for all Providers;

(e)    The Lockbox Agreements referenced in Section 5.3 hereof at People's Bank, including arrangements for the transfer thereto, on June 14, 2012, of all balances in other deposit accounts at Bank of America or otherwise where Accounts have been deposited except for amounts needed to fulfill obligations to HCI or meet current operating expenses;

(f)    Multiple copies (as instructed by Buyer) of the Notice to Payors in the form attached hereto as **Exhibit B**;

(g)    The Intercreditor Agreement  satisfactory in form and substance to the Buyer in its sole discretion;

(h)    A Subordination, Non-Disturbance and Attornment Agreement with the Secretary of United States Department of Housing and Urban Development and a DSS letter limiting offsets and recoupments against the Accounts in each case satisfactory in form and substance to the Buyer in its sole discretion (the "DSS Letter");

(i)    A termination agreement from HCI and related UCC filing termination statements, releases, and termination of account control agreements satisfactory in form and substance to the Buyer in its sole discretion;

(j)    Proof of authorization by Providers of the execution of the foregoing documents (which generally shall be by way of a certified resolution of the governing board of the Providers, containing the authorizing provisions set forth in **Exhibit D** hereto);

(k)    An opinion of counsel regarding the due execution and legal, valid and binding effect of the documents executed by the Providers and its affiliates; and

(l)     Such additional documents as Buyer or its counsel may reasonably require, including without limitation arrangements satisfactory to the Buyer in its sole discretion regarding the resolution of all claims of HCI, including the termination of all liens and deposit account control agreement rights of HCI.

It is possible that this Agreement will be executed before the foregoing provisions are satisfied.  For the avoidance of doubt, all agreements set forth in this Agreement regarding the Lockbox Accounts, and the rights of Buyer to amounts deposited therein shall be immediately effective prior to the first Closing.  If a deposit account control agreement is not yet in effect with regard to any deposit account into which Accounts are deposited, whether such Accounts are Purchased Accounts or Non-Purchased Accounts, the Providers shall issue such instructions to the bank as Buyer may direct, including without limitation any instruction to sweep funds into a separate account of Buyer or make payments to Buyer of amounts due to Buyer under this Agreement. The Providers agree to take such actions and, at the request of Buyer, execute such amendments to this Agreement and the related documents as Buyer may deem necessary to effectuate the transactions herein contemplated, including without limitation the establishment of appropriate deposit control accounts and sweep orders and the obtaining of appropriate assurances from HUD and DSS and the recording of appropriate Uniform Commercial Code filings. Each Closing hereunder prior to the complete satisfaction of items (a) through and including (l) above   will occur only when Buyer is satisfied in its sole discretion with the appropriateness and sufficiency of the interim arrangements regarding such matters.

2.4     **Facility Cap**.

The aggregate amount of the Outstanding Initial Installments plus any outstanding Obligations of the Providers shall not (except as permitted by Buyer in its sole discretion) exceed $2,500,000.00 (the "**Facility Cap**").

2.5     **Liabilities Not Assumed by Buyer**.  The Providers covenant, represent and warrant that the Buyer shall not be deemed by anything contained in this Agreement to have assumed liabilities relating to, or arising out of, the Assets or any other business, property or assets of the Providers, including, without limitation, the following (hereinafter collectively referred to as "**Retained Liabilities**"):

(a)     Any liability of any of the Providers to any person or entity;

(b)     Any liability of any of the Providers for any federal, state, municipal, local or foreign taxes, assessments, additions to tax, interest, penalties, deficiencies, duties, fees and other government charges or impositions of each and every kind or description, whether measured by properties, assets, wages, payroll, purchases, value added, payments, sales, use, business, capital stock, surplus or income with respect to ownership of the Assets up to and including the related Closing Date with respect to

(c)     Any liability or obligation (contingent or otherwise) of any of the Providers to any person or entity arising out of any litigation, claim, arbitration or other proceeding;

(d)     Any liabilities or obligations of any kind whatsoever relating to any action or inaction by any person or entity, including, without limitation, any of the Providers' officers, directors, shareholders, employees, agents, representatives or independent contractors, relating in any way to the Healthcare Services rendered or provided by any of them in connection with the Accounts or the servicing of any of the Accounts in the case of such servicing up to and including the Closing Date;

(e)     Any liability or obligation (contingent or otherwise) of any of the Providers arising out of defects in or mislabeling of, or damages to persons or property arising out of defects or mislabeling of, products (including, without limitation, prescription medications) manufactured, sold, or prescribed by such Providers in connection with any of the Accounts;

(f)     Any claim by a third party payor for refund or rebate of amounts paid to the Providers, Buyer or otherwise with respect to any Account created or generated by the Providers, including any claim for repayment of funds paid in error;

(g)     Any liability or obligation of the Providers to compensate any person or entity, including, without limitation, any agent, licensor, supplier, distributor or customer of the Providers, in respect of any rendered or provided in connection with the Accounts; and

(h)     Any recapture, set-off, or other claim made by any third party payor against the Accounts.

3.     **Fees; Reserve Account; Security**

3.1     **Funding Fee; Deductions of Fees from Purchase Price**.

(a)     The Providers shall pay to Buyer the Funding Fee monthly until all Obligations are paid in full at the time of the processing of the final billing file or pursuant to 3.1(b), but in any event by the end of each month.

(b)     At Buyer's option, there shall be deducted from the Initial Installment of the Purchase Price payable at the Initial Closing Date and, if applicable, at each subsequent Closing, the amount of the Funding Fee (which will thereafter not be payable again at the end of May), Buyer's out-of-pocket costs and expenses as described in Section 10.13, the indemnification obligations set forth in Section 6.1, the Lock Box Fees described in Section 5.3(d), wire transfer fees as described in Section 10.15 and any other fees and Obligations of the Providers that are then due and payable and any collection expenses, including collection agency

expenses ("Expenses"). In addition, Audit Fees described in Section 5.1, and the Servicing Fee described in Section 5.3(c) to the extent accrued, may at the discretion of the Buyer be deducted from the Initial Installment of the Purchase Price. In the event that the foregoing amounts result in the Initial Installment being reduced to zero or in the event that Buyer in its sole discretion determines to defer payment of such amounts, Buyer may deduct such amounts from any subsequent installment of Purchase Price that may be due hereunder. The foregoing shall not limit Buyer's rights to demand payment of such fees, Expenses and Obligations at any other time or in any other manner.

3.2    **The Reserve Account**.

(a)    The Buyer will establish a reserve account (the "**Reserve Account**"). The Reserve Account will be owned, maintained, managed and controlled by the Buyer and the Providers shall have no legal or equitable interest therein. The funds in the Reserve Account may be commingled with other funds of Buyer so long as Buyer separately accounts for transactions in the Reserve Account pursuant to this Section 3.2.

(b)    The Reserve Account shall be accounted for on a Batch-by-Batch basis and will be credited with all cash received by Buyer with respect to the Providers' Accounts in accordance with the terms and conditions of this Section 3.2, including any amounts paid by the Providers as a result of the Providers' repurchase obligations, as set forth in Section 3.3(b)(iii), below.

(c)    The Buyer may debit or withdraw at any time and from time to time from the Reserve Account all Expenses and other amounts due to Buyer hereunder, including without limitation amounts with respect to any Obligations and repurchase obligations then owed by the Providers to the Buyer under this Agreement and may allocate such amounts among the various Batches as deemed advisable or appropriate in the sole discretion of the Buyer (except that Expenses or other obligations not attributable to a specific Batch s shall not be allocated to Batches).

(d)    The Buyer may debit or withdraw at any time and from time to time from the Reserve Account pursuant to this Section 3.2(d) all amounts paid by third party Payors and others with respect to the Accounts Purchased from the Providers by Buyer; provided, however, Buyer shall not debit or withdraw from the Reserve Account pursuant this Section 3.2(d) an aggregate amount with respect to any Batch in excess of the aggregate ENR of the Accounts in such Batch as of the Purchase Date.

(e)    Buyer shall account monthly to the Providers with a statement of the Outstanding Initial Installments, the Outstanding ENR Balance, the Reserve Account, and charges and payments made pursuant to this Agreement, and in the absence of manifest error, any such accounting rendered by Buyer shall be deemed final, binding and conclusive on Provider unless Buyer is notified by the Providers in writing to the contrary within 30 calendar

days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(f)     If no Event of Default has occurred, and after all amounts have been debited or withdrawn from the Reserve Account pursuant to Section 3.2(c) and (d) above and Section 3.3 below, the Buyer will, after establishing such reserves as in its discretion are required as a reserve against future withrawals from the Reserve Account permitted by this agreement, including without limitation Sections 3.2 or 3.3 hereof, or against Obligations and repurchase obligations of Providers that may arise under this Agreement, make payments of Subsequent Installments of the Purchase Price of previously Purchased Accounts (allocable to such Batches as Buyer may in its discretion determine) on the 28th day of each month, in the amount of (i) $250,000.00 plus (ii) any additional then remaining in the Reserve Account after such $250,000 payment as Buyer determines in good faith will exceed eighty percent (80%) of the Outstanding ENR Balance of all Accounts previously purchased by Buyer. Payments to the Providers under this Section 3.2(f) shall not exceed an amount equal to the aggregate Purchase Price of Purchased Accounts minus the aggregate Initial Installments with respect thereto. Upon termination of this Agreement in accordance with Section 9, balance remaining in the Reserve Account after all withdrawals permitted by this agreement, including without limitation Sections 3.2 and 3.3 will be distributed to the Providers up to an amount equal to the then unpaid Purchase Price of all Accounts purchased hereunder and any excess funds then remaining in the Reserve Account shall be debited to or withdrawn by Buyer.

(g)     Notwithstanding the provisions of this Section 3.2, in the event the Buyer determines that the Providers have breached any of their representations, warranties or covenants set forth in this Agreement, Buyer shall have no obligation to release any further amounts from the Reserve Account on account of Subsequent Installments of the Purchase Price until the Providers has cured such breach to Buyer's satisfaction.

(h)     On or before the 10th day of each month, Providers will send to Buyer, in a format approved by Buyer, a collection activity report with regard to the Accounts for the preceding month's collection activities which shall reflect the collection status of the Accounts as at the end of the preceding month.

3.3     **Repurchase Obligation; Security Interest**.

(a)     If the Outstanding Initial Installment for an Account has not been reduced to zero by the Repurchase Date, the Providers shall repurchase such unpaid or partially paid Account on the Repurchase Date for an amount equal to the Outstanding Initial Installment as of the Repurchase Date, less any portion of the Initial Installment with respect to an Account that the Providers establish to the reasonable satisfaction of the Buyer prior to the Repurchase Date has not been paid due to the bankruptcy, insolvency or financial inability to pay of the Payor with respect thereto.

(b)     At Buyer's option, the Buyer (i) may deduct the repurchase price from the Initial Installment otherwise payable for Accounts Purchased by Buyer, (ii) may deduct the repurchase price from funds otherwise available in the Reserve Account or the Lockbox Accounts, or (iii) may require the Providers to pay the repurchase price by delivery of a certified or bank check, which check shall be deposited in the Reserve Account pursuant to Section 3.2(b).

(c)     It is the intention of the parties hereto that each payment by the Buyer to the Providers with respect to Purchased Accounts to be made hereunder shall constitute part of the purchase and sale of such Purchased Accounts and not a loan.  In the event, however, that a court of competent jurisdiction were to hold that the transactions evidenced hereby constitute loans and not purchases and sales, it is the intention of the parties hereto that this Agreement shall constitute a security agreement under the UCC and any other applicable law and that the Providers shall be deemed to have granted and does hereby grant to the Buyer a first priority perfected security interest in all of the Providers' right, title and interest in, to and under, whether now owned and existing or hereafter acquired or arising, the Purchased Accounts; the Lockbox Accounts; all payments of principal of or interest on such Purchased Accounts; all Related Property of the Purchased Account; all other rights relating to and payments made in respect of this Agreement; and all proceeds of any of the foregoing.  The Providers do hereby also grant to the Buyer a perfected security interest in all of the Providers' right, title and interest in, to and under, whether now owned and existing or hereafter acquired or arising, the Non-Purchased Accounts, all payments of principal of or interest on such Non-Purchased Accounts; all Related Property of the Non-Purchased Accounts; all other rights relating to and payments made in respect of this Agreement; and all proceeds of any of the foregoing.   The Providers hereby authorizes the Buyer to file any and all financing statements, amendments, assignments, and continuation statements that the Buyer deems necessary or appropriate to memorialize the sale of the Purchased Accounts and the lien on the Non-Purchased Accounts under this Agreement, perfect or maintain the perfection of the security interest(s) granted by the Providers to the Buyer under this Agreement or otherwise evidence the transactions contemplated in this Agreement.   The Providers shall take such action, including execution of such financing statements and other documentation as Buyer may request, from time to time in order to perfect and protect Buyer's security interest in the Accounts and other Assets and to ensure that it is a first lien on the Accounts and other Assets.

4.     **Representations and Warranties of the Providers**.  The Providers represents and warrants to Buyer as of the date hereof and as of each Closing Date hereafter, as follows:

4.1     **Organization and Good Standing**.  The Providers are either corporations or limited liability companies, duly organized and validly existing under the laws of the State of Connecticut, with full power to carry on their respective businesses as they are now operated, to own their respective assets and to convey good and marketable title and ownership of the Accounts to Buyer.  The Providers are qualified to do business and in good standing in each

jurisdiction in which the nature of their businesses or the character of their properties makes such qualification necessary.

4.2  **Proper Authority**. The Providers have all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other Agreements and instruments to be executed by the Providers in connection herewith have been (or upon execution will have been) duly executed and delivered by the Providers, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of the Providers in accordance with their respective terms.

4.3  **Ownership of Assets**. The Providers are the lawful owners of each of the Assets, and all Assets are free and clear of all Liens, other than as set forth on **Exhibit A** hereto. The execution and delivery to Buyer of this Agreement and, if applicable, the instruments of transfer of ownership contemplated by this Agreement will vest good and marketable title to the Assets in Buyer free and clear of all Liens and shall constitute a true sale of the Accounts under applicable law (including for tax and accounting purposes) and not a secured financing. Without limiting the generality of the foregoing, except as set forth in the Intercreditor Agreement, none of the Assets is subject to any contract, agreement or understanding (other than this Agreement), whether oral or written, or any indenture or other instrument to which any of the Providers are a party or by which any of the Providers are bound which subjects the Assets to any Lien or prohibits or restricts the conveyance of any interest therein.

4.4  **Material Agreements and Laws**. The execution and delivery of this Agreement by the Providers and the consummation of the transactions contemplated hereby will not result in a breach of any of the terms and provisions of, or constitute a default under, or conflict with, any Material Agreement, Certificates of Incorporation, Articles of Organization, Operating Agreements or Bylaws, as the case may be, of the Providers, or any Laws applicable to any of the Providers. Without limiting the foregoing, no event of default, or event with which the giving of notice or passage of time would constitute an event of default, has occurred under this Agreement or any other Material Agreement.

4.5  **Absence of Litigation; No Set-Off**.

(a)  Except as set forth in **Schedule 4.5(a)** attached hereto, there are no actions, suits, proceedings or investigations pending or, to the best knowledge of the Providers, threatened by or against any of the Providers before any court, governmental agency or other tribunal, which could materially or adversely affect its ability to perform under this Agreement or which could materially or adversely affect the conduct of its business. Without limiting the foregoing, there are no claims, disputes, actions, proceedings or investigations of any nature pending or, to the best knowledge of the Providers, threatened, against or involving any of the Providers or any of their employees or persons who provide Healthcare Services under agreements with the Providers that relate in any way to any of the Assets or to the Healthcare Services rendered or provided in connection therewith. Further, there are no injunctions, writs,

restraining orders or other orders of any nature against any of the Providers that adversely affect such Providers' performance of the agreements and transactions contemplated in this Agreement, and there are no proceedings or investigations pending or threatened which adversely affect the payment or enforceability of the Accounts.

(b)     Except as set forth in **Schedule 4.5(b)** attached hereto, there are no set-offs, recoupments, allowances, discounts, deductions, counterclaims, or disputes with respect to any Account, either at the time it is accepted by Buyer for purchase or any time prior to the date it is to be paid. "Dispute," as used in the last preceding sentence, shall mean any claim by of any kind whatsoever that is asserted by the Payor as a basis for refusing to pay an Account either in whole or in part, other than its own bankruptcy, insolvency or financial inability to pay.

4.6     **Licenses and Permits; Regulatory Approval; Compliance With Law**.

(a)     The Providers and their employees and persons who provide Healthcare Services under agreements with the Providers have all permits, licenses, accreditations, certifications, authorizations, approvals, consents and agreements of all Payors, governmental agencies and instrumentalities, accreditation agencies and any other person (the **"Permits and Licenses"**) necessary or required for each of the Providers to own the assets that it now owns, to carry on its business as now conducted, and to execute, deliver, perform and consummate the transactions contemplated by this Agreement; and none of the Providers have been notified by any such Payor, governmental agency or instrumentality, accreditation agency or any other person, during the immediately preceding 24-month period, that such person has rescinded or not renewed, or intends to rescind or not renew, any such permit, license, accreditation, certification, authorization, approval, consent or agreement granted by it to the Providers or their employees or persons who provide Healthcare Services under agreements with the Providers or to which it and the Providers are parties.

(b)     With respect to the Assets and the Healthcare Services rendered or provided in connection therewith, neither any of the Providers nor, to the best knowledge of the Providers, any of their employees or persons who provide Healthcare Services under agreements with the Providers have violated, and on the date hereof does not violate, in any respect, any law, rule or regulation. Neither the Providers nor, to the best knowledge of the Providers, any of their employees or persons who provide Healthcare Services under agreements with the Providers have received any notice of any such violation.

(c)     Neither the Providers nor, to the best knowledge of the Providers, any of Providers' employees or persons who provide Healthcare Services under agreements with the Providers have engaged in any activities which are prohibited, or have received any notice that they are engaged in activities that are prohibited, under federal Medicare and Medicaid statutes, regulations promulgated pursuant to such statutes or related state or local statutes or regulations or which are prohibited by rules of professional conduct, including but not limited to: (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (B) knowingly and willfully

making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration: (x) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program or (y) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program; or (z) making prohibited referrals.

4.7 **Disclosure**. The information provided and to be provided by the Providers to the Buyer under or in connection with this Agreement and in any Exhibit or Schedule hereto and thereto, or in any other writing in connection herewith, does not and will not contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or made available to Buyer pursuant hereto were or will be complete and accurate records of such documents.

4.8 **No Prior Collections on Accounts**. Other than Patient Co-Payments paid on the Date of Service (as to which no payments have been received from payors), no monies have been collected by or on behalf of any of the Providers as of the date of Purchase in respect of any Account, or, if any monies have been collected with respect to the Accounts, such funds have been turned over to Buyer.

4.9 **Sale of Accounts Conveys Valid Enforceable Claims Against Payors.** Providers have fully enforceable rights to collect each Account. Each and every step has been taken by the Providers pursuant to the terms of this Agreement or otherwise to assign to Buyer, all of the Providers' rights to collect and enforce payment of the Account by the respective Payor and the assignment thereof shall transfer fully enforceable rights to Buyer against each Payor of the respective Account to collect the full amount of each of the Accounts from such Payor.

4.10 **Solvency of Payor**. The Payor with respect to each Account is not, as of the date such Account is purchased, the subject of any bankruptcy, insolvency or receivership proceeding.

4.11 **Representations, Warranties and Covenants of Providers Relating to the Accounts.** In addition to the other representations, warranties and covenants of the Providers set forth herein, Providers hereby represent, warrant, and covenant with regard to each of the Accounts as of the Closing Date for the Purchase of such Accounts, that:

(a)     The services stated in, and covered by, the Accounts are Healthcare Services that were actually rendered or provided;

(b)     The patient consent form signed in connection with all Accounts is sufficient to allow the Providers to deliver to the Buyer and any servicer with respect to each such Account, and for the Buyer and any servicer to deliver to the Payor with respect to each such Account, information or documents necessary for the performance of the servicing obligations with respect to such Accounts without violating any patients' privacy rights;

(c)     The private health insurance or other contractual coverage by the responsible Payor was effective at the time the Healthcare Services were rendered or provided and each Provider has pre-verified such coverage prior to the rendering or provision of the Healthcare Services;

(d)     All supporting documentation necessary to verify a claim has been submitted to the Payor by the Providers;

(e)     To the best of Providers' knowledge, all information with respect to the Accounts offered for sale by Providers to Buyer is accurate and complete;

(f)     All billing in respect of the Account was, if billed as of the Closing Date with respect to such Account, or will be, if not billed by the Closing Date with respect to such Account, completed and submitted on a timely basis, accurately and free of errors, and in accordance with all applicable Medicare, Medicaid, other Laws, professional standards and contracts between the Providers and the Payor, including any Payor's rules, procedures or standards incorporated therein;

(g)     No other person or entity participated in the rendering of the Healthcare Services covered by the Account or is entitled to any payment whatsoever in respect of such Services;

(h)     The Healthcare Services covered by the Account were rendered in full in the ordinary course of business, in accordance with the prevailing standards of the practice of medicine in the County in which the Providers operate and are medically necessary under the Payor's standards;

(i)     The amounts charged for the Healthcare Services covered by the Account as set forth in the Accounts represent the standard amounts billed by the Providers for the same or similar services in the ordinary course of business at the date on which such Services were rendered; and

(j)     Each Account is the legal, valid and binding obligation of the respective Payor enforceable in accordance with its terms and is not subject to any dispute,

Purchase Agreement, Page 19

offset, counterclaim or encumbrance of any kind and Providers have no reason to believe that such Account will not be paid in the ordinary course of the business of the respective Payors.

4.12   **Financial Condition.**  The Providers have furnished to Buyer true and complete copies of the Providers' unaudited balance sheets and unaudited income and cash flow statements.  The balance sheets and income and cash flow statements have been prepared in accordance with generally accepted accounting principles and the Providers' regular business practices and fairly and accurately set forth the assets and liabilities and results of operations of the Providers as of the date of the balance sheets and for the periods covered by the income and cash flow statements.  Since the date of the most recent balance sheet delivered to Buyer, the Providers have not incurred any liabilities or obligations except in the normal course of its business and no event has occurred which adversely affects Providers' operations, including its ability to perform the transactions contemplated by this Agreement.

4.13   **Solvency; No Fraud against Creditors**.  Except as disclosed in the financial information referred to in Section 4.12 above, the Providers are not insolvent nor will any of them be rendered insolvent as a result of the sale and transfer of the Assets pursuant to this Agreement or as a result of the transactions contemplated by this Agreement.  The Providers' tangible assets are in excess of the total amount of its direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed liabilities, whether or not such liabilities are reflected on a balance sheet prepared in accordance with generally accepted accounting principles.  The sale of the Accounts pursuant to this Agreement is made in good faith and without actual intent to hinder, delay or defraud present or future creditors of the Providers.

4.14   **Tax Returns and Taxes**.  Except as set forth on **Schedule 4.14** attached hereto, all federal, state and local income, ad valorem, excise, sales, use, real or personal property, premium and other taxes and assessments of any kind, including, without limitation, amounts withheld from payroll for the payment of income tax and other governmental charges ("**Taxes**") which have become due and payable by the Providers have been properly computed, duly reported, fully paid and discharged (together with all interest and penalties thereon) and there are no unpaid Taxes which are or could become a lien on the properties and assets of the Providers except for current Taxes not yet due and payable.  No waivers of federal or state statutes of limitations are outstanding.   There are no pending assessments or proposed adjustments or audits presently in progress with respect to any returns of the Providers.  The Providers have furnished Buyer with true and correct copies of their federal, state and local income tax returns for the preceding two fiscal years and copies of any extensions filed with respect to any such fiscal years and of their Forms 941 or any other report with respect to their payments to the applicable government agency of amounts withheld from payroll.

4.15   **Providers' Pension and Profit Sharing Plans**.  Except as set forth in **Schedule 4.15** attached hereto, the Providers' (and any of Providers' consolidated subsidiaries) pension or profit sharing plans have been fully funded in accordance with Providers' applicable

obligations. The Providers have not received notice of non-compliance, of a pending audit or investigation or of any charge or deficiency with respect to any such plan. None of Providers' plans are multi-employer plans.

4.16 **Providers' Principal Place of Business**. The Providers' principal place of business and chief executive offices are located at the address set forth on the signature page of this Agreement, and have been located at such address for the past three months. Except as otherwise disclosed to Buyer in writing on or prior to the date of this Agreement, the Providers each conduct business only in the location set forth on the signature page of this Agreement.

4.17 **Identity of Providers**. The full and correct legal name and jurisdiction of incorporation or organization of the Providers are as set forth in the first paragraph of this Agreement; none of the Providers have changed its name in the last two years; and the Providers have no trade names, fictitious names, assumed names or "doing business as" names except as have previously been disclosed in writing to the Buyer.

4.18 **Financing Statements or Control Agreements**. There are no (i) financing statements now on file in any public office governing any property of any kind, real or personal, in which any of the Providers is named in or has signed as the debtor, or (ii) account control agreements applicable to deposit accounts of any of the Providers except the financing statement or statements filed or to be filed in respect of this Agreement or those statements now on file that are listed on **Exhibit A** hereto.

4.19 **Absence of Noncompliance**.

None of the Providers is in default under any obligation owed by the Providers to DRS, DSS, DPH, HUD, or any other governmental entity or any creditor or third party of any material threatened action, investigation or penalty made by any governmental entity or any creditor, (except as stated on Schedule    ).

5. **Certain Understandings and Agreements of the Parties.**

5.1 **Access and Cooperation**. From and after the date hereof (i) Buyer and any other authorized agents and appointed representatives of Buyer shall have reasonable access during normal business hours to all account records and any and all other documentation relating to the Accounts, including, without limitation, patient records and information, to the extent permitted by law, and all other information and documents relating to the Providers' financial condition and business, (ii) the Providers shall promptly furnish or cause to be furnished to Buyer all information (including turning over originals or copies of such information) requested by Buyer or any of its agents relating to the Assets and Providers' financial condition and business, (iii) the Providers shall provide Buyer with all information, account numbers and passwords necessary to allow Buyer to view on the Internet all deposits to

and withdrawals from each of the Providers' bank accounts, and (iv) the Providers shall provide Buyer with all information, account numbers and passwords necessary to allow Buyer to view on the Internet all accounts the Providers have with Payors. All costs, fees and expenses incurred by Buyer in conducting any such review or audit ("**Audit Fees**") shall be paid by Providers to Buyer, upon demand. Providers will give to Buyer and its Processors any information necessary to verify the eligibility and validity of the Accounts sold to Buyer. Providers hereby grant to Buyer or its Processor the right to verify the eligibility and validity of the Accounts sold to the Buyer by contacting any Payor. Further, Providers will instruct Payors to provide any assistance to Buyer and its Processor to conduct this process. After the Closing Date for each Purchase the Providers shall continue to cooperate fully with Buyer and Buyer's agents in any and all matters related to any Accounts, including, without limitation, matters relating to the collection of any Account. It is further understood and agreed that, to the extent permitted by law, Buyer and its agents shall have the right at any time to communicate with and seek the assistance of Payors, patients and relatives or guardians of patients of the Providers for the purpose of facilitating the servicing and collection of the Accounts.

5.2    **Handling of Accounts**.  Subject to Sections 5.3, 7.5 and 8.2, below, from and after the date hereof the Accounts and Related Property shall be handled by the Providers in the ordinary course of its business, and no act shall be done or omitted to be done by or on behalf of any of the Providers, which act or omission could jeopardize collection of payment on any Account. The Providers shall make all appropriate entries in their computers or other billing system for billing or re-billing of Accounts which require that all payments be forwarded directly from the Payors of such Accounts to the appropriate Lockbox Account described in Section 5.3(a) hereof. Buyer shall refer any inquiries it receives concerning the Accounts to Providers.

5.3    **Pay-Over of Receivables and Lockbox Accounts**.

(a)    Prior to the consummation of the transactions contemplated by this Agreement, the Providers shall (i) establish and maintain at the Providers' expense (A) an account in the name of each of the Providers with a depository institution satisfactory to the Buyer (the **"Governmental Lockbox Account"**) into which all collections in respect of Medicaid, Medicare, Title V Maternal and Child Health Services Block Grant Program, Title XX Social Services Block Grant Program, TRICARE (formerly known as CHAMPUS) and CHAMPVA Accounts shall be deposited and (B) an account in the name of the Buyer with a depository institution satisfactory to the Buyer into which all Collections in respect of other Accounts shall be deposited (the **"Commercial Lockbox Account"**). (The Governmental Lockbox Account and the Commercial Lockbox Account are referred to collectively in this Agreement as the **"Lockbox Account"**). The Providers hereby agree to direct each Payor of an Account to remit all payments with respect to such Account for deposit in the Commercial Lockbox Account (other than the Payers of Medicaid, Medicare, Title V Maternal and Child Health Services Block Grant Program, Title XX Social Services Block Grant Program, TRICARE and CHAMPVA Accounts which shall be directed to remit all payments with respect

to such Receivables for deposit in the Governmental Lockbox Account) by (A) delivering to such Payor a notice attached as **Exhibit B** hereto and (B) identifying the Commercial Lockbox Account as the "pay to" address on all bills sent to Payors of Non-Governmental Receivables. The Providers further agree not to change such directive to Payors without the prior written consent of the Buyer. The Providers agree not to terminate the Governmental Lockbox Account or the Commercial Lockbox Account without first providing the Buyer with written notice at least 30 days prior to the effective date of such termination. The Providers shall give standing instructions to the bank at which the Governmental Lockbox Account shall be maintained to transfer any balances in the Governmental Lockbox Account into the Commercial Lockbox Account on a daily basis. Such instructions shall be irrevocable except on 45 days prior written notice to Buyer and the Providers hereby agree not to change or direct the custodian thereof to modify such sweep order nor to provide any other or additional instructions to the custodian thereof. In the event any Provider terminates the Governmental Lockbox Account or the Commercial Lockbox Account, changes the sweep order with respect to the Governmental Lockbox Account or the Payors receive any instruction whatsoever from such Provider indicating that Collections with respect to the Purchased Accounts should be sent to any location other than the Lockbox Account, the Providers hereby acknowledge and agree that such actions would be an express violation of this Agreement, would cause irreparable harm to the Buyer for which there would be no adequate remedy at law, and agrees and consents to entry of an order by a court of competent jurisdiction granting the Buyer specific performance of the terms and provisions of this Agreement as to the Providers.

So long as Collections with respect to Purchased Accounts are in the possession of the Providers, the Providers will (i) hold such Collections in trust for the sole and exclusive benefit of Buyer, (ii) segregate such Collections from other funds of the Providers, (iii) forward such Collections within one business day of receipt thereof to the appropriate Lockbox Account, and (iv) forward immediately to the Lockbox Account at the address stated herein, any Collections received by any Provider or its agents after the date hereof in payment or partial payment of any Accounts (including any payments made to the Governmental Lockbox Account or any other payments in respect of Government Receivables which the Providers will continue to receive notwithstanding their sale and assignment to Buyer). The Providers shall enter into such agreements with Buyer and Buyer's bank with respect to the Governmental Lockbox Account and the Commercial Lockbox Account as Buyer and its bank shall request (the "**Lockbox Agreements**"), including, without limitation, agreements that perfect Buyer's security interest in such accounts. The Providers further agree that, at Buyer's request, the Providers shall render to the Buyer a full and complete accounting of all Collections received in payment or partial payment of any Accounts by or on behalf of any Provider or any other person or entity other than Buyer, of which such Provider, after due investigation, is aware. Contemporaneously with each remittance of Collections to either Lockbox Account, the Providers shall deliver to Buyer a report identifying the related Account and the related Payor. All funds received into the Commercial Lockbox Account shall be property of the Buyer and the Buyer can direct to movement of funds from the Commercial Lockbox Account to any other account as Buyer shall designate in its sole discretion, regardless of whether the amounts on deposit therein represent

Purchased Accounts or Non-Purchased Accounts. For accounting purposes, all funds received into the Commercial Lockbox Account shall be credited to the Reserve Account and shall be accounted for as set forth in Section 3.2.

(b)     The Providers shall not pay, settle, compromise any Account or release any Payor from its obligation to pay the Purchased Account without the prior written consent of Buyer. The Providers agree that in connection with the Purchase of the Accounts by Buyer, at Buyer's request, the Providers shall indicate in their computer files, in the manner requested by Buyer, that the Purchased Accounts have been sold to the Buyer and that Buyer has a security interest in all other Accounts.

(c)     The Providers shall directly pay bank fees and charges for the maintenance of the Lockbox Accounts incurred by Buyer (the "**Lock Box Fees**"). In the event Buyer pays any such fees, Providers shall reimburse Buyer immediately. Such fees shall be due and payable as and when incurred and, at Buyer's option, may be deducted from the payment of the Initial Installment pursuant to Section 3.1(c) or from the Reserve Account or the Lockbox Accounts pursuant to Section 3.2(c) or may be required to be paid directly to Buyer.

(d)     Subject to Sections 7.5 and 8.2, the Providers shall diligently bill, service and collect all Accounts, and shall, additionally, comply with the following procedures: (i) Payors will be billed by electronic submission; (ii) all bills shall indicate conspicuously on their face and in BOX 33 of HCFA 1500 forms that the Accounts represented thereby should be paid directly, with respect to Government Receivables, to the Governmental Lockbox Account, and with respect to Commercial Receivables, to the Commercial Lockbox Account; (iii) at Buyer's request from time to time the Providers shall notify Payors designated by Buyer, that the Accounts have been purchased by Buyer; (iv) the Providers shall post all collections with respect to the Accounts as of the date such collections are deposited in the Lockbox Account, (v) any collections not deposited in the Lockbox Account in violation of this Agreement shall be separately accounted for and not posted to any account until such posting is authorized by Buyer; and (vi) the Providers shall institute any additional billing, servicing or collection procedures with respect to the Accounts as Buyer may request. In the event any Provider fails to bill and service all Accounts in accordance with this Section 5.3(e), Buyer may elect to perform such billing or servicing and such Provider shall pay Buyer's customary rates therefor.

5.4     **Software Interface**. Upon request of the Buyer, Providers will provide sufficient specifications to Buyer to enable Buyer to build an electronic data interface compatible with Providers' patient accounting system so that Buyer can receive data from Providers. The Providers acknowledge that inaccuracies and or omissions in the information provided for the interface specifications will affect the funding provided for the Providers pursuant to this Agreement. Buyer will not be liable for any consequences of inaccuracies and or omission of information, regarding the interface specifications. The Providers will be given the opportunity to review the specifications that will be used to develop the interface. The Buyer will make a reasonable effort to ensure that the information being sent by the Providers is

interpreted accurately and timely.  In the event that a processing error occurs or that a correction is required of the interface, it is understood by all parties that:

> (a)　　the Buyer is only responsible for correcting the errors that it made to the extent that the remedy is reasonable and that no further liability exists;

> (b)　　any required correction to the interface or its operation that is the responsibility of the Buyer will be corrected, to the extent that the remedy is reasonable, at the Buyer's expense;

> (c)　　any correction to the interface or its operation that is due to incorrect interface specifications and or omissions in the interface specifications given to the Buyer by any of the Providers will be corrected, to the extent that the remedy is reasonable, at the Providers' expense;

> 5.5    **Power of Attorney**.

> (a)　　The Providers hereby grant to Buyer and its officers, employees and agents a power of attorney which is irrevocable and coupled with an interest to do any and all of the following:

>> (i)　　to endorse and cash any checks, instrument or other payments in respect of any of the Accounts and Related Property made payable or endorsed to the Providers or their order, whether received by Buyer or received by any other party and delivered to Buyer pursuant to this Agreement;

>> (ii)　　receive, open and deal with any mail addressed to the Providers and put Buyer's address or the address of the appropriate Lockbox Account on any statements mailed to Payors;

>> (iii)　　pay, settle, compromise, prosecute or defend any action, claim, conditional waiver and release, or proceeding relating to Accounts;

>> (iv)　　upon the occurrence of an Event of Default, notify in the name of the Providers the Post Office to change the address for delivery of mail addressed to the Providers to such address as Buyer may designate.  Buyer shall turn over to the Providers all such mail not relating to the Accounts but may retain copies for Buyer's files;

>> (v)　　execute and file on behalf of the Providers any financing statement deemed necessary or appropriate by Buyer to protect its interest in and to the Accounts, including the Accounts and Related Property or in the Collateral.

(vi)     to do all things necessary and proper in order to carry out this Agreement.

5.6     **Future Encumbrances**.  It is understood and agreed that the Providers shall not, at any time, for any reason or under any circumstances, cause or permit any of the Assets to become subject to any Liens other than the lien of Buyer or its assigns in the Accounts, other than the Liens listed on **Exhibit A**.  It is further understood and agreed that, as of the Closing Date for each Purchase, the Providers shall have no right, title or interest in or to the Assets related thereto, and shall not, at any time, for any reason or under any circumstances, hold themselves out to third parties as having any right, title or interest in or to such Assets.

5.7     **Cooperation in Litigation**.  The Providers shall fully cooperate with Buyer in the defense or prosecution of any litigation or proceeding which may be instituted hereafter against Buyer or Buyer's assigns on account of enforcement of Buyer's ownership of the Assets and the enforcement of payment from the related Payor thereof, and the Providers shall indemnify Buyer and its agents or assigns for any loss or expense including their reasonable attorneys' fees incurred by such parties relating to or arising out of the Providers' billing, administration or handling of the Assets prior to or after the Closing Date related thereto.

5.8     **Delivery of Financial Statements and Tax Returns**.  So long as this Agreement is in effect, each Provider shall deliver to the Buyer: (i) within 45 days after the end of each fiscal quarter, the Providers' financial statements for such period and for that portion of their fiscal year through the end of such period; (ii) within 150 days after the end of the Providers' fiscal year, the Providers' annual financial statements for such year certified by the Providers' chief financial officers; (iii) when filed, copies of all federal, state tax returns, request for extension or any other returns and, when received, copies of all notices from any federal, state or local agencies with respect to Taxes and pension or profit-sharing plans, (iv) when received by the Providers, all Medicare and Medicaid cost reports and audits, (v) when received by the Providers, any other financial or quality of professional service audits or surveys, (vi) weekly reports on financial condition of the type available to management of the Providers, and (vii) promptly upon request, such other information concerning the Providers as the Buyer may from time to time request.  All financial statements delivered to Buyer shall be prepared in accordance with generally accepted accounting principles and on a basis consistent with those previously submitted to the Buyer.  The Providers shall file all federal, state and local tax returns and pay all Taxes when due.

5.9     **No Change of Address**.  The Providers shall not change their names, mailing addresses, chief executive offices, principal places of business or places where such records are maintained without 30 days prior written notice to Buyer.

5.10    **Sale of Accounts to be Reflected on Providers' Books and Records**.  The Providers will reflect on all of their books, records, tax filings and financial statements, and in all its dealings with the Payors of such Accounts, that it has sold the Accounts and related

Assets to Buyer and shall treat and characterize all Purchases as sales of the Accounts and related Assets for accounting and tax purposes. Each of the Providers hereby affirms that they have valid business reasons for selling the Accounts to the Buyer as contemplated by this Agreement rather than obtaining a loan with the Accounts being utilized as collateral therefor.

5.11   **Proceeds.**   The proceeds of the sale of the Accounts will be used for the business and commercial purposes of the Providers.

5.12   **No Proceedings.**   Each of the Providers hereby agrees that it will not institute against Buyer or join any other person or entity in instituting against Buyer, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law.

5.13   **Conduct of Business and Maintenance of Existence, Permits, Licenses, Compliance with Law and Material Agreements**.

(a)   The Providers will continue to engage in business of the same general type as they now conduct and will preserve, renew and keep in full force and effect their existence and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business. The Providers shall not merge, consolidate or sell all or substantially all of their assets without the express prior written consent of Buyer. The Providers shall not change their respective jurisdictions of incorporation or organization without the express prior written consent of Buyer.

(b)   The Providers will comply with all requirements of all applicable Medicare and Medicaid laws, ordinances, rules, regulations, and requirements and all other Laws. The Providers will keep all of their Permits and Licenses in full force and effect and obtain any renewals of such Permits and Licenses and any additional Permits and Licenses that are necessary or desirable for the continued conduct of Providers' businesses as presently conducted. The Providers will not permit an event of default to occur under any of their Material Agreements.

(c)   The Providers will immediately forward to Buyer any notices or correspondence received by the Providers with respect to its failure to comply with any Laws, the limitation, restriction, forfeiture or untimely lapse of any Permit or License and its default under any Material Agreement.

5.14   **Notice of Noncompliance**.

The Providers will provide immediate written notice to Buyer of any default in any covenant set forth in this article 5 and of any delinquency in any obligation owed by the Providers to DRS, DSS, DPH, HUD, or any other governmental entity or any creditor or third party of any material threatened action, investigation or penalty made by any governmental entity or any creditor.

5.15    **Additional Information**.

The Providers will promptly provide to Buyer such additional information regarding their business, operations and financial condition as Buyer may reasonably request. Providers will further provide notice to Buyer of any pending controversies or claims involving HCI.

6.    **Indemnification and Claims.**

6.1    **Indemnification by the Providers**. The Providers shall forthwith on demand jointly and severally indemnify and hold harmless Buyer and its officers, directors, shareholders, employees, agents and assigns (each an "**Indemnified Party**") from and against any and all claims, losses, damages, liabilities and expenses (including, without limitation, settlement costs and any legal, accounting and other expenses for enforcing Buyer's rights and remedies hereunder, or for investigating, prosecuting or defending any actions or threatened actions) (hereinafter "**Indemnified Claims**") awarded or incurred by any of them arising out of or relating to this Agreement or the transactions contemplated hereby or the use of proceeds therefrom, together with interest on cash disbursements in connection therewith at the Default Rate from the date cash disbursements were made or incurred by any Indemnified Party until paid in full by the Providers, including without limitation Indemnified Claims relating to each and all of the following:

(a)    Any breach or alleged breach of any representation or warranty made by any of the Providers in this Agreement or any Exhibit to this Agreement, with respect to any Account, or in any document delivered in connection herewith;

(b)    Any breach or alleged breach of any covenant, agreement or obligation of any of the Providers contained in this Agreement, any Exhibit to this Agreement or document provided in connection herewith (including any list of Accounts submitted to Buyer by Providers pursuant to Section 2.1), or any other instrument contemplated by this Agreement;

(c)    Any misrepresentation or alleged misrepresentation contained in any statement or certificate furnished by any of the Providers pursuant to this Agreement (including any list of Accounts submitted to Buyer by Providers pursuant to Section 2.1), or in connection with the transactions contemplated by this Agreement;

(d)    Any Retained Liabilities;

(e)    Any fees and expense of any broker, investment banker or finder with whom it has dealt in connection with the purchase and sale of the Accounts hereunder or the transactions contemplated hereby; and

6.2    **Claims for Indemnification**. Whenever any claim shall arise for indemnification hereunder, the Buyer shall promptly notify the Providers of the claim and, when known, the facts constituting the basis for such claim. In the event of any claim for

Purchase Agreement, Page 28

indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, the notice to the Providers shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.  The Buyer shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Providers (which shall not be unreasonably withheld) unless the Providers shall have failed to pay indemnification obligations as they accrue or in the event that suit shall have been instituted against them the Providers shall not have taken control of such suit after notification thereof as provided in Section 6.3 of this Agreement.

6.3    **Defense by Indemnifying Party**.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to this Agreement against the Buyer, the Providers at their sole cost and expense may, upon written notice to the Buyer, assume the defense of any such claim or legal proceeding if it acknowledges to the Buyer in writing its obligations to indemnify the Buyer or any other Indemnified Party with respect to all elements of such claim.  The Buyer shall be entitled to participate in the defense of any such action, with its counsel and at its own expense.  If the Providers shall not have retained counsel to have charge of the defense of any such claim or litigation resulting therefrom, or if the Buyer or any Indemnified Party shall reasonably conclude that there may be defenses available to it that are different from or additional to those available to the Providers, the Providers shall not have the right to direct the defense of action on behalf of the Buyer or any such Indemnified Party and the Buyer or any such Indemnified Party shall have the right to retain separate counsel in any such action and to participate in the defense thereof in such manner as it may deem appropriate (including but not limited to, settling such claim or litigation, after giving notice of the same to the Providers, on such terms as the Buyer or such Indemnified Party, as the case may be, may deem appropriate) and the reasonable fees and expenses of such counsel shall be assumed by the Providers.  If the Buyer or such Indemnified Party defends or settles such third party claim, the Providers shall have the burden to prove by a preponderance of the evidence that the Buyer or such Indemnified Party did not defend or settled such third party claim in a reasonable manner.

6.4    **Manner of Indemnification**.  All amounts payable with respect to the Providers' indemnification obligations hereunder shall be due upon demand by the Indemnified Party and shall, at the option of the Buyer, be paid by (i) cash or delivery of a certified or official bank check by one or more of the Providers in the amount of the indemnification obligation, (ii) deduction from the Initial Installment pursuant to Section 3.1(c), or (iii) from the Reserve Account pursuant to Section 3.2(c).

7.    **Additional Security; Rights of Buyer as Secured Party.**

As security for the Providers' payment and performance of all Obligations and its repurchase obligations under Sections 3.3(c) and 8.2, the Providers hereby grant to the Buyer a security interest in the Collateral.  The Providers shall execute such financing statements and other documentation as Buyer may request from time to time in order to perfect and protect

Buyer's security interest in the Collateral. The security interests in the Collateral under this Section 7 and under Sections 3.3(c) and 8.2 shall be on the following terms and conditions:

7.1    Recourse to security shall not at any time be required and the Providers shall at all times remain liable for the repayment upon demand of all Obligations and its repurchase obligations under Sections 3.3(c) and 8.2. The Providers represent, warrant and covenant that Buyer shall have a first priority security interest in all of the Accounts and Related Property of the Accounts and Collateral in which a security interest is being granted hereunder, subject to the permitted liens in favor of HUD set forth in the Intercreditor Agreement and/or listed in **Exhibit A**. During the term of this Agreement, the Providers shall not sell or assign, negotiate, pledge or grant any security interest in, or permit any Liens to be placed upon, any of the Accounts and Related Property of the Accounts and Collateral to anyone other than Buyer.

7.2    The security interest shall secure any and all of the Providers' Obligations and their repurchase obligations under Section 2.3(a) and (b) above. The Providers hereby waive any and all suretyship defenses available to the Providers under applicable law.

7.3    Providers hereby authorize Buyer to file UCC-1 Financing Statements with respect to the Collateral, and any amendments or continuations relating thereto, without the signatures of Providers and hereby ratify, confirm and consents to any such filings made by Buyer prior to the date hereof. Providers shall not allow any financing statement (other than that filed by or on behalf of Buyer) to be on file in any public office covering any Collateral or the proceeds thereof, except as set forth on Schedule 7.3. Providers will do all reasonable lawful acts which Buyer deems necessary or desirable to protect the security interest or otherwise to carry out the provisions of this Agreement, including, but not limited to, the execution of all documents, instruments and agreements in form necessary to Buyer. The Providers irrevocably appoints Buyer as their attorney in fact during the term of this Agreement to do all acts which they may be required to do in connection with the creation and perfection of Buyer's security interest under this Agreement, such appointment being deemed to be a power coupled with an interest.

7.4    Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of seller and purchaser of Account and not that of lender and borrower. Nothing in this Section shall be construed to limit the rights that Buyer has as purchaser of the Accounts and Related Property pursuant to the other provisions of this Agreement or at law.

7.5    Without limiting any other rights of Buyer in the Accounts, Related Property of the Accounts and Collateral, immediately upon the occurrence of any Event of Default, Buyer may exercise any and all rights of a secured party under the Uniform Commercial Code other applicable law and, in addition, to the extent permitted by law: may (a) remove from any premises where same may be located any and all documents, instruments, files and records, and any receptacles or cabinets containing same, relating to the Accounts, or Buyer

may use, at Providers' expense, such of Providers' personnel, supplies or space at Providers' places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) receive, take, endorse, assign, deliver, accept and deposit, in the name of Buyer or the Providers, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Accounts or the proceeds thereof; (c) notify any Payor obligated with respect to any Accounts, that such Accounts have been assigned to Buyer by the Providers and that payment thereof is to be made to the order of and directly and solely to Buyer, (d) communicate directly with Payor to verify the amount and validity of any Accounts created by the Providers; (e) bring suit, in the name of any of the Providers, and generally shall have all other rights respecting said Accounts, including without limitation the right to accelerate or extend the time of payment, settle, compromise, release in whole or in part any amounts owing on any Accounts and issue credits in the name of the Providers; (f) sell, assign and deliver the Accounts and any returned, reclaimed or repossessed merchandise, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at Buyer's sole option and discretion, and Buyer may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Providers; (g) foreclose the security interests created herein by any available judicial procedure, or take possession of any or all of the inventory without judicial process, and enter any premises where any inventory may be located for the purpose of taking possession of or removing the same and (h) exercise any other rights and remedies provided in law, in equity, by contract or otherwise.  Buyer shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral whether in its then condition or after further preparation or processing, in the name of the Providers or Buyer, or in the name of such other party Buyer may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such other terms and conditions as Buyer in its sole discretion may deem advisable, and Buyer shall have the right to purchase at any such sale.  If any equipment or merchandise repossessed by Buyer shall require rebuilding, repairing, maintenance or preparation, Buyer shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the equipment and merchandise in such saleable form as Buyer shall deem appropriate.  If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days' notice shall constitute reasonable notification and full compliance with the law.  The net cash proceeds resulting from the Buyer's exercise of any of the foregoing rights, (after deducting all charges, costs and expenses, including reasonable attorneys' fees) shall be applied by Buyer to the payment of Providers' Obligations and their repurchase obligations under Sections 3.3(c) and 8.2, whether due or to become due, in such order as Buyer may elect, and Providers shall remain liable to Buyer for any deficiencies, and Buyer in turn agrees to remit to Providers or their successors and assigns, any surplus resulting therefrom. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. Nothing in this Section shall be construed to limit the Providers' exercise of their rights as set forth elsewhere in this Agreement prior to the occurrence of any Event of Default in, and with respect to, any Accounts.

7.6     The security interest created under this Section 7 in the Accounts and Related Property shall not be merged or extinguished upon the sale of the Accounts to Buyer hereunder.

7.7     Nothing herein shall limit the exercise by Buyer of any other legal or equitable rights that Buyer may have as a secured party.

8.     **Events of Default and Remedies**

8.1     Notwithstanding anything hereinabove to the contrary, Buyer may exercise any or all of the remedies set forth in Section 8.2, immediately upon the occurrence of any of the following (herein "**Events of Default**"):

(a)     Cessation of any material part of the business of any of the Providers or the calling of a meeting of the creditors of any of the Providers for purposes of compromising the debts and obligations of the Providers;

(b)     The occurrence of an Insolvency Proceeding with respect to any of the Providers or any affiliate of the Providers;

(c)     The breach by any of the Providers of any representation, warranty, or covenant contained herein (other than those referred to below) or in any other written agreement between the Providers and Buyer, provided that such breach by the Providers of any of the representations, warranties or covenants referred in this clause (iv) shall not be deemed to be an Event of Default unless and until such breach shall remain uncured or unremedied (if capable of being remedied) to Buyer's satisfaction for a period of ten (10) days from the date Buyer gives the Providers notice of such breach, except that no notice of breach or cure period shall apply to any failure by Providers to provide required notices to Buyer;

(d)     Any Event of Default occurs under the terms of any Guaranty;

(e)     Any default occurs, which is not cured within any applicable grace period or cure period or waived, (A) in the payment of any amount with respect to any Indebtedness (other than the Obligations) of the Providers in excess of $100,000.00; or (B) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which any of the Providers is a party or to which any of their properties or assets are subject or bound under or pursuant to which any Indebtedness was issued, created, assumed, guaranteed or secured and such default continues for more than any applicable grace period or permits the holder of any Indebtedness to accelerate the maturity thereof;

(f)     Any Indebtedness of any of the Providers is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof, or any obligation of such Person for the payment of Indebtedness (other

than the Obligations) is not paid when due or within any applicable grace period, or any such obligation becomes or is declared to be due and payable before the expressed maturity thereof, or there occurs an event which, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable;

(g)     Any of the Providers shall, directly or indirectly, instruct any Payor (except as otherwise expressly set forth in this Agreement) to mail or deliver payment on any Accounts to any address or bank account other than Buyer's Lock Box Account, or, in the case of Government Receivables, the Governmental Lockbox Account;

(h)     Any of the Providers fails to remit to Buyer any check, replacement fund, or other payment it receives with respect to an Account within three (3) Business Days of receipt or the discovery of same;

(i)     There has been a breach of representations or warranties affecting Accounts with an aggregate Outstanding ENR Balance of more than $50,000;

(j)     There has been a change of control of any of the Providers, which shall include, without limitation, a direct or indirect sale or transfer of 50% or more of the capital stock, membership interests or other economic or voting interests in such Providers;

(k)     Failure on the part of any Provider to promptly remit any sums payable by it hereunder when due, including without limitation any repurchase obligation

(l)     The operating license, Medicare provider number or provider agreement, or Medicaid provider number or provider agreement of any Provider is suspended or terminated;

(m)     the Cut-Off Time occurs under the Intercreditor Agreement among the Providers and the United States of America acting through the Secretary of Housing and Urban Development, or such agreement is terminated or modified without the prior written consent of the Buyer,

(n)     any right of set-off or recoupment is exercised or notice of proposed exercise is given with respect to Accounts by the DSS or any other payor or third party (other than as set forth in the DSS Letter with respect to setoffs up to a monthly limit of $100,000)

(o)     any Lockbox Account or account control agreement with respect to any of the Accounts is terminated or modified without the prior written consent of the Buyer.

8.2     Upon the occurrence of an Event of Default, at the option of Buyer (i) all Obligations or the Obligations designated by Buyer shall become immediately due and payable; (ii) Interest shall accrue on all outstanding or thereafter accrued Obligations at the Base Rate and Buyer may elect to charge Providers interest at the Default Rate rather than at the Base Rate on all then outstanding or thereafter incurred Obligations; (iii) Providers shall be required to repurchase all outstanding Accounts (other than Accounts as to which the Providers establish to the satisfaction of Buyer are unpaid as a result of the bankruptcy, insolvency or financial inability to pay of the third party Payor with respect thereto) at a repurchase price equal to (A) the aggregate Outstanding ENR Balance of all Batches of Accounts, plus (B) the amount of all fees, costs and expenses, that have been paid out of the proceeds of the Accounts, plus (C) the amount of any other outstanding Obligations, plus (D) the amount of any reasonable reserve requested by Buyer, plus (E) interest at the Base Rate, or at Buyer's election, at the Default Rate on the Outstanding Initial Installment with respect to such Accounts from the date such repurchase obligation arose; (iv) Buyer may perform, at Providers' cost and expense, which shall be immediately due and payable, any or all of the covenants and agreements of Providers contained in this Agreement, (v) Buyer may bill, service, or collect any and all of the Accounts and Providers shall pay Buyer's customary rates therefor, or (vi) Buyer may immediately terminate its obligations under this Agreement.  The exercise of any option is not exclusive of any other option or remedy whether pursuant to this Agreement or otherwise which may be exercised at any time or at the same time by Buyer.

9.     **Term and Termination.**

9.1     The Providers' obligations to submit Eligible Accounts for purchase hereunder shall be for a period of one (1) year after the initial Closing Date (the "**Term**") and during any Extended Term.  The initial Term shall be automatically extended for successive one year periods (each, an "**Extended Term**") unless the Providers notify Buyer, not less than ninety (90) days prior to the end of the then current Term or Extended Term, as the case may be, that it does not wish to extend such Term or Extended Term.  All other terms and provisions of this Agreement shall remain in full force and effect until this Agreement is terminated.  This Agreement shall be terminated as follows:

(a)     Upon the execution and delivery of the express written consent of the Providers and Buyer to such termination.

(b)     Subject to Section 9.2, below, by either the Providers or Buyer at any time after (i) the aggregate Outstanding Initial Installments of all Batches shall have been reduced to zero; (ii) all of the Providers' Obligations under this Agreement, including any interest accrued thereon, shall have been paid to Buyer in full; (iii) there is no Insolvency Proceeding pending or threatened against Buyer, and (iv) there are no pending or threatened claims against Buyer arising out of this Agreement or Buyer's purchase of Accounts hereunder.

9.2     In the event this Agreement is terminated prior to the end of the Term or any Extended Term for any reason other than voluntary termination by Buyer alone, Providers shall pay to Buyer an early termination fee equal to the greater of (A) three percent (3)% of the Facility Cap as of the proposed date of termination or (B) the aggregate of (i) all Funding Fees, Servicing Fees and Origination Fees payable hereunder from and after the Closing Date to the proposed date of termination, divided by (ii) the number of calendar days that have elapsed since the Closing Date to the proposed date of termination, and then multiplied by (iii) the number of calendar days left from the proposed termination date to the end of the Term or the end of the then-current Extended Term.  In the event Buyer exercises any of the remedies set forth in Section 8.2 following an Event of Default, Providers shall pay to Buyer a default termination fee in the amount of five percent (5)% of the Facility Cap as of the date of such Event of Default.

10.    **Miscellaneous.**

10.1    **Notices**.  Any notice or request under this Agreement shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 10.1.  Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon:  (i) registered or certified mail, return receipt requested, on the date on which such received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) facsimile or electronic transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

10.2    **Assignability; Parties in Interest; Participations**.  The parties hereto acknowledge and agree that this Agreement, including all rights and obligations contained herein, may be sold, assigned or otherwise transferred, in whole or in part, by Buyer without the consent of the Providers.  This Agreement is not assignable by the Providers.  This Agreement shall inure to the benefit of and be binding upon Buyer and the Providers, and their respective permitted successors and assigns.  This Agreement shall not benefit or create any right or cause of action in any or on behalf of any person or entity other than the parties hereto and their respective permitted successors and assigns.  This Agreement shall not benefit or create any right or cause of action in any or on behalf of any person or entity other than the parties hereto and their respective permitted successors and assigns.

10.3    **Counterparts**.  This Agreement may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which shall constitute but one and the same Agreement.

10.4    **Severability**.  Any provision of this Agreement which is invalid, illegal, or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of

such invalidity, illegality, or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal, or unenforceable in any other jurisdiction.

10.5 **Due Diligence Investigation**. All representations and warranties contained herein which are made to the best knowledge of a party shall require that such party make reasonable investigation and inquiry with respect thereto to ascertain the correctness and validity thereof. No investigation or inquiry made by or on behalf of Buyer shall in any way affect or lessen Buyer's right to rely (or the reasonableness of Buyer's reliance) on the representations, warranties and covenants made and entered into by the Providers hereunder.

10.6 **Construction**. This Agreement shall, in all cases, be construed simply, according to its fair meaning, and not strictly for or against either party. Any section and paragraph headings contained in this Agreement are for convenience of the reference only and shall not affect the construction or interpretation of this Agreement.

10.7 **Survival of Representations and Warranties**. All representations, warranties, covenants and indemnities made by the parties in this Agreement or in any instrument or document furnished in connection herewith shall survive the initial Closing and any subsequent Closing for the sale of Accounts to Buyer.

10.8 **Applicable Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the internal substantive law, and not the choice of law rules, of the State of Connecticut. The Providers hereby consent to, and agrees to submit to the jurisdiction of the Superior Court of the State of Connecticut and the United States District Court for the District of Connecticut, and agrees, at the Buyer's election, that any legal action or proceeding arising out of or with respect to this Agreement shall be brought by the Providers and the Buyer in the Superior Court of the State of Connecticut or in the United States District Court for the District of Connecticut, in each case, that are located in New Haven County, as the Buyer shall elect. Each of the parties hereto irrevocably consents to the service of any and all process in any such action or proceeding brought in the Superior Court of the State of Connecticut or the United States District Court for the District of Connecticut by the delivery of copies of such process to such party at its address specified below its signature.

10.9 **Waiver of Jury Trial, Punitive and Consequential Damages, etc.** Each Provider hereby (a) irrevocably waives, to the maximum extent not prohibited by law, any right it may have to a trial by jury in respect of any litigation directly or indirectly at any time arising out of, under or in connection with this Agreement or any transaction contemplated hereby or associated herewith; (b) irrevocably waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any such litigation any special, exemplary, punitive or consequential damages, or damages other than, or in addition to, actual damages; and (c) certifies that no party hereto nor any representative or agent or counsel for any party hereto has represented, expressly or otherwise, or implied that such party would not, in the event of litigation, seek to enforce the foregoing waivers.

10.10  **Complete Agreement**.  This Agreement, any list of Accounts submitted by Providers to Buyer pursuant to Section 2.1, the exhibits and schedules hereto and the documents delivered or to be delivered pursuant to this Agreement set forth the entire understanding and agreement of the parties hereto with respect to the transactions contemplated herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties, including, without limitation, any term sheet or indication of interest provided by Buyer to Providers.  No modification or amendment of or supplement to this Agreement or such other documents shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced.

10.11  **Equitable Relief**.  In the event any of the Providers commits any act or omissions which (i) prevents or unreasonably interferes with: (a) Buyer's exercise of the rights and privileges arising under the power of attorney granted in Section 5.7 of this Agreement; or (b) Buyer's perfection of or levy upon the ownership or security interest granted in the Accounts, including any seizure of any Account, or (ii) constitutes a breach of any of its representations, warranties or covenants hereunder, such conduct will cause immediate, severe, incalculable and irreparable harm and injury, and shall constitute sufficient grounds to entitle Buyer to an injunction, writ of possession, or other applicable relief in equity, and to make such application for such relief in any court of competent jurisdiction, without any prior notice to such Provider.  The Providers agree that they shall not defend against any such relief on the basis that Buyer has adequate remedies at law or for damages.

10.12  **Cumulative Rights**.  All rights, remedies and powers granted to Buyer in this Agreement, or in any other instrument or agreement given by the Providers to Buyer, are cumulative and may be exercised singularly or concurrently with such other rights as Buyer may have.  These rights may be exercised from time to time as to all or any part of the Accounts purchased hereunder as Buyer in its discretion may determine.  Buyer may not waive its rights and remedies unless the waiver is in writing and signed by Buyer.  A waiver by Buyer of a right or remedy under this Agreement on one occasion is not a waiver of the right or remedy on any subsequent occasion.

10.13  **Attorney's Fees; Costs of Enforcement; Expenses of Administration**.  Providers agree to reimburse Buyer upon demand for all reasonable attorney's fees, court costs and other expenses incurred by Buyer in negotiating, administering, terminating or enforcing this Agreement  and protecting or enforcing its interest in the Accounts or the Assets, in collecting the Accounts or the Assets, or in the representation of Buyer in connection with any bankruptcy case or insolvency proceeding involving the Providers, the Assets, any Payor, or any Account and in connection with any matters relating to HCI .  The Providers shall also be responsible for all reasonable out-of-pocket costs and expenses incurred by Buyer arising out of or related to (i) the documentation of the transactions contemplated by the Agreement including any amendment, supplement or modification of such documentation, which costs and expenses may include due diligence costs and legal fees and expenses; (ii) the transfer of the Assets to Buyer pursuant to the terms of this Agreement, including, without limitation, all sales and

transfer taxes, together with all other transfer or recordation fees and expenses and any legal fees and costs associated therewith, lien searches, and filing and recording fees; and (iii) the administration of the transactions contemplated hereby, including but not limited to, internal and outside legal fees, and all other out-of-pocket expenses.

10.14  **Interest**. If any Obligation of the Providers hereunder is not paid when due, such Obligation shall bear interest at the Base Rate (or if the Buyer so elects, at the Default Rate) until payment in full of such obligation to Buyer. Any amounts uncollected by the Buyer on a Purchased Account thirty days after purchase, by reason of interception by the prior factor or otherwise, shall be immediately repurchased by the Providers. In furtherance thereof the parties stipulate and agree that none of the terms and provisions contained in this Agreement shall ever be construed to provide for payment of interest by Providers in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect. Providers shall not ever become liable for payment of any Obligation hereunder, shall ever be liable for accrued interest thereon, or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under applicable law from time to time in effect and the provisions of this Section 10.14 shall control over all other provisions of this Agreement. Any interest that may be collected that is in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect shall be credited to the Reserve Account established pursuant to Section 3.2 for disposition as therein provided.

10.15  **Wire Transfer Fees.**  Payment of each Initial Installment and all Subsequent Installments shall be made by wire transfer in accordance with the wire instructions set forth in **Exhibit C** hereto. Providers shall pay a wire transfer fee of $25.00 for each wire transfer of funds to the Providers; provided, however, if any of Providers request wire transfers more frequently than once a week, Providers shall pay a wire transfer fee of $25.00 for each such additional wire transfer.

10.16  **Further Assurances.** From time to time on and after the Closing Date, the Providers shall immediately execute and deliver to Buyer such instruments of sale, transfer, conveyance, assignment and delivery consents, assurances, powers of attorney and other instruments as may be requested by Buyer in order to vest in Buyer all right, title and interest of the Providers in and to the Assets and otherwise in order to carry out the purpose and intent of this Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.

**PROVIDERS:**

**HEALTH CARE INVESTORS, INC.**
**d/b/a Alexandria Manor**

By:
Name:
Title:

**HEALTH CARE ALLIANCE, INC.**
**d/b/a Blair Manor**

By:
Name:
Title:

**HEALTH CARE ASSURANCE, LLC**
**d/b/a Douglas Manor**

By:
Name:
Title:

**HEALTH CARE RELIANCE, LLC**
**d/b/a Ellis Manor**

By:
Name:
Title:

**BUYER:**

**REVENUE MANAGEMENT**
**SOLUTIONS, LLC**

By:
Name:
Title:
Address:

Purchase Agreement, Page 39

## **SCHEDULE OF EXHIBITS**

EXHIBIT A:   List of Outstanding Liens, including all Financing Statements and Deposit Account Control Agreements

EXHIBIT B:  Form of Notice to Payors

EXHIBIT C:  Wire Instructions

EXHIBIT D:  Form of Board Resolutions

EXHIBIT E:  Form of Guaranty

EXHIBIT F:  Form of Landlord Waiver and Consent

EXHIBIT G:  IRS Form 8821

**Exhibit B**

Medicaid Billing & Collections Authorization Letter

———

Letterhead of Provider

DATE


COMPANY NAME
ADDRESS
CITY, ST  ZIP

To whom it may concern:

    Ladies and gentlemen, I hereby authorize Revenue Management Solutions, LLC, a Connecticut limited liability company ("RMS"), and its agents, to submit billings and claims to you, and receive collections in respect of, all accounts receivable arising from all medical and healthcare services rendered by **[Provider's Name]**, Medicaid Provider Number _____ under your contract with us.

    This authorization is irrevocable, absent the written consent of RMS.

                 Sincerely,

                 **[Provider's Name]**
                 A _____[corporation]


                 By:  _____
                     [Principal's Name]
                     Its:  Title

**Exhibit ~~D~~ C**

Provider's Wire Instructions for Disbursement of all Payments

Revenue Management Solutions, LLC, a Connecticut limited liability company ("RMS"), is hereby instructed to deliver all payments to Provider, in the form of wire transfer of funds to:

| Affinity Health Care Management, Inc, a New York corporation |
|---|

Actual Account Name

in the care of the following bank:

Bank Name: _Peoples United Bank_

Bank Branch Address: _850 Main Street_
Street Address

_Bridgeport_        _CT_        _06604_
City              State         Zip Code

Bank Branch Phone Number: _203-338-4603_

ABA: _221172186_

Account Number: _6500292274_   (_Affinity Health Care - Master_)

Name of Bank Officer to contact: _Ken Khongkham_

Telephone number of Bank Officer: _203-338-4603_

**Provider:**
[Name of Provider]

By: _____
    [Principal's Name]
    Its: Title



# Wire Transfer and ACH Transfer Instructions

People's United Bank accepts many different kinds of electronic payments from both domestic and international Banks. The method that your client will pay you may vary and require different instructions for them to route your payment to People's United without any unnecessary delays. On this product sheet we have listed the payment instructions for the different payment types. Please provide this sheet to your client as a guide to sending payments.

## Wire Transfer Instructions - Domestic

| | |
|---|---|
| Receiving Bank ABA/Routing Number: | 221172186 |
| Receiving Bank Name: | People's United Bank |
| Receiving Bank Address: | Bridgeport, CT |
| Beneficiary Account Number: | <Your account Number> |
| Beneficiary Name: | <Company name> |

## Wire Transfer Instructions - International

People's United Bank as established a relationship with the Bank of New York as our intermediary bank in order to receive payments via SWIFT.

You may instruct your customers requesting a SWIFT address to send the payment as follows:

| | |
|---|---|
| SWIFT Address: | IRVTUS3N |
| The "account with institution" A/C# and Name: | 8900684356  People's United Bank |
| Your account number: | (exactly as it reads at People's United Bank) |
| Your company name: | (exactly as it reads at People's United Bank) |

Note: This swift address belongs to our intermediary Bank, The Bank of New York/Chase

| SWIFT formatted fields: | {56} | IRVTUS3N | |
|---|---|---|---|
| | {57} | 8900684356 | Peoples United Bank |
| | {59} | Bene a/c # and  Bene exact name | |

## Automated Clearing House (NACHA, ACH, EFT, Vendor Payments)

| | |
|---|---|
| Receiving Bank ABA/Routing Number: | 221172186 |
| Receiving Bank Name: | People's United Bank |
| Receiving Bank Address: | Bridgeport, CT |
| Account Number: | <Your account number> |
| Company Name: | <Company name> |

Note: People's United can accept electronic payments in the following formats: CCD, CCD+, CTX, CTP for corporate to corporate payments. However, PPD and PPD+ are accepted, but should only be used by the sending party for consumer transactions.

**Kon Khongkham**
*Vice President*
*Treasury Management Officer*
*Treasury Management Services*



850 Main Street
12th Floor - RC 285
Bridgeport, Connecticut 06604

T: 203.338.4603  F: 203.615.9154
E: kon.khongkham@peoples.com

Form **8821**

(Rev. October 2011)

Department of the Treasury
Internal Revenue Service

## Tax Information Authorization

▶ **Do not sign this form unless all applicable lines have been completed.**
▶ **Do not use this form to request a copy or transcript of your tax return.
Instead, use Form 4506 or Form 4506-T.**

OMB No. 1545-1165

For IRS Use Only
Received by:
Name _____
Telephone _____
Function _____
Date _____

**1  Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

| Taxpayer name(s) and address (type or print) | Taxpayer identification number |
|---|---|
| Health Care Assurance, LLC. d/b/a Douglas Manor<br>103 North Road<br>Windham, CT 06280 | 06-1479014 |

| | Daytime telephone number<br>860-423-4636 | Plan number (if applicable) |
|---|---|---|

**2  Appointee.** If you wish to name more than one appointee, attach a list to this form.

| Name and address | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____<br>Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |
|---|---|

**3  Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a)<br>Type of Tax<br>(Income, Employment, Excise, etc.)<br>or Civil Penalty | (b)<br>Tax Form Number<br>(1040, 941, 720, etc.) | (c)<br>Year(s) or Period(s)<br>(see the instructions for line 3) | (d)<br>Specific Tax Matters (see instr.) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**4  Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 4. If you check this box, skip lines 5 and 6  .  .  ▶ ☐

**5  Disclosure of tax information** (you **must** check a box on line 5a or 5b unless the box on line 4 is checked):

  **a** If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ ☐
  **Note.** Appointees will no longer receive forms, publications and other related materials with the notices.
  **b** If you do not want any copies of notices or communications sent to your appointee, check this box  .  .  .  .  .  .  .  ▶ ☐

**6  Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you **must** attach a copy of any authorizations you want to remain in effect **and** check this box  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ ☐
  To revoke this tax information authorization, see the instructions on page 4.

**7  Signature of taxpayer(s).** If a tax matter applies to a joint return, **either** husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

▶ **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

▶ **DO NOT SIGN THIS FORM IF IT IS BLANK OR INCOMPLETE.**

| Signature | Date | Signature | Date |
|---|---|---|---|
| _Benjamin Fischman_ | 05/24/12 | | |

| Print Name<br>Benjamin Fischman | Title (if applicable)<br>Managing Member | Print Name | Title (if applicable) |
|---|---|---|---|

☐☐☐☐☐ PIN number for electronic signature          ☐☐☐☐☐ PIN number for electronic signature

For Privacy Act and Paperwork Reduction Act Notice, see page 4.          Cat. No. 11596P          Form **8821** (Rev. 10-2011)

Form **8821**

(Rev. October 2011)

Department of the Treasury
Internal Revenue Service

## Tax Information Authorization

▶ Do not sign this form unless all applicable lines have been completed.
▶ Do not use this form to request a copy or transcript of your tax return.
Instead, use Form 4506 or Form 4506-T.

OMB No. 1545-1165

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date _____

**1  Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

| Taxpayer name(s) and address (type or print) | Taxpayer identification number |
|---|---|
| Affinity Health Care Management, Inc<br>1781 Highland Avenue, Suite 206<br>Cheshire, CT 06410 | 13-3680070 |

| | Daytime telephone number | Plan number (if applicable) |
|---|---|---|
| | 203-250-2030 | |

**2  Appointee.** If you wish to name more than one appointee, attach a list to this form.

| Name and address | |
|---|---|
| | CAF No. -------------------------------------- |
| | PTIN -------------------------------------- |
| | Telephone No. |
| | Fax No. -------------------------------------- |
| | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

**3  Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a)<br>Type of Tax<br>(Income, Employment, Excise, etc.)<br>or Civil Penalty | (b)<br>Tax Form Number<br>(1040, 941, 720, etc.) | (c)<br>Year(s) or Period(s)<br>(see the instructions for line 3) | (d)<br>Specific Tax Matters (see instr.) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**4  Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 4. If you check this box, skip lines 5 and 6 . . ▶ ☐

**5  Disclosure of tax information** (you **must** check a box on line 5a or 5b unless the box on line 4 is checked):
**a** If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
**Note.** Appointees will no longer receive forms, publications and other related materials with the notices.
**b** If you do not want any copies of notices or communications sent to your appointee, check this box . . . . . . . ▶ ☐

**6  Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you **must** attach a copy of any authorizations you want to remain in effect **and** check this box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
To revoke this tax information authorization, see the instructions on page 4.

**7  Signature of taxpayer(s).** If a tax matter applies to a joint return, **either** husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

▶ **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

▶ **DO NOT SIGN THIS FORM IF IT IS BLANK OR INCOMPLETE.**

| Signature _____ | Date  05/23/12 | Signature _____ | Date _____ |
|---|---|---|---|
| Benjamin Fischman | Pres | | |
| Print Name | Title (if applicable) | Print Name | Title (if applicable) |
| ☐ ☐ ☐ ☐ ☐  PIN number for electronic signature | | ☐ ☐ ☐ ☐ ☐  PIN number for electronic signature | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.    Cat. No. 11596P    Form **8821** (Rev. 10-2011)

Form **8821**

(Rev. October 2011)

Department of the Treasury
Internal Revenue Service

## Tax Information Authorization

▶ Do not sign this form unless all applicable lines have been completed.
▶ Do not use this form to request a copy or transcript of your tax return.
Instead, use Form 4506 or Form 4506-T.

OMB No. 1545-1165

**For IRS Use Only**

Received by:
Name
Telephone
Function
Date

**1 Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

| Taxpayer name(s) and address (type or print) | Taxpayer identification number |
|---|---|
| Health Care Investors, Inc. d/b/a Alexandria Manor<br>55 Tunxis Avenue<br>Bloomfield, CT 06002 | 13-3646976 |

| | Daytime telephone number<br>860-242-0703 | Plan number (if applicable) |

**2 Appointee.** If you wish to name more than one appointee, attach a list to this form.

| Name and address | |
|---|---|
| | CAF No. |
| | PTIN |
| | Telephone No. |
| | Fax No. |
| | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

**3 Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a)<br>Type of Tax<br>(Income, Employment, Excise, etc.)<br>or Civil Penalty | (b)<br>Tax Form Number<br>(1040, 941, 720, etc.) | (c)<br>Year(s) or Period(s)<br>(see the instructions for line 3) | (d)<br>Specific Tax Matters (see instr.) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**4 Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 4. If you check this box, skip lines 5 and 6   . . ▶ ☐

**5 Disclosure of tax information** (you **must** check a box on line 5a or 5b unless the box on line 4 is checked):

  **a** If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

  **Note.** Appointees will no longer receive forms, publications and other related materials with the notices.

  **b** If you do not want any copies of notices or communications sent to your appointee, check this box   . . . . . . . ▶ ☐

**6 Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you **must** attach a copy of any authorizations you want to remain in effect **and** check this box   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

To revoke this tax information authorization, see the instructions on page 4.

**7 Signature of taxpayer(s).** If a tax matter applies to a joint return, **either** husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

▶ **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

▶ **DO NOT SIGN THIS FORM IF IT IS BLANK OR INCOMPLETE.**

| Signature | Date | | Signature | Date |
|---|---|---|---|---|
| Benjamin Fischman   *Pres managing member* | | | | |
| Print Name | Title (if applicable) | | Print Name | Title (if applicable) |
| ☐☐☐☐☐ PIN number for electronic signature | | | ☐☐☐☐☐ PIN number for electronic signature | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.          Cat. No. 11596P          Form **8821** (Rev. 10-2011)

Form **8821**

(Rev. October 2011)

Department of the Treasury
Internal Revenue Service

# Tax Information Authorization

▶ Do not sign this form unless all applicable lines have been completed.
▶ Do not use this form to request a copy or transcript of your tax return.
Instead, use Form 4506 or Form 4506-T.

OMB No. 1545-1165

**For IRS Use Only**

Received by:

Name _____
Telephone _____
Function _____
Date _____

**1 Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

| Taxpayer name(s) and address (type or print) | Taxpayer identification number |
|---|---|
| Health Care Alliance Inc. d/b/a Blair Manor<br>612 Hazard Avenue<br>Enfield, CT 06082 | 06-1401064 |

| Daytime telephone number | Plan number (if applicable) |
|---|---|
| 860-749-8388 | |

**2 Appointee.** If you wish to name more than one appointee, attach a list to this form.

| Name and address | |
|---|---|
| | CAF No. _____ |
| | PTIN _____ |
| | Telephone No. _____ |
| | Fax No. _____ |
| | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

**3 Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a)<br>Type of Tax<br>(Income, Employment, Excise, etc.)<br>or Civil Penalty | (b)<br>Tax Form Number<br>(1040, 941, 720, etc.) | (c)<br>Year(s) or Period(s)<br>(see the instructions for line 3) | (d)<br>Specific Tax Matters (see instr.) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**4 Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 4. If you check this box, skip lines 5 and 6 . . ▶ ☐

**5 Disclosure of tax information** (you **must** check a box on line 5a or 5b unless the box on line 4 is checked):

**a** If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Note.** Appointees will no longer receive forms, publications and other related materials with the notices.

**b** If you do not want any copies of notices or communications sent to your appointee, check this box . . . . . . . ▶ ☐

**6 Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you **must** attach a copy of any authorizations you want to remain in effect **and** check this box . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

To revoke this tax information authorization, see the instructions on page 4.

**7 Signature of taxpayer(s).** If a tax matter applies to a joint return, **either** husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

▶ **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

▶ **DO NOT SIGN THIS FORM IF IT IS BLANK OR INCOMPLETE.**

| Signature _____ | Date 1/28/12 | Signature _____ | Date _____ |
|---|---|---|---|
| Print Name Benjamin Fischman  Title (if applicable) President | | Print Name _____  Title (if applicable) | |

☐ ☐ ☐ ☐ ☐  PIN number for electronic signature     ☐ ☐ ☐ ☐ ☐  PIN number for electronic signature

For Privacy Act and Paperwork Reduction Act Notice, see page 4.        Cat. No. 11596P        Form **8821** (Rev. 10-2011)

| Form **8821** | **Tax Information Authorization** | OMB No. 1545-1165 |
|---|---|---|
| (Rev. October 2011) | ▶ **Do not sign this form unless all applicable lines have been completed.** | **For IRS Use Only** |
| Department of the Treasury | ▶ **Do not use this form to request a copy or transcript of your tax return.** | Received by: |
| Internal Revenue Service | **Instead, use Form 4506 or Form 4506-T.** | Name _____ Telephone _____ Function _____ Date _____ |

**1   Taxpayer information.** Taxpayer(s) must sign and date this form on line 7.

| Taxpayer name(s) and address (type or print) | Taxpayer identification number |
|---|---|
| Health Care Reliance LLC d/b/a Ellis Manor<br>210 George Street<br>Hartford, CT 06114 | 06-1479015 |
| | Daytime telephone number<br>860-296-9166 | Plan number (if applicable) |

**2   Appointee.** If you wish to name more than one appointee, attach a list to this form.

| Name and address | CAF No. --------------------- |
|---|---|
| | PTIN --------------------- |
| | Telephone No. --------------------- |
| | Fax No. --------------------- |
| | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

**3   Tax matters.** The appointee is authorized to inspect and/or receive confidential tax information in any office of the IRS for the tax matters listed on this line. Do not use Form 8821 to request copies of tax returns.

| (a)<br>Type of Tax<br>(Income, Employment, Excise, etc.)<br>or Civil Penalty | (b)<br>Tax Form Number<br>(1040, 941, 720, etc.) | (c)<br>Year(s) or Period(s)<br>(see the instructions for line 3) | (d)<br>Specific Tax Matters (see instr.) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the tax information authorization is for a specific use not recorded on CAF, check this box. See the instructions on page 4. If you check this box, skip lines 5 and 6  . . ▶ ☐

**5   Disclosure of tax information** (you **must** check a box on line 5a or 5b unless the box on line 4 is checked):

**a** If you want copies of tax information, notices, and other written communications sent to the appointee on an ongoing basis, check this box . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Note.** Appointees will no longer receive forms, publications and other related materials with the notices.

**b** If you do not want any copies of notices or communications sent to your appointee, check this box . . . . . . . ▶ ☐

**6   Retention/revocation of tax information authorizations.** This tax information authorization automatically revokes all prior authorizations for the same tax matters you listed on line 3 above unless you checked the box on line 4. If you do not want to revoke a prior tax information authorization, you **must** attach a copy of any authorizations you want to remain in effect **and** check this box  . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

To revoke this tax information authorization, see the instructions on page 4.

**7   Signature of taxpayer(s).** If a tax matter applies to a joint return, **either** husband or wife must sign. If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods on line 3 above.

▶ **IF NOT SIGNED AND DATED, THIS TAX INFORMATION AUTHORIZATION WILL BE RETURNED.**

▶ **DO NOT SIGN THIS FORM IF IT IS BLANK OR INCOMPLETE.**

| Signature | Date | Signature | Date |
|---|---|---|---|
| Benjamin Fieldman | managing member | | |
| Print Name | Title (if applicable) | Print Name | Title (if applicable) |
| ☐☐☐☐☐ PIN number for electronic signature | | ☐☐☐☐☐ PIN number for electronic signature | |

For Privacy Act and Paperwork Reduction Act Notice, see page 4.    Cat. No. 11596P    Form **8821** (Rev. 10-2011)