# Exhibit B

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

------------------------------------------------------------X

In re:                                              Chapter 11

AFFINITY HEALTHCARE MANAGEMENT,          Case Number:  16-30043 (JAM)
INC.,

                        Debtor.
------------------------------------------------------------X

In re:
                                                    Chapter 11

HEALTH CARE INVESTORS, INC. d/b/a
ALEXANDRIA MANOR,                            Case Number:  16-30044 (JAM)

                        Debtor.
------------------------------------------------------------X

In re:
                                                    Chapter 11

HEALTH CARE ALLIANCE, INC.
d/b/a BLAIR MANOR,                           Case Number:  16-30045 (JAM)

                        Debtor.
------------------------------------------------------------X

In re:
                                                    Chapter 11

HEALTH CARE ASSURANCE, LLC
d/b/a DOUGLAS MANOR,                         Case Number:  16-30046 (JAM)

                        Debtor.
------------------------------------------------------------X

In re:
                                                    Chapter 11

HEALTH CARE RELIANCE, LLC
d/b/a ELLIS MANOR,                           Case Number:  16-30047 (JAM)

                        Debtor.
------------------------------------------------------------X

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

```
------------------------------------------------------------- X
In re:                                                        :
                                                              :
AFFINITY HEALTHCARE MANAGEMENT,                               :
INC., et al                                                   :
                                                              :
                    v.                                        :
                                                              :
                                                              :
REVENUE MANAGEMENT SOLUTIONS, LLC;                            :
STATE OF CONNECTICUT DEPARTMENT OF                            :
SOCIAL SERVICES;                                              :
STATE OF CONNECTICUT DEPARTMENT OF                            :
REVENUE SERVICES; AND                                         :
STATE OF CONNECTICUT DEPARTMENT OF                            :
LABOR                                                         :
------------------------------------------------------------- X
```

**ORDER (A) APPROVING SALE OF PROVIDER ACCOUNTS RECEIVABLE TO REVENUE MANAGEMENT SOLUTIONS, LLC PURSUANT TO §§ 363(B) AND (F) OF THE BANKRUPTCY CODE; (B) GRANTING FIRST-PRIORITY SECURITY INTERESTS ON PURCHASED ACCOUNTS; (C) AUTHORIZING INDEBTEDNESS WITH ADMINISTRATIVE SUPER-PRIORITY AND SECURED BY LIENS ON AND SECURITY INTERESTS IN NON-PURCHASED ACCOUNTS AND ON ALL OTHER ASSETS OF THE PROVIDERS PURSUANT TO §§ 364(C) AND (D) OF THE BANKRUPTCY CODE; (D) AUTHORIZING USE OF CASH COLLATERAL AND (E) <u>GRANTING RELATED RELIEF</u>**

Upon the motion (the "Motion") of Affinity Health Care Management, Inc. (the "Lead Debtor"), Health Care Investors, Inc. d/b/a Alexandria Manor, Health Care Alliance, Inc. d/b/a Blair Manor, Health Care Assurance, LLC d/b/a Douglas Manor, and Health Care Reliance, LLC d/b/a Ellis Manor (collectively, the "Debtors"), the debtors and debtors-in-possession, in the above-referenced chapter 11 cases (collectively, the "Cases"), by their undersigned counsel,

pursuant to §§ 105, 361, 362, 363, 364, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, inter alia, entry of an interim order (this "Interim Order") and a final order (the "Final Order) that:

      (a)    authorizes and obligates the Health Care Investors, Inc. d/b/a Alexandria Manor, Health Care Alliance, Inc. d/b/a Blair Manor, Health Care Assurance, LLC d/b/a Douglas Manor, and Health Care Reliance, LLC d/b/a Ellis Manor (individually and collectively, jointly and severally, the "Providers") to affirm, undertake and continue to perform all of their respective obligations under that certain Purchase Agreement (the "Purchase Agreement," a true and genuine copy of which is attached hereto as **Exhibit A**) made as of May 25, 2012, by and between the Providers and Revenue Managements Solutions, LLC or its permitted successors and assigns[1] ("RMS"), as "Buyer"[2], wherein the four (4) Providers, each of which operate a skilled nursing facility as aforesaid, shall continue, jointly and severally, individually and collectively, as set out in the Purchase Agreement, to offer to sell and RMS may purchase, at its discretion, certain healthcare accounts receivables of the Providers (the "Post-Petition Purchased Accounts") together with all books, records, billing and credit files, an irrevocable paid-up license to use related medical and patient records, chattel paper, documents, instruments and general intangibles related to the Post-Petition Purchased Accounts and certain other assets necessary for RMS or its agents to collect the Post-Petition Purchased Accounts, all as set forth in the Purchase Agreement (collectively, with the Purchased Accounts, the "Post-Petition Conveyed Property"), on the terms and conditions set forth in the Purchase Agreement and the

---

[1] Funding affiliates of RMS (owned directly or indirectly by RMS or its principals) are permitted assigns under the Purchase Agreement.
[2] Terms with initial capitalization herein have the same meaning as provided for in the Purchase Agreement, unless otherwise defined herein.

other documents and instruments provided for therein and related thereto (collectively, with the Purchase Agreement, the "Funding Documents"), such purchases and sales being made free and clear of liens, claims, interests and encumbrances, under §§ 363(b) and (f) of the Bankruptcy Code;

(b)    grants RMS a first-priority security interest in the Post-Petition Purchased Accounts and in the proceeds thereof pursuant to § 1-201(35) of the Uniform Commercial Code of the State of Connecticut, Conn. Gen. Stat. § 42a-1-101 et seq., to secure all of its right, title and interest in the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property (the "Post-Petition Ownership Interests");

(c)    authorizes the Providers to obtain Initial Installments, Subsequent Installments and other financial accommodations and post-petition funding from RMS pursuant to the terms and conditions of the Funding Documents and this Interim Order (the "Post-Petition Funding Facility");

(d)    approves of the terms of this Interim Order approving the Post-Petition Funding Facility in the form and substance satisfactory to RMS, at its sole and absolute discretion;

(e)    authorizes the Providers to grant RMS assurances for the Providers' full and timely payment by and performance of all Obligations owed by the Providers to RMS arising under, out of, or in connection with the Funding Documents, by granting RMS (i) pursuant to § 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim allowable under § 503(b) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code including, without limitation, §§ 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as hereinafter defined), and (ii) pursuant to § 364(d) of the Bankruptcy Code, a valid, enforceable, binding and duly

4

perfected continuing first-priority security interest in and to and a first lien upon the Non-Purchased Accounts and the credit balances, and all of the Providers' other rights, property and assets, real, personal, tangible and intangible not sold to RMS under the Purchase Agreement (including, without limitation, inventory, general intangibles, contract rights, purchase orders, documents, instruments, chattel paper, goods, good will, patents, trademarks and other intellectual property, cash, deposit accounts, rights to payment, furniture, fixtures, machinery, equipment, lease rights, land and other real property, causes of action, commercial tort claims, and all other "Collateral" defined in the Security Agreement which definition is incorporated herein by reference) wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, subject only to the Carve-Out; provided, however, that the DIP Collateral (as defined below) shall not include any avoidance or similar actions of the Providers arising under §§ 544, 545, 547, 548, 550 and 551 of the Bankruptcy Code ("Avoidance Actions");

(f)     authorizes and directs the Providers to pay all Obligations of every nature of the Providers now or hereafter existing under or arising out of or in connection with the Purchase Agreement, including, without limitation, the Outstanding Initial Installments, the Funding Fee, Buyer's out-of-pocket costs and expenses, the indemnification obligations, the Lock Box Fees, wire transfer fees, and other amounts payable under the Funding Documents as they become due, all to the extent provided by and in accordance with the terms of the respective Funding Documents;

(g)     authorizes the Debtors' continued use of "cash collateral" as that term is defined by Bankruptcy Code § 363(a) ("Cash Collateral") on the terms and conditions set forth in this Interim Order;

(h)     authorizes the Debtors to provide adequate protection of the liens and security interests of RMS and the State of Connecticut Department of Labor ("DOL");

(i)     provides adequate protection to RMS (to the extent any Prepetition Obligations, as defined below, remain outstanding) and the DOL for any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral;

(j)     vacates and modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Funding Documents and this Interim Order;

(k)     schedules a final hearing (the "Final Hearing") on the Motion no later than January __, 2016, to consider the entry of the Final Order authorizing the borrowings under the DIP Documents on a final basis and approve the form of notice procedures with respect thereto; and

(l)     provides for other related relief.

The Court having considered the Motion, the exhibits attached thereto, the Funding Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on January 15, 2016 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; RMS having agreed to provide post-petition funding by the purchase of Accounts and the payment of Initial Installments and Subsequent Installments, and other financial accommodations to the Providers on the terms of the Funding Documents and this Interim Order; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having

been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**NOW, THEREFORE**, upon the record of the Interim Hearing and after due deliberation, good and sufficient cause appearing therefore, the Court hereby makes the following **FINDINGS OF FACT and CONCLUSIONS OF LAW**:

A.     <u>Petition</u>.  On January _, 2016, (the "Petition Date") the Debtors each filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to possess their assets and manage and operate their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.     <u>Jurisdiction</u>.  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.  The Motion is a "core" matter as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (N).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     <u>The Providers' Business</u>.  The Providers operate four (4) skilled nursing facilities in Connecticut, as aforesaid, and the Lead Debtor manages the business affairs of the Providers.

D.     <u>Statutory Committee</u>.  As of the date hereof, the United States Trustee (the "U.S. Trustee) has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "<u>Statutory Committee</u>").

E. <u>Debtors' Stipulations</u>. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 18 herein, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge and agree that (collectively, paragraphs E(i) through E(vii) below are referred to herein as the "<u>Debtors' Stipulations</u>"):

(i) <u>Prepetition Funding Facility</u>: Pursuant to the Purchase Agreement and other Funding Documents, prior to the Petition Date, the Providers, jointly and severally, individually and collectively, as set out in the Purchase Agreement, offered to sell and RMS purchased certain healthcare accounts receivables of the Providers (the "Prepetition Purchased Accounts," and together with the Post-Petition Purchased Accounts, the "Purchased Accounts") together with all books, records, billing and credit files, an irrevocable paid-up license to use related medical and patient records, chattel paper, documents, instruments and general intangibles related to the Prepetition Purchased Accounts and certain other assets necessary for Buyer or its agents to collect the Prepetition Purchased Accounts, all as set forth in the Purchase Agreement (collectively, with the Prepetition Purchased Accounts, the "Prepetition Conveyed Property," and, together with the Post-Petition Conveyed Property, the "Conveyed Property"), on the terms and conditions set forth in the Purchase Agreement and the other Funding Documents (the "Prepetition Funding Facility," and together with the Post-Petition Funding Facility, the "Funding Facility");

(ii) <u>Prepetition Obligations</u>: The Purchase Agreement provided that the aggregate amount of the Outstanding Initial Installments plus any other outstanding Obligations of the Providers shall not (except as permitted by Buyer in its sole discretion) exceed $2,500,000 (the "Facility Cap"). As of the Petition Date, the aggregate amount of the Outstanding Initial

Installments due and payable pursuant to the Prepetition Funding Facility was $1,400,000 (together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Funding Documents, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations, all obligations of the Lead Debtor as provided in the Lead Debtor Guaranty (as defined below), and other Obligations of the Debtors to RMS of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Obligations").

(iii)    <u>Prepetition Guaranties</u>:

(a)    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Lead Debtor Guaranty</u>"), by and among the Lead Debtor and RMS, the Lead Debtor, *inter alia*, guaranteed the obligations of the Providers under the Purchase Agreement. The Lead Debtor granted a security interest in and lien upon (the "Lead Debtor Liens") all of its assets to RMS to secure it obligations under the Lead Debtor Guaranty including its guarantee of the Providers' obligations under the Purchase Agreement.

(b)    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Fischman Guaranty</u>"), by and among Benjamin Z. Fischman ("Fischman") and RMS, Fischman, *inter alia*, guaranteed the obligations of the Providers under the Purchase Agreement.

(c)    Pursuant to that certain Guaranty dated May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Strasser Guaranty</u>"), by and among Samuel Strasser ("Strasser") and RMS, Strasser, inter alia, guaranteed the obligations of the Providers under the Purchase Agreement.

(iv)    <u>Prepetition Liens and Prepetition Collateral</u>.   Pursuant to that certain Security Agreement dated as of May 25, 2012 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Security Agreement"), by and between the Buyer and the Providers, and as more fully set forth in the other Funding Documents, to secure all of the Obligations of every nature of the Providers then or thereafter existing under or arising out of or in connection with the Purchase Agreement, the Providers granted to RMS a continuing security interest in and liens upon (the "Prepetition Liens") their respective right, title and interest in all of the properties, assets and rights of the Providers, wherever located, whether now owned or thereafter acquired or arising, and all proceeds and products thereof (the "Prepetition Collateral," and together with the DIP Collateral, the "Collateral").   The Prepetition Liens are validly perfected and prior in right, title and interest to any other lien, encumbrance or interest in the Prepetition Collateral.

(v)    <u>Validity, Perfection and Priority of Prepetition Liens and Prepetition Obligations</u>.   Subject to the provisions of paragraph 18 of this Order, the Debtors (for themselves and their estates) and RMS acknowledge and agree that:   (a) as of the Petition Date, the Providers had absolutely sold, transferred and conveyed and RMS had absolutely purchased and acquired all right, title and interest in the Prepetition Purchased Accounts and the other Prepetition Conveyed Property, on the terms and conditions set forth in the Purchase Agreement and the other Funding Documents, and that the transfer of ownership and title to the Prepetition Purchased Accounts and the other Prepetition Conveyed Property from the Providers to RMS constituted a "true sale" of the Prepetition Conveyed Property for fair value and is not subject to re-characterization as a loan or a financing; (b) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected;

(b) as of the Petition Date, the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Funding Documents (to the extent any such permitted liens are valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens"); (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, re-characterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against RMS or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (g) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Obligations exceeded the amount of those obligations, and accordingly the Prepetition Obligations are allowed secured claims within the meaning of § 506 of the Bankruptcy Code, in an amount of not less than $5,900,000 on account of the Outstanding Initial Installments as of the Petition Date together with any and all other amounts of whatever nature owing in respect of such Prepetition Obligations of the Debtors; and (h) any payments made on account of the Prepetition Obligations to or for the benefit of RMS prior to the Petition Date were on account of amounts in respect of which RMS was over-secured, were payments out of the Prepetition Collateral, and therefore

such payments did not diminish any property otherwise available for distribution to any other creditors of the Debtors.

(vi)     <u>Cash Collateral</u>.   The Debtors represent that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the Cash Collateral of RMS; provided, however, that, notwithstanding the forgoing, the Purchased Accounts and their proceeds, wherever located, constitute the exclusive property of RMS pursuant to the terms of the Funding Documents and this Interim Order.

(vii)     <u>Default by the Debtors</u>.   The Debtors acknowledge and stipulate that the Debtors are in default of their debts and Obligations under the Funding Documents.

F.       <u>Findings Regarding the Post-Petition Funding</u>.

(i)     <u>Post-Petition Funding</u>.   The Providers have requested from RMS, and RMS is willing to purchase Accounts and extend to the four (4) Providers, jointly and severally, as one Provider, certain Initial Installments, Subsequent Installments and other financial and funding accommodations, as more particularly described and on the terms and conditions of the Purchase Agreement, the other Funding Documents and this Order.

(ii)     <u>Need for Post-Petition Funding</u>.   The Providers do not have sufficient available sources to provide working capital to operate their businesses in the ordinary course without the requested post-petition funding from RMS.  The Providers' ability to provide patient services, and maintain their business relationships with vendors, suppliers and employees, and to otherwise fund their operations, are essential to the Providers' viability.  There is an immediate need for funding to minimize the disruption of the Providers' business and daily operations, manage and preserve the assets of its bankruptcy estate, provide patient care to existing and

future patients and enhance the likelihood of a successful reorganization for the benefit of the

Debtors' bankruptcy estates, creditors and other parties-in-interest. Thus, the Post-Petition

Funding Facility contemplated by the Motion is necessary, essential and appropriate to prevent

immediate and irreparable harm to the Debtors, and their estates, employees and patients.

Absent entry of this Interim Order, the Debtors' operations risk being disrupted, resulting in

immediate and irreparable harm to the estate and the likelihood of a successful reorganization

will be impaired. The sale of the Post-Petition Purchased Accounts to RMS on the terms and

conditions set forth in the Funding Documents and this Interim Order is in the best interests of

the Debtors' estates, creditors and other parties-in-interest.

      (iii)  <u>True Sale</u>. The Providers, jointly and severally, individually and

collectively, are treated as one "Provider" under the Purchase Agreement. As such, the Provider

has agreed to sell, and RMS has agreed to purchase, the Post-Petition Purchased Accounts and

the other Post-Petition Conveyed Property, now existing or hereafter arising, together with all

proceeds thereof, and to advance funds and provide other financial accommodations to the

Provider, upon the entry of this Interim Order (and, later, the Final Order), which sales to RMS

shall be free and clear of liens, claims, interests and encumbrances under §§ 363(b) and (f), upon

the terms and conditions of the Purchase Agreement, attached hereto as **<u>Exhibit A</u>** and the other

Funding Documents. To secure all of its right, title and interest in the Post-Petition Purchased

Accounts and the related Post-Petition Conveyed Property, and their proceeds, RMS shall be

granted a first-priority security interest in the Post-Petition Purchased Accounts and the other

Post-Petition Conveyed Property, and in the proceeds thereof, pursuant to § 1-201(35) of the

Uniform Commercial Code of the State of Connecticut, Conn. Gen. Stat. § 42a-1-101 *et seq.*

The transfer of ownership and title to the Post-Petition Purchased Accounts and the other Post-

Petition Conveyed Property from the Provider to RMS constitutes a "true sale" of the subject property for fair value and is not subject to re-characterization as a loan or a financing.

(iv)    No Credit Available on More Favorable Terms.  In view of the Provider's current financial condition, financing arrangements and capital structure, the Provider has represented to the Court, and the Court finds, that the Provider is unable at this time to obtain sufficient unsecured financing on an administrative priority basis under §503(b)(1) of the Bankruptcy Code.

(v)    Conditions Precedent.  RMS is unwilling to purchase the Post-Petition Purchased Accounts and to provide the Initial Installments and Subsequent Installments on account thereof and any other financial accommodations without being afforded the protections afforded by: (i) a "true sale" finding, as to the Purchased Accounts and the related Conveyed Property; (ii) a sale "free and clear" of liens, claims, interests and encumbrances pursuant to §§ 363(b) and (f), as to the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property; (iii) the grant, in accordance with § 364(c)(1) of the Bankruptcy Code, of an administrative expense claim allowable under § 503(b) of the Bankruptcy Code with priority over any and all claims specified in any other section of the Bankruptcy Code, including, without limitation, §§ 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out; and (ii) the grant, in accordance with § 364(d)(1) of the Bankruptcy Code, of a continuing security interest in and lien on the DIP Collateral pledged to RMS by the Provider under the Funding Documents as security for the Provider's Obligations thereunder, such lien of RMS being senior in priority to any existing duly perfected liens and security interests in the DIP Collateral of any person (including the DOL) which existed on the Petition Date and any replacement liens they

may hold, subject only to the Carve-Out; and (iv) the other protections afforded by § 363(m) and § 364(e) of the Bankruptcy Code, and this Interim Order.

(vi)    <u>Use of Proceeds of the Post-Petition Funding Facility; Payment of Prepetition Obligations</u>.  As a condition to RMS' continued funding and the agreement for the use of Cash Collateral, RMS requires, and the Debtors have agreed, that proceeds of the Post-Petition Funding Facility shall be used, in each case in a manner consistent with the terms and conditions of the Funding Documents, and solely for (1) payment of the Prepetition Obligations, (2) working capital and other general corporate purposes, (3) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out (as defined herein)), (4) payment of fees and expenses due under the Post-Petition Funding Facility, (5) payment of such prepetition expenses, in addition to the Prepetition Obligations permitted to be so paid in accordance with the consents required under the Funding Documents, and as approved by the Court.  Payment of the Prepetition Obligations in accordance with this Interim Order is necessary as RMS will not otherwise consent to providing the Post-Petition Funding Facility, and will not otherwise consent to the use of its Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve Out.  Such payment will not prejudice the Debtors or their estates, because payment of such amounts is on account of RMS being over-secured and is subject to the rights of certain parties in interest under paragraph 18 herein.

(vii)    <u>Guaranties</u>.  As a condition to RMS' continued funding and agreement for the use Cash Collateral and other Prepetition Collateral, Benjamin Z. Fischman and Samuel Strasser (individually and collectively referred to herein as the "Individual Guarantors") shall consent and agree to the entry of this Interim Order and any further and Final Order relating to

15

the Post-Petition Funding Facility, and they shall execute and deliver guaranty agreements to RMS.

(viii)    Adequate Protection.  RMS and DOL are each entitled to receive adequate protection on account of their respective interests in the Prepetition Collateral, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, the subordination to the Carve Out (as defined herein) and to the DIP Liens (as defined herein), the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").  Pursuant to sections 361, 363, 364 and 507(b), as adequate protection:  (i) RMS will receive (a) adequate protection liens and super-priority claims, (b) current payments fees, costs and expenses and other amounts due under the Funding Documents, and (c) ongoing payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of RMS; and (ii) DOL will receive adequate protection liens.

(ix)    Sections 506(c) and 552(b).  In light of (i) the Post-Petition Funding Facility and RMS' agreement to subordinate its rights of payment, liens and super-priority/priority claims to the Carve Out; and (ii) DOL's agreement to subordinate its rights of payment, liens and super-priority/priority claims to the Carve Out, DIP Liens and DIP Super-Priority Claims, each of the RMS and DOL are entitled to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) upon entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

16

G.   <u>Business Judgment and Good Faith</u>. The terms of the Post-Petition Funding Facility taken as a whole are at least as favorable to the Providers as those available from other sources, and are fair, just and reasonable under the circumstances, are ordinary and appropriate for funding of a debtor-in-possession and reflect the Providers' exercise of prudent business judgment, and also as to the Lead Debtor as guarantor of the Providers' obligations and indebtedness to RMS, consistent with the fiduciary duties of the Debtors, supported by reasonably equivalent value and fair consideration, and the Funding Documents are enforceable in accordance with their terms.   Consequently, (i) the sale of the Post-Petition Purchased Accounts to RMS and their funding by RMS under §§ 363(b) and (f) of the Bankruptcy Code shall be deemed to have been in good faith, as that term is used in §363(m) of the Bankruptcy Code, and (ii) any other financial accommodations, credit, loans, indebtedness, and liens on the DIP Collateral extended to the Provider by RMS under the terms of this Interim Order and the Funding Documents provided on or after the commencement of these Cases shall be deemed to have been extended in good faith, as that term is defined in § 364(e) of the Bankruptcy Code, in the event that any provision of this Interim Order is vacated, reversed, or modified, on appeal or otherwise.

H.   <u>Notice</u>. Notice of the Hearing and of the relief requested in the Motion was given to (i) the United States Trustee for the District of Connecticut; (ii) RMS and its counsel; (iii) the United States Attorney, (iv) the Internal Revenue Service (v) the State of Connecticut Department of Revenue Services ("DRS"); (vi) the State of Connecticut Department of Social Services ("DSS"); (vii) the State of Connecticut Department Labor (viii) the United States Department of Housing and Urban Development; (ix) the Twenty Largest Unsecured Creditors filed in each of the Cases (x) the Office of the Attorney General for the State of Connecticut; and (xi) all other

persons entitled to notice under the Federal Rules of Bankruptcy Procedure (collectively, the "Notice Parties"), together with a motion to shorten time. Such notice constitutes good and sufficient notice of the Hearing under the circumstances in accordance with Fed. R. Bankr. P. 4001(b), Fed. R. Bankr. P. 4001(c), Fed. R. Bankr. P. 4001(d) and §102(1) of the Bankruptcy Code, as required by §§ 363(c), 363(e) and 364(e) of the Bankruptcy Code, in light of the emergency nature of the relief requested in the Motion.

**BASED UPON** the foregoing findings of fact and conclusions of law, and upon the record made before the Court at the Interim Hearing, and good cause therefore appearing, it is hereby **ORDERED, ADJUDGED AND DECREED** that:

1.      Record.  The record at the Hearing and the findings of fact and conclusions of law above are incorporated by reference.

2.      Motion Granted.  The Motion is **GRANTED**, and the Providers are authorized to obtain funding from RMS under terms of the Purchase Agreement, the other Funding Documents, and this Interim Order, by selling Accounts to RMS and receiving in exchange Initial Installments, Subsequent Installments and other payments and other financial accommodations from RMS on the terms and conditions set forth in the Purchase Agreement and other Funding Documents.

3.      Authorization and Approval of Funding Documents; Sale of Accounts, and Indebtedness and other Financial Accommodations Thereunder.  The Providers hereby affirm and undertake and shall continue to perform all of their respective obligations under that certain the Purchase Agreement and the other Funding Documents, each of which is hereby approved in all respects.  Without limitation thereof:

(a)    The Providers may sell and RMS may purchase Post-Petition Purchased Accounts and associated Post-Petition Conveyed Property, on the terms and conditions of the Purchase Agreement and the other Funding Documents, and RMS may exercise its rights under the Funding Documents, subject to the terms of this Order and of such documents.  The sale of Accounts hereunder by the Providers to RMS shall be a "true sale" of the Post-Petition Purchased Accounts which vests all right, title and interest in the Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property sold under this Order, and their proceeds, in RMS and such sale is not subject to re-characterization as a loan or a financing;

(b)    The sale of the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property to RMS under this Interim Order is free and clear of liens, claims, interests and encumbrances pursuant to §§ 363(b), (f) and (m) of the Bankruptcy Code, and RMS shall receive and is hereby granted a first-priority security interest in the Post-Petition Purchased Accounts and in the proceeds thereof pursuant to § 1-201(35) of the Uniform Commercial Code of the State of Connecticut, Conn. Gen. Stat. § 42a-1-101 *et seq.*, to secure all of its right, title and interest in the Post-Petition Purchased Accounts and the related Post-Petition Conveyed Property in the proceeds thereof.  Any valid pre-petition liens and security interests on the property sold to RMS at the time of their sale are released by this Interim Order and shall attach to the proceeds of sale, in their respective order of priority;

(c)    The Debtors' are hereby authorized and directed to do and perform all acts and make, execute and deliver all documents that may be necessary or desirable for the Debtors' performance under the Funding Documents, and to execute and deliver and make payments of monies and proceeds to RMS as called for therein;

(d)     The Providers are authorized to incur Obligations and to receive other financial accommodations from RMS under the Funding Documents, and the Lead Debtor is authorized and directed to guarantee and undertake certain other obligations and indebtedness on the terms and conditions set forth in the Lead Debtor Guaranty.

(e)     The Providers may use the DIP Collateral only on the terms and subject to the conditions set forth in this Interim Order and the Funding Documents.

4.     <u>Payments and Transfers to RMS</u>.   The Providers are authorized to and shall, consistent with the requirements of the Medicare statutes and regulations, make all payments and transfers of property to RMS or for the benefit of RMS which are contemplated by this Interim Order or may be provided, permitted or required under the Funding Documents.  These payments and transfers shall not be subject to avoidance under § 549 or any other provision of the Bankruptcy Code or state law.

5.     <u>Lockbox Accounts</u>.

(a)     The Providers and RMS are authorized to maintain and/or establish and operate the Lock Box Accounts required by the Purchase Agreement and the other Funding Documents for the collection of the Provider's Government Receivables and Non-Government Receivables in accordance with the terms and conditions of the Purchase Agreement and the other Funding Documents, and the Providers are authorized and directed to execute, deliver and perform under any and all Lock Box Agreements governing such Lock Box Accounts.  The Governmental Lockbox Accounts for the Government Receivables shall be in the name and sole control of the Providers, alone, without limitation of the contractual covenants of the Providers to RMS under the Purchase Agreement.

(b)      Promptly upon entry of this Order, the Providers (and to the extent applicable, RMS) shall take all actions necessary and appropriate to cause all payments on the Providers' Accounts, whether or not purchased by RMS, to be paid into or deposited in the Lock Box Accounts, including, without limitation: (a) giving written notice, as per the terms and conditions of the Purchase Agreement, to all governmental Payors and non-governmental Payors; (b) depositing or transferring into the Lock Box Accounts all cash, checks, or wire transfers representing, in whole or in part, all payments on Purchased Accounts, in accordance with the Funding Documents; and (c) implementing such other actions as are required to effectuate the foregoing.

6.      Post-Petition Ownership Interests.  RMS shall have full right, title and ownership interest in all Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property which are purchased from the Providers under this Interim Order and the Funding Documents with a first priority-perfected security interest therein, as buyer thereof, senior to the ownership and lien rights of the Providers and of any creditor of the Providers.  On the terms of the Purchase Agreement and the other Funding Documents, RMS shall receive the proceeds of the Post-Petition Purchased Accounts and the other Post-Petition Conveyed Property, which Post-Petition Ownership Interests of RMS represent the sole property of RMS, as owner, and are not subject to re-characterization as collateral for a loan or a financing.

7.      Liens And Super-Priority Administrative Claim as Collateral Security.  As collateral security for the full and timely performance of the Obligations of the Providers to RMS under the Purchase Agreement and the other Funding Documents, RMS is hereby indefeasibly granted:

(a)       Pursuant to § 364(d) of the Bankruptcy Code, a valid, enforceable, binding and duly perfected continuing first-priority security interest in and to and a first lien upon (the "DIP Liens") the Non-Purchased Accounts and the credit balances, and all of the Providers' other rights, property and assets, real, personal, tangible and intangible not sold to RMS under the Purchase Agreement (including, without limitation, inventory, general intangibles, contract rights, purchase orders, documents, instruments, chattel paper, goods, good will, patents, trademarks and other intellectual property, cash, deposit accounts, rights to payment, furniture, fixtures, machinery, equipment, lease rights, land and other real property, causes of action, commercial tort claims, and all other "Collateral" defined in the Security Agreement which definition is incorporated herein by reference) wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (collectively, the "DIP Collateral"), subject only to the Carve-Out.

(b)       A super-priority administrative expense claim under § 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses, whether heretofore or hereafter incurred, specified in any other section of the Bankruptcy Code, including, without limitation, §§ 503(b) and 507(b) of the Bankruptcy Code (the "DIP Super-Priority Claim"), subject only to the Carve-Out.

(c)       Nothing in this Order or in the Funding Documents shall be deemed to grant RMS any claims, causes of actions or recoveries from any "avoidance actions" under §§ 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code, and the Avoidance Actions are specifically excluded from the DIP Collateral, and RMS shall not receive any recover on account of its DIP Liens or its DIP Super-Priority Claim from any proceeds of the Avoidance Actions.

(d)     Prior to any Event of Default under the Purchase Agreement, the Providers may pay professionals court-approved compensation and expense reimbursements in the ordinary course and as may be allowed and payable under §§ 328, 330 and 331 of the Bankruptcy Code, and any procedures order from this Court, but only pursuant to pre-approved budgets approved by RMS in writing, at its sole and absolute discretion, and only out of Cash Collateral and out of funding proceeds paid by RMS to the Providers.  During an Event of Default, no professional fees can be paid absent an authorizing Order from this Court.  RMS's security interest as Buyer in Purchased Accounts and in Conveyed Property cannot be invaded or used to pay professional fees or costs.

(e)     Payment on account of the Carve-Out shall not be deemed to reduce the Obligations owed to RMS and shall not be deemed to subordinate any right or interest granted to RMS under this Order or the Funding Documents.

8.     <u>Validity and Perfection of Ownership and Security Interests and Liens; Automatic Perfection</u>.

(a)     Upon entry of this Order, the Post-Petition Ownership Interests, security interests and liens granted to RMS pursuant to this Interim Order shall be valid, enforceable, valid, attached and perfected without further notice and without regard to any other federal, state or local requirements or laws requiring notice, filing, registration, recording or possession of collation or any other act.  RMS shall not be required to file any financing statements, mortgages, UCC-1 financing statements, notices of lien of similar instruments in any jurisdiction or filing office, or required to take any other action in order to validate or perfect the Post-Petition Ownership Interests, security interests and liens granted by Provider pursuant to this Interim Order and the Purchase Agreement.

23

(b)    Notwithstanding the foregoing, RMS may, in its sole discretion, elect to file, record or otherwise record this Order and/or such UCC-1 financing statements, mortgages, deeds of trust and other documents as RMS may deems fit, including, without limitation, a UCC-1 financing statement as to the Purchased Accounts and the Conveyed Property listing RMS as secured party and the Provider as Provider, to secure all of its right, title and interest in the Purchased Accounts and the related Conveyed Property, and a UCC-1 financing statement reflecting RMS's lien on the Collateral.

(c)    Should RMS in its sole discretion, from time to time, choose to file such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, or take any other action to validate or perfect any such Post-Petition Ownership Interests, security interest, lien or mortgage, the Provider and its officers are hereby directed to execute any such documents or instruments as RMS may reasonably request in accordance with the Purchase Agreement and the other Funding Documents, and all such documents and instruments shall be deemed to have been filed or recorded as of the date and time of the entry of this Order.

(d)    A certified copy of this Order may, in the discretion of RMS, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, deeds, mortgages, notices of lien and similar instruments, and all filing offices are hereby directed to accept such certified copy of this Order for filing and recording.

9.    <u>Validity and Priority of the Post-Petition Ownership Interests</u>.  The Post-Petition Ownership Interests granted to RMS herein are fully valid and this Order vests title in all the Conveyed Property in RMS, free and clear of, and senior in priority to, all other competing ownership claims, security interests, liens, mortgages and encumbrance of any kind asserted by the Provider or any third party, whether created consensually, by a Court order or otherwise,

including, without limitation, liens and security interests granted by the Provider in favor of third parties under §§ 363, 364, or any other section of the Bankruptcy Code.

10.     <u>Seniority of RMS Liens on the Collateral</u>.  Subject only to the Carve-Out and the provisions of paragraph 18, the liens and security interests granted to RMS herein on the Collateral to secure any Obligations due by the Provider to RMS under the Funding Documents shall be of first-priority and senior to, and shall not be subordinated or made equal to, any lien, security interest, mortgage or other interest in favor of any party by any order of the Court or otherwise, including, without limitation, liens or interests:

(a)     authorized in connection with the use of Cash Collateral under § 363 of the Bankruptcy Code;

(b)     granted in connection with the obtaining of credit or incurring of indebtedness under § 364 of the Bankruptcy Code;

(c)     recognized as senior under § 510 of the Bankruptcy Code, governing subordination; or

(d)     provided for in a plan of reorganization or an order confirming a plan of reorganization in these cases, in these Cases or in any Successor Cases unless:

(i)     RMS has given its prior express written consent, which shall not be implied from any other action, inaction of acquiescence by RMS or (ii) the order providing for such lien, interest or subordination is conditioned on full satisfaction of the Obligations of the Provider to RMS, as determined after all open Batches have first closed (as confirmed in writing by RMS). Without limitation of the foregoing, unless RMS has given its prior written consent, or the Court enters an order, upon proper notice and hearing, requiring that all of the Providers' Obligations to RMS be immediately satisfied in full, as determined after all open Batches have first closed

(as confirmed in writing by RMS) and the same has occurred, there shall not be, at any time, in these Cases or any Successor Cases any further order that authorizes (i) under § 363 of the Bankruptcy Code, the use of Collateral in which RMS has an interest or the use, sale or lease, other than in the ordinary course of business, of any other property of the Providers in which RMS has an interest; (ii) under § 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness that is (A) secured by a security interest on lien in property that constitutes part of the Collateral pledged to RMS or (B) entitled to priority administrative status which is equal or senior to that granted to RMS herein, or (iii) the enforcement by any creditor of the Provider of any alleged judgment, security interest or lien in any Collateral found by the Court to be junior to RMS, nor shall the Provider and/or its creditors take any other action which impairs RMS' Post-Petition Ownership Interests in the Purchased Accounts and the other Conveyed Property.

11.    <u>Limitations on the Funding Facility, Cash Collateral, and Carve Out</u>.    The proceeds of the Funding Facility, Cash Collateral, and Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of RMS or its rights and remedies under the Funding Documents, or this Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Statutory Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Obligations; (iii) for monetary, injunctive or

other affirmative relief against any RMS or its Collateral, or (iv) preventing, hindering or otherwise delaying the exercise by RMS of any rights and/or remedies under this Interim Order, the Funding Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by RMS upon any of the Collateral; (b) to make any distribution under a plan of reorganization in any of the Cases or any Successor Cases; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consents required under the Funding Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consents required under the Funding Documents, (e) subject to the limited use of Cash Collateral as provided in this Interim Order, objecting to, contesting, or interfering with in any way the RMS' enforcement or realization upon any of the Collateral once an Event of Default has occurred; (f) using or seeking to use Cash Collateral or selling or otherwise disposing of Collateral without the consents required under the Funding Documents; (g) using or seeking to use any insurance proceeds constituting Collateral without the consents required under the Funding Documents; (h) incurring any debt outside the ordinary course of business without the prior consents required under the Funding Documents; (i) objecting to or challenging in any way the claims, liens, or interests (including interests in the Prepetition Collateral or Collateral) held by or on behalf of RMS; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against RMS; (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations, Prepetition Liens, or any other rights or interests of any of RMS; or (l) preventing,

hindering or otherwise delaying the exercise by any RMS of any rights and remedies granted under this Interim Order.  Notwithstanding the foregoing, an aggregate amount not to exceed $7,500 in the aggregate of the Funding Facility, Cash Collateral and Carve Out may be used by any Statutory Committee to investigate the Prepetition Obligations and Prepetition Liens within the Challenge Period (as defined herein).

12.     <u>No Obligation to Extend Credit</u>.  RMS shall not have any obligation to purchase any Accounts or pay any Initial Installments or Subsequent Installments, or extend any other financial accommodation unless and until all of the conditions precedent to the making of such purchase and the payment or extension of credit under the applicable Funding Documents and this Interim Order have been satisfied in full or waived by RMS, in its sole and absolute discretion.

13.     <u>Use of DIP Facility Proceeds; Payment of Prepetition Obligations</u>.  From and after the Petition Date, the Debtors shall use funding received pursuant to the Post-Petition Funding Facility only for the purposes specifically set forth in this Interim Order and the Funding Documents.  Notwithstanding any first-day orders entered authorizing the Debtors to pay any prepetition or other expenses all such payments shall be made in accordance with the Budget (a copy of the Budget is attached to this Interim Order as <u>Exhibit B</u>.)

14.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the Funding Documents, and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the Termination Date; provided, however, that during the five seven (7) calendar days after the Termination Date, the Debtors may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll and to pay expenses critical to the preservation of the Debtors and their estates.  Nothing in this Interim

Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the Funding Documents, and in accordance with the Budget.

15.     <u>Adequate Protection Liens</u>.

(a)     <u>Prepetition Funding Facility Adequate Protection Liens</u>.     Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of RMS in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to RMS continuing valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the DIP Collateral (the "Prepetition Funding Facility Adequate Protection Liens").

(b)     <u>DOL Adequate Protection Liens</u>.     Pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of DOL in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the DOL continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the DIP Collateral (the "DOL Adequate Protection Liens," and together with the Prepetition Funding Facility Adequate Protection Liens, the "Adequate Protection Liens").

(c)     <u>Priority of Adequate Protection Liens</u>.

(i)     The Prepetition Funding Facility Adequate Protection Liens shall be junior in payment and priority only to the: (A) Carve Out; (B) DIP Liens; and (D) Permitted Prior Liens.   The Prepetition Funding Facility Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(ii)     The DOL Adequate Protection Liens shall be junior in payment and priority only to the: (A) Carve Out; (B) DIP Liens; (C) Prepetition Liens; (D) Prepetition Funding Facility Adequate Protection Liens; and (F) Permitted Prior Liens.   The DOL Adequate

Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(iii)     Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to §§ 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made pari passu with or senior to the Adequate Protection Liens.

16.     Adequate Protection Super-Priority Claims.

(a)     Prepetition Facility Super-Priority Claims.  As further adequate protection of the interests of RMS in the Prepetition Collateral (to the extent any Prepetition Obligations remain outstanding) against any Diminution in Value of such interests in the Prepetition Collateral, RMS is hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Facility Super-Priority Claim").

(b)     Priority of Prepetition Facility Super-Priority Claims.  The Prepetition Facility Super-Priority Claims shall be junior in payment and priority only to the Carve-Out and DIP Super-Priority Claims.  Except as set forth herein, the Prepetition Facility Super-Priority Claims shall have priority over all administrative expense claims and unsecured claims against

the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

17.     <u>Adequate Protection Payments and Protections</u>.

(a)     <u>Prepetition Funding Facility Adequate Protection Payments and Protections</u>.  As further adequate protection to RMS, to the extent any Prepetition Obligations remain outstanding, the Debtors are authorized and directed to provide adequate protection to RMS in the form of:  (i) payments of fees and other amounts due under the Funding Documents; (ii) ongoing payment of RMS' reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses; and (iii) delivery to RMS of all proceeds of the Prepetition Purchased Accounts and other Prepetition Conveyed Property in accordance with the terms and conditions of the Purchase Agreement and the other Funding Documents (together, the "Prepetition Facility Adequate Protection Payments").

(b)     <u>Section 507(b) Rights</u>.  To the extent applicable, if RMS's liens on and security interests in the Collateral is insufficient to pay indefeasibly in full all Obligations due to RMS, as determined after all open Batches have first closed (as confirmed by RMS, in writing), RMS shall also have the payment priority afforded by § 507(b) of the Bankruptcy Code, as to any deficiency.

18.     <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>. Nothing in this Interim Order shall prejudice the rights of any Statutory Committee if granted standing by this Court, and, solely if no Statutory Committee is appointed, any other party in interest granted standing by this Court (other than the Debtors and their successors), to seek,

solely in accordance with the provisions of this paragraph 18, to assert on behalf of the Debtors'

or the Debtors' creditors or interest holders claims against RMS that arose prior to the Petition

Date or to otherwise challenge the Debtors' Stipulations, including, but not limited to those in

relation to:  (a) the sale, transfer and conveyance of the Prepetition Purchased Accounts to RMS;

(b) the validity, extent, priority, or perfection of the Prepetition Lines of RMS against the

Prepetition Collateral; (c) the validity, allowability, priority, secured status or amount of the

Prepetition Obligations; or (d) any liability of RMS with respect to anything arising from or

related to the Funding Documents, Prepetition Obligations and/or Prepetition Liens (separately

or collectively, a "Challenge").   A party in interest, including any Statutory Committee, if

appointed, must, after obtaining Court-approved standing, commence, as appropriate, a contested

matter or adversary proceeding raising such a Challenge, including, without limitation, any claim

or cause of action against RMS, within thirty (30) calendar days following the date of entry of

the Final Order or, if it occurs sooner, within forty-five (45) calendar days following the date of

entry of this Interim Order (the "Challenge Period").  The applicable Challenge Period may only

be extended with the written consent of RMS.  Only those parties in interest who commence a

Challenge within the Challenge Period may prosecute such a Challenge.  As to (i) any parties in

interest, including the Statutory Committee, who fail to file a Challenge within the Challenge

Period, or, if any such Challenge is filed and overruled or (ii) any and all matters that are not

expressly the subject of a timely Challenge:  (A) any and all such Challenges by any party

(including, without limitation, any Statutory Committee, any chapter 11 trustee, and/or any

examiner or other estate representative appointed in these Cases, and any chapter 7 trustee and/or

examiner or other estate representative appointed in any Successor Case), shall be deemed to be

forever waived and barred, (B) all of the findings, Debtors' Stipulations, waivers, releases,

affirmations and other stipulations as to the right, title, interest, priority, extent, and validity as to RMS' property, claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' Estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases, and (C) any and all claims or causes of action against any of RMS relating in any way to the Debtors shall be released by the Debtors' Estates, all creditors, interest holders and other parties in interest in these Cases and any Successor Cases.

19.    Carve-Out.

(a)    Carve Out Amounts and Other Provisions.  As used in this Interim Order, the "Carve Out" shall encompass the following expenses: (i) allowed fees and reimbursement for disbursements of professionals  retained by the Debtors ("Debtors' Professional Fees") in an aggregate amount for all such Professional Fees not to exceed $___; (ii) allowed fees and reimbursement for disbursements of professionals retained by the Statutory Committee ("Committee's Professional Fees") in an aggregate amount of all such Committee's Professional Fees not to exceed $___; (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) amounts due and owing to the Debtors' employees for post-petition wages.  The Carve-Out shall be junior and subordinate to all right, title and interest of RMS in the Purchased Accounts and the other Conveyed Property, and their respective proceeds, including the Prepetition Facility Adequate Protection Payments.  The DIP Liens, DIP Super-Priority Claims, the Adequate Protection Liens, and the Prepetition Facility Super-Priority Claims granted pursuant to this Interim Order shall all be subject and subordinate in lien, payment and priority to the amounts payable by the Debtors on account of the Carve Out (collectively, the "Carve-Out Amount").  The Carve-Out Amount shall be reduced dollar for dollar by the aggregate amount of the Debtors' Professional Fees and Committee's Professional

Fees actually paid by the Debtors and their estates during the pendency of the Cases (exclusive of retainers paid to such professionals prior to the Petition Date).

(b)   No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  RMS shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors and/or any Statutory Committee incurred in connection with the Cases.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate RMS in any way to pay compensation to or to reimburse expenses of any professionals retained by the Debtors and/or any Statutory Committee appointed, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out Amount if actual professional fees exceed the Carve-Out Amount; (iii) as consent to the allowance of any professional fees or expenses of any professionals retained by the Debtors and/or any Statutory Committee appointed; or (iv) to affect the right of RMS to object to the allowance and payment of such fees and expenses.

20.   Payment of Administrative Expenses.  Subject to the terms and conditions of this Interim Order, as long as an Event of Default has not occurred, the Providers shall be permitted to pay, as the same may become due and payable, (i) administrative expenses of the kind specified in § 503(b) of the Bankruptcy Code incurred in the ordinary course of business; (ii) subject to the terms hereof, compensation and reimbursement of expenses of professionals allowed and payable under §§ 330 and 331 of the Bankruptcy Code, and (iii) any other pre-filing or post-filing expenses of the Providers including for adequate protection, all of which are approved by Order of this Court and consented to in writing by RMS, as reflected in RMS's approval of the Providers' budgets, from time to time.

21. <u>No Subordination</u>.  Except for the Carve-Out, no costs or expenses of administration shall be imposed against RMS or against the Collateral pledged to RMS as security for the Obligations of the Provider to RMS, as determined after all open Batches have first closed (as confirmed by RMS in writing) under any of §§ 105, 506(c), or 552 of the Bankruptcy Code, or otherwise, and, except with respect to the Carve-Out, no other claim or expense having a priority senior to or *pari passu* with that granted to RMS in this Order shall be granted in this Chapter 11 case or any superseding Chapter 7 case while any portion of the Obligations due to RMS by the Providers remain outstanding, calculated after all open Batches have first closed (as confirmed in writing by RMS).  Any and all payments realized by RMS upon the sale, liquidation, collection or disposition of the Collateral or the Purchased Accounts shall be paid to RMS free and clear of any claim or charge arising out of or based upon § 506(c) of the Bankruptcy Code or § 552(b) of the Bankruptcy Code.  The "equities of the case" exception under § 552(b) of the Bankruptcy Code shall not apply to RMS with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.  No costs or expenses of administration which have or may be incurred in the Debtors' Chapter 11 cases, any conversion of the Debtors' case to Chapter 7 pursuant to § 1112(b) of the Bankruptcy Code, or pursuant to § 506(c) of the Bankruptcy Code, or in any future proceedings or cases related thereto, shall be charged against RMS or the Collateral, without the prior written consent of RMS, and no such consent shall be implied from any other action, inaction or acquiescence of RMS.

22. <u>Rights and Remedies upon an Event of Default</u>.

(a)  Upon the occurrence of an Event of Default under the Funding Documents or hereunder, RMS shall provide the Providers, the Providers' counsel, counsel for the United

States Attorney, and counsel for the Attorney General of the State of Connecticut, and counsel to the Creditors' Committee, and the Office of the United States Trustee with a notice of Event of Default via telephone and in writing, by facsimile transmission or by overnight, national courier service (a "Default Notice").

(b)    Upon provision of a Default Notice, and pending a Court hearing thereon (the "Default Hearing"), and notwithstanding the automatic stay of § 362 of the Bankruptcy Code, (i) the Providers shall cease offering Accounts to RMS for its discretionary purchase consideration; (ii) RMS shall cease funding to the Providers under the Purchase Agreement; and (iii) RMS shall have all other rights and remedies it holds under the Funding Documents.

(c)    At the Default Hearing, the only issue that may be raised by any party is opposition thereto shall be whether or not, in fact, and Event of Default has occurred and is continuing.

(d)    RMS may serve a motion for Order granting itself relief from the automatic stay contemporaneously with the Default Notice. Should the Court find, at the Default Hearing, that the Event of Default alleged in the Default Notice has occurred, RMS shall have immediate relief from the automatic stay (the 14-day stay under Fed. R. Bankr. P. 4001(a)(3) being waived) to exercise all of RMS's rights and remedies under the Funding Documents, this Order or applicable law to, among other things, do any or all of the following: (i) terminate the Purchase Agreement; (ii) foreclose any and all Collateral pledged to RMS under the Purchase Agreement and other Funding Documents, whether by direct collection of Non- Purchased Accounts, by public or private sale, or by retention of the Collateral, or as otherwise allowed under the Uniform Commercial Code; (iii) set-off funds of the Providers held by RMS, (iv) accelerate the Obligations due to RMS by the Provider; and/or (v) exercise any other rights and

remedies against the Collateral pledged to RMS under the Funding Documents, and exercise any other right or remedy otherwise held by RMS under or in respect of the terms of the Funding Documents, this Order or under applicable law.

(e)    Nothing herein shall impair the right of the Court to order such other and further relief as the Court deems fit at the Default Hearing, or the right of RMS or the Providers or the Lead Debtor to seek other or supplemental relief at the Default Hearing.

(f)    The representations, warranties, covenants, duties, and Obligations of the Providers to RMS under the Funding Documents together with the rights, claims, liens, security interests and ownership interests of RMS under the Funding Documents shall all remain unimpaired and unaffected and shall survive the occurrence of an Event of Default.

(g)    Nothing in this paragraph 22 implies or means that RMS is subject to the automatic stay, as to the Purchased Accounts and the other Conveyed Property which RMS is purchasing hereunder and/or to which RMS holds ownership interests therein.

23.    <u>Termination Events</u>.  The Purchase Agreement shall terminate, notwithstanding the automatic stay of § 362 of the Bankruptcy Code, upon the earliest to occur of the following (the "Termination Date"):

(a)    Occurrence of an Event of Default under the Purchase Agreement which creates rights in RMS to terminate the Purchase Agreement, and RMS's exercise of that right;

(b)    If as to any Provider, it fails to perform or satisfy any of the terms, conditions or covenants of this Order or under the Funding Documents;

(c)    Any Provider files, supports or confirms a Chapter 11 plan of reorganization in this bankruptcy case that does not provide for the prior full satisfaction of the Obligations on or before the "effective date" of the Plan, unless otherwise agreed in writing by

RMS (such as, for example, in a written commitment by RMS to convert the financing hereunder into exit financing);

      (d)    The factoring called for under the Purchase Agreement terminates by its own terms or by operation of law;

      (e)    Any material portion of the Collateral is foreclosed, liquidated, levied, or the subject of a similar act by any person;

      (f)    Any person terminates their respective forbearances and subordinations to RMS under any inter-creditor or similar agreement related to these Debtors, or any of these persons sent notice of their intent to do the same to any person;

      (g)    Any party (including, but not limited to, DSS or DRS) makes any set-offs or recoupments against the Purchased Accounts, the Conveyed Property or the Collateral, beyond limits previously agreed upon with RMS, in writing or as provided for in this Interim Order;

      (h)    Any Provider's bankruptcy case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

      (i)    There occurs a stay, modification, amendment, vacating or reversal of any terms of this Order or of the Funding Documents, or any of the rights and acknowledgements conferred thereunder, without the prior written consent of RMS;

      (j)    Any Provider commences or continues or voluntary participates in any lawsuit, adversary proceeding or contested matter against RMS, other than with respect to a dispute by the United States Trustee, the Official Committee of Unsecured Creditors or the Debtors as to any reimbursable expense claimed by RMS; and

(k)    Any person commences or continues any non-frivolous action or process with respect to any material portion of the Collateral.

24.    <u>Effect of Termination</u>.    The representations, warranties, duties, covenants, and Obligations of the Providers to RMS under the Funding Documents and this Order, together with the rights, claims, liens and security interests and ownership interests of RMS under the Funding Documents and this Interim Order shall all remain unimpaired and unaffected and shall survive the termination of the Funding Facility and the Termination Date.    Without limitation of the foregoing, the Providers shall also, both pre-termination and post-termination, allow access to their respective records and facilities to RMS (including any records sold to RMS hereunder which any Provider still holds, as Primary Servicer for RMS) and the Providers shall otherwise provide RMS with information with respect to and otherwise comply with the terms and conditions and the undertakings in this Order, any subsequent orders or the Final Order, and the Funding Documents, until the Obligations of the Providers to RMS are satisfied in full, as determined after all open Batches have first closed (as confirmed by RMS in writing).

25.    <u>Relief from the Automatic Stay</u>. The automatic stay of § 362 of the Bankruptcy Code is hereby vacated and modified, and the 14-day period of Fed. R. Bank. P. 4001(a)(3) waived, insofar as necessary, and the stay is lifted in favor of RMS to permit RMS and the Providers to: (a) implement the Funding Documents and the Funding Facility pursuant to the terms of such documents and this Order, including, without limitation, by the turnover of monies by the Providers to RMS thereunder; (b) create, validate, evidence, attach and perfect the Post-Petition Ownership Interests, liens and security interests granted to RMS under the Funding Documents and this Order; (c) assess, charge and collect payments, discount fees, and other fees and expenses as provided for by the Funding Documents, and apply such payments first to the

Prepetition Obligations and then to the other Obligations owed by the Providers to RMS pursuant to the terms of the Funding Documents; and (d) take any other action authorized or contemplated by this Order the Funding Documents and to carry out the terms thereof.

26.     <u>Miscellaneous</u>.

(a)     <u>No Impairment of RMS's Rights</u>.   If any provision of this Order is hereafter modified, vacated, altered, stayed or reversed by any subsequent order of this or any other court, for any reason, or any failure of the Court to enter a final order acceptable to RMS on the Motion, or if this case is converted to Chapter 7 or dismissed (each a "Subject Event"), such modification, vacation, stay, alteration, reversal, failure, dismissal or conversion shall not impair (i) the validity of any sale of Purchased Accounts or Conveyed Property by the Providers to RMS under this Interim Order and the Funding Documents and the Post-Petition Ownership Interests created in RMS therein, prior to the Subject Event; (ii) the validity or priority of any lien or security interest in the Collateral granted by the Providers to RMS under this Order or the Funding Documents, prior to the Subject Event; (iii) the Obligations created under or due to RMS under this Order and the Funding Documents, prior to the Subject Event; or (iv) the creation of or exercise by RMS of any rights or remedies under the Funding Documents or this Order, prior to the Subject Event, and, without limitation, such rights, remedies, liens, security interests and Post-Petition Ownership Interests shall be governed in all respects by the original provisions of the Funding Documents and this Order and shall all remain in full force and effect, pursuant to §§ 363(m) and 364(e) of the Bankruptcy Code. For purposes of §§ 364(e) and 363(m), the term "appeal" shall include any proceeding for reconsideration, rehearing or reevaluation of this Order by the Court or any other tribunal. RMS is a good faith Buyer, within the meaning of § 363(m) of the Bankruptcy Code. Notwithstanding any such modification,

vacatur or stay, any duties, obligations, representations, warranties, or Obligations of the Providers and the Lead Debtor to RMS, as well as any right created in RMS under the Funding Documents or this Interim Order prior to such modification, vacatur or stay, shall be governed in all respects by the original provisions of this Interim Order and the Funding Documents and RMS shall be entitled to all the rights, remedies and privileges granted herein and pursuant to the Funding Documents.  The Providers and the Lead Debtor shall give notice to RMS of any motion by any Debtor to modify, amend or vacate this Order.

(b)     <u>Inconsistencies</u>.   In the event of any inconsistency between the terms of this Order and the Funding Documents this Order shall govern.

(c)     <u>No waiver</u>.  RMS's failure to seek or exercise any right or remedy under this Order or the Funding Documents shall not constitute a waiver of its rights hereunder or thereunder, or otherwise.

(d)     <u>Immediate Effect</u>.  This Order shall take immediate effect upon its entry.

(e)     <u>Additional Insured</u>.   Upon entry of this Order, RMS shall be and is deemed to be, without further action or notice, an additional insured on each insurance policy or policies of the Providers which in any way relates to the Collateral.  Each Provider will, at its own expense, keep the Collateral insured to its maximum reasonable insured values against loss, peril and hazards, pay all post-petition taxes, assessments and charges as required by the Funding Documents, and provide proof of payment of the same to RMS, upon its request.  Each Provider will further provide RMS with reasonable rights to inspect the Collateral and records related thereto.

(f)     <u>Execution of Documents</u>.  The execution by each Debtor's officers of the Funding Documents is ratified, approved and confirmed.

(g)    <u>Right to Factor and Fund on Other Terms</u>.  RMS retains the right to provide factoring and other funding services to the Providers on such other, different or additional terms than in this Order, as may be authorized by the Providers and approved by the Court. The Debtors shall not negotiate exit financing with any person other than RMS, unless they are unable, after reasonable efforts, to negotiate acceptable terms with RMS, substantially identical to the DIP funding provided by RMS, and provides written notice to RMS of the same.

(h)    <u>Providers' Acknowledgement</u>.  This Order approves the Providers' acknowledgement and agreement that the Funding Documents create a "true sale" of the Purchased Accounts and associated Conveyed Property to RMS and that the liens, security interests, Obligations and duties of the Providers to RMS thereunder are valid, perfected and unavoidable under the Bankruptcy Code or any other applicable law, in accordance with their terms.

(i)    <u>Binding Effect</u>.  The provisions of this Order shall be binding upon the Providers, the Lead Debtor, all parties in interest in this bankruptcy case, any examiner, Chapter 7 trustee or Chapter 11 trustee in this bankruptcy case, and upon their respective successors and assigns, provided, however, that RMS shall have no obligation to extend funding or financing to any Chapter 7 trustee, any Chapter 11 trustee or to an examiner, on the terms thereof.

(j)    <u>Right of Recoupment by Medicare</u>.  Notwithstanding anything to the contrary herein, nothing in this Order or in any agreement between RMS and any of the Debtors shall (i) impair, modify or affect Medicare's right of recoupment, if any or (ii) be construed, as to the Providers, only, to impair, modify or effect the government's process of administering the Medicare provider agreements to which each Provider is a party, or the Medicare program as it relates to the Providers.

(k)     Affirmation of Letter Agreement Between DSS and RMS.  Subject to the terms and conditions of this Interim Order, DSS shall continue to comply with the terms and conditions set forth in that certain letter agreement by and between RMS and DSS entered into as of May 25, 2012.

(l)     Recoupments or Set-Offs By The State Of Connecticut.  As an inducement to RMS's consent to this Interim Order and to provide the Post-Petition Funding Facility, and DSS' and DRS' consent to this Interim Order:

(i)     The Providers shall pay DRS $50,000 per month on or before the 15th day of each month commencing in February, 2016, and continue during the pendency of the Cases under Chapter 11 of the Bankruptcy Code, by check made payable to the Commissioner of Revenue Services and delivered to the Department of Revenue Services, 25 Sigourney Street, Hartford, CT 06106.

(ii)     If and when there is a shortfall in provider taxes due DRS accrued after the Petition Date, amounts otherwise due and payable to the Providers by the State of Connecticut may be recouped or set-off against, but in an aggregate amount not to exceed $10,000 per month.

(iii)     Other than to collect payments permitted under this paragraph, the State of Connecticut, including DSS and DRS, shall not recoup, set-off, issue a warrant, or engage in any other collection mechanism against any Purchased Accounts, the Collateral or their proceeds.

(iv)     DSS and/or DRS will give RMS contemporaneous notice of any provider taxes due and not paid by the Providers. DSS and/or DRS will also give both the

Providers and RMS a 10-business day cure period following the delivery to the Providers and RMS of such notice.

(m)    Objections Overruled.  All objections to the funding requested by the Provider in the Motion, to the extent not previously withdrawn, are **OVERRULED**.

(n)    Service of Order.  The Provider shall serve a copy of this Order on the Providers and on all creditors of the Debtors and other interested persons within two (2) business days, unless they have been served via the ECF system, which service shall be good service.

(o)    No Deemed Control.  By consenting to this Order, by purchasing receivables and by making advances and other financial accommodations and credit of any type, kind or nature under this Order or the Funding Documents, RMS shall not be deemed to be in control of the operations of the Providers nor shall it be deemed to be a "responsible person", "managing agent", "owner" or "operator" with respect to the Providers.

(p)    No Third-Party Beneficiaries.  Other than as expressly set forth above, no rights are created hereunder for the benefit of any third party, any creditor (other than RMS) or any direct, indirect or incidental beneficiary.

(q)    Amendment.  The Providers and RMS may modify, amend, supplement or waive any provision of the Funding Documents if they do so in writing and the amendment, modification, supplement or waiver is not, in the good faith business judgment of RMS and the Providers, material, without any need for further approval from the Court or for notice to third parties, provided, however, that the Provider shall provide DSS, DRS, the Statutory Committee, the United States Trustee, and any party requesting notice with prior written notice of any proposed amendment, waiver, modification or supplement, and the Providers shall further file a notice of such amendment, waiver, modification or supplement, as agreed to in final form, with

the Court.  Any material amendment, waiver, modification or supplement must be in writing, executed by both the Providers and RMS, and shall be subject to approval by the Court, on appropriate notice.

(r)    <u>Post-Petition Professional Fees of RMS</u>.  Costs, fees and expenses incurred by RMS in respect of the preparation, negotiation, documentation and execution of documents necessary to implement the Post-Petition Funding Facility and the terms and conditions of this Interim Order, and such further Orders as may hereinafter be entered in connection with the Funding Documents and the Post-Petition Funding Facility, including reasonable legal fees, expenses and costs, as well as fees, expenses and costs, including reasonable legal fees, to enforce, protect and preserve RMS's rights under the Funding Documents and this Interim Order, shall be charged to and paid by the Providers weekly (or at such greater intervals as RMS shall determine at its sole discretion) either directly from the Providers or, if RMS so elects, at its sole discretion, by deducting such amounts from any funding otherwise due to the Providers on account of the Post-Petition Funding Facility.

(s)    <u>Conversion</u>.  No order under § 1112 of the Bankruptcy Code or otherwise converting any Debtor's Chapter 11 case to a case under Chapter 7 may be entered unless such Order expressly provides that the priority of RMS's ownership interests, liens and rights as set forth herein and in the Funding Documents are preserved.

(t)    <u>Waiver of Chapter 11 Discharge as to RMS</u>.  Without limitation of any right of RMS under the Funding Documents, the Obligations of the Providers and the Lead Debtor to RMS under the Funding Documents shall not be discharged by the entry of an order confirming a Chapter 11 plan of reorganization in the Debtors bankruptcy cases and, pursuant to §1141(d)(4) of the Bankruptcy Code, unless and until all of the Providers' Obligations to RMS,

as determined after all open Batches have first closed (as confirmed in writing by RMS), have been paid or satisfied in full and, before such time, the Providers waive such a discharge and the Providers will not propose a reorganization plan that crams-down on RMS, over its Objection.

(u)     <u>Successors and Assigns</u>.  The provisions of this Order shall inure and be binding upon RMS, the Providers and the Lead Debtor, any successor trustee or examiner hereinafter appointed in this case, and all creditors of the Providers and the Lead Debtor, and their respective successors and assigns, including in these Cases or any Successor Cases.

(v)     <u>Immediate Effect</u>.  The 14 day stay provided by Fed. R. Bankr. P. 6004(h) is not applicable, so that the parties may immediately comply with this Order, and this Order shall be deemed effective and enforceable immediately.

(w)     <u>Notice</u>.  Notice of the Motion and of the January 15, 2016, hearing thereon was adequate for all purposes of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.